**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| JAMAL J. KIFAFI, individually and on behalf of all others similarly situated, |
| Plaintiff, |
| v. |
| HILTON HOTELS RETIREMENT PLAN, *et al.*, |
| Defendants. |

Civil Action No. 98-1517  (CKK)

**MEMORANDUM OPINION**
(May 15, 2009)

Plaintiff Jamal J. Kifafi, on behalf of himself and similarly situated individuals, brings this lawsuit alleging that the terms and implementation of the Hilton Hotels Retirement Plan violated the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*  In particular, Kifafi alleges that (1) the terms of the Plan produced an impermissible amount of variation among accrual rates, commonly called "backloading," (2) Defendants improperly applied the Plan's vesting provisions, and (3) Defendants committed multiple other ERISA violations as to Kifafi individually by, for example, failing to keep on file records of his marital status.  On May 11, 1999, the Court certified a so-called "benefit-accrual class" as to the first allegation, and on March 30, 2005, the Court certified four sub-classes as to the second allegation.

Defendant Hilton Hotels Corporation (together with the Hilton Hotel Retirement Plan, Committee, and individual members, "Hilton"), assert that the terms of the Plan have not violated ERISA, and that they have fully implemented the Plan in accordance with its terms.

Hilton has, nevertheless, continuously amended its Plan throughout the course of this litigation in an attempt to respond to Kifafi's allegations and to moot all of the claims in this case.

Currently pending before the Court are the parties' Cross-Motions for Summary Judgment, Hilton's Motion to Strike certain declarations submitted by Kifafi in support of his Motion for Summary Judgment, and a Motion for Leave to submit a Sur-Reply, which was filed by Kifafi as support for his Opposition to Hilton's Motion to Strike.  After thoroughly reviewing the parties' submissions, relevant case law, applicable statutory and regulatory authority, and the record of the case as a whole, the Court shall GRANT-IN-PART and DENY-IN-PART Kifafi's [177] Motion for Summary Judgment, GRANT-IN-PART and DENY-IN-PART Hilton's [180] Cross-Motion for Summary Judgment, DENY Hilton's [183] Motion to Strike, and DENY [194] Kifafi's Motion for Leave to file a Sur-Reply, for the reasons that follow.

## I.  BACKGROUND

### A.  Statutory and Regulatory Background

It is well established that ERISA does not require employers to establish retirement plans for their employees and does not mandate any particular level of benefits that must be provided should an employer choose to have such a plan.  *See Lockheed Corp. v. Spink*, 517 U.S. 882, 887 (1996).  "Employers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans."  *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995).  Nevertheless, employers' discretion with respect to their retirement plans is not without limitation.  ERISA contains certain requirements that "protect[] employees' justified expectations of receiving the benefits their employers promise them."  *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004).

2

The present case involves ERISA protections associated with employees' accrual of benefits (the amount of benefits to which an employee is entitled) and vesting of benefits (the time at which an employee obtains a right to his or her accrued benefits).  These are distinct but related concepts:

> the 'vesting schedule' specifies the time at which an employee obtains his nonforfeitable right to a particular percentage of his accrued benefit.  It does not provide any formula or schedule for determining the amount of the accrued benefit.  Thus, 'vesting' governs when an employee has a right to a pension; 'accrued benefit' is used in calculating the amount of the benefit to which the employee is entitled.

*Holt v. Winpisinger*, 811 F.2d 1532, 1536 (D.C. Cir. 1987) (quoting *Stewart v. Nat'l Shopman Pension Fund*, 730 F.2d 1552, 1562 (D.C. Cir. 1984) (emphasis in original omitted)).  Because "vesting is tied to length of employment" and the accrual of benefits "depends upon participation in the plan," it is possible for employees to "earn credit toward vesting without accumulating any pension benefits."  *Id.* at 1537.

With respect to the accrual of benefits, ERISA protects employees by limiting the variation associated with rates of accrual, setting forth three alternative tests for monitoring accrual rates.  *See Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 512-13 (1981).  By requiring defined benefit plans to comply with any one of these three alternative tests, ERISA prevents employers from "backloading" benefits, a term of art used to describe "a plan's use of a benefit accrual formula that postpones the bulk of an employee's accrual to [his] later years of service."  *In re Citigroup Pension Plan ERISA Litig.*, 470 F. Supp. 2d 323, 333 (S.D.N.Y. 2006). *See also* 26 C.F.R. 1.411(b)-1 ("[a] defined benefit plan is not a qualified plan unless the method provided by the plan for determining accrued benefits satisfies at least one of the alternative

methods . . . for determining accrued benefits with respect to all active participants under the

plan").[1]  Backloading is prohibited because it defeats ERISA's minimum vesting provisions:

> [t]he primary purpose of [minimum accrual rates] is to prevent attempts to defeat
> the objectives of the minimum vesting provisions by providing undue
> 'backloading,' *i.e.*, by providing inordinately low rates of accrual in the
> employee's early years of service when he is most likely to leave the firm and by
> concentrating the accrual of benefits in the employee's later years of service when
> he is most likely to remain with the firm until retirement.

*Langman v. Laub*, 328 F.3d 68, 71 (2d Cir. 2003) (quoting H.R. Rep. No. 93-807 (1974),

*reprinted in* 1974 U.S.C.C.A.N. 4639, 4688).

The three alternative tests are set forth in Section 204(b) of ERISA, 29 U.S.C. §

1054(b)(1).  The first test is commonly called the "3% rule," 29 U.S.C. § 1054(b)(1)(A).[2]  The

second test is commonly called the "133 1/3% rule," and it requires that the annual rate of accrual

in any later year of participation not exceed 133 1/3% of the accrual rate in any earlier year under

the plan:

---

[1] The Court notes that this and other Internal Revenue Service ("IRS") regulations relate
directly to ERISA's provisions.  As the Supreme Court has explained,

> [w]hen Title I of ERISA was enacted to impose substantive legal requirements on
> employee pension plans . . ., Title II of ERISA amended the Internal Revenue
> Code to condition the eligibility of pension plans for preferential tax treatment on
> compliance with many of the Title I requirements.  The result was a curious
> duplicate structure with nearly verbatim replication in the Internal Revenue Code
> of whole sections of text from Title I of ERISA.

*Central Laborers' Pension Fund*, 541 U.S. at 746.  While the IRS "has primary jurisdiction and
rule-making authority over [certain] ERISA provisions, 'regulations prescribed by the Secretary
of the Treasury [under I.R.C. §§ 410 and 441] shall also be used to implement the related
provisions contained in [ERISA].'" *In re Citibank Pension Plan ERISA Litig.*, 470 F. Supp. 2d
323, 333 n.39 (quoting *Esden v. Bank of Boston*, 229 F.3d 154, 158 (2d Cir. 2000)).

[2] Neither party suggests that this test bears any relevance in this case.

> [a] defined benefit plan satisfies the requirements of this paragraph of a particular plan year if under the plan the accrued benefit payable at the normal retirement age is equal to the normal retirement benefit and the annual rate at which any individual who is or could be a participant can accrue the retirement benefits payable at normal retirement age under the plan for any later plan year is not more than 133 1/3 percent of the annual rate at which he can accrue benefits for any plan year beginning on or after such particular plan year and before such later plan year.

*Id.* § 1054 (b)(1)(B).  The third test is commonly called the "fractional rule," and it requires an employee's accrued benefit to exceed a fractional projected retirement benefit:

> [a] defined benefit plan satisfies the requirements of this paragraph if the accrued benefit to which any participant is entitled upon his separation from the service is not less than a fraction of the annual benefit commencing at normal retirement age to which he would be entitled under the plan as in effect on the date of his separation if he continued to earn annually until normal retirement age the same rate of compensation upon which his normal retirement benefit would be computed under the plan, determined as if he had attained normal retirement age on the date any such determination is made (but taking into account no more than the 10 years of service immediately preceding his separation from service).  Such fraction shall be a fraction, not exceeding 1, the numerator of which is the total number of his years of participation in the plan (as of the date of his separation from the service) and the denominator of which is the total number of years he would have participated in the plan if he separated from the service at the normal retirement age.

*Id.* § 1054 (b)(1)(C).

With respect to vesting, Section 203(a) of ERISA provides that an employee's accrued benefits cannot be forfeited once an employee reaches the age of retirement.  *Id.* § 1053(a). Whether an employee has reached the age of retirement turns, at least in part, on his or her years of service.  *Id.* § 1002(24) (allowing retirement plans to specify the age of retirement or, alternatively, setting the age of retirement as 65 years old or the fifth year of participation in the plan).

Pursuant to Section 203(b) of ERISA, employers are required to count all of an

employee's years of service for calculating his or her years toward vesting.  *Id.* § 1053(b)(1)

(requiring employers to count "all of an employee's years of service with the employer or

employers maintaining the plan").  An employee's years of service are counted even if they occur

prior to participation in the retirement plan.  *See Holt*, 811 F.2d at 1537 (citing H.R. Conf. Rep.

No. 1280, 93rd Cong., 2d Sess. 268 (1974), *reprinted in* 1974 U.S. Code Cong. & A. News 5038,

5050 ("generally, . . . once an employee becomes eligible to participate in a pension plan, all his

years of service with an employer (including pre-participation service, and service performed

before the effective date of [ERISA]) are to be taken into account for purposes of determining his

place on the vesting schedule")).

An employee who is credited with 1,000 hours of service during an "eligibility

computation period" must generally be credited with one year of service.  29 C.F.R. §

2530.200b-1.  Pursuant to this calculation, the employer must count hours reflected in its records

not only for hours as to which the employee was paid or entitled to be paid for the performance

of his or her duties, but also for hours "during which no duties are performed . . . due to vacation,

holiday, illness, incapacity . . . layoff, jury duty, military duty or leave of absence."  *Id.* §

2530.200b-2(a).  To calculate these hours, an employer may rely on any records in its possession,

"provided that they accurately reflect the actual number of hours of service with which an

employee is required to be credited . . . ."  *Id.* § 2530.200b-3(a).

If an employer's existing records do not allow it to properly calculate an employee's

actual number of hours that are required to be credited, "a plan must either develop and maintain

adequate records or use a permitted "equivalenc[y]," provided that it credits "no less than the

actual number of hours of service required be credited under § 2530.200b-2 to each employee in

a computation period." *Id.*  If an employer is unable to accurately determine an employee's total hours of service under this standard, an employer "may determine service to be credited to an employee on the basis of hours worked . . . if 870 hours worked are treated as equivalent to 1,000 hours of service . . . ." *Id.* § 2530.200b-3(d).  Accordingly, if an employer is relying on its records to calculate an employee's total hours of service, it may credit one year of service time if the employee has worked 1,000 hours (taking into account all hours and not only those during which the employee is required to be paid for performance); if an employer is unable to calculate an employee's total hours of service, it may credit one year of service time if the employee has worked 870 hours (taking into account only the hours during which the employee is required to be paid for performance).

A third method for calculating an employee's years of service for vesting purposes is not based on an employee's hours, but rather, based upon the total time elapsed while the employee is employed with the employer or employers maintaining the plan (the "elapsed time" method). *See* 26 C.F.R. 1.410(a)-7(a)(ii).  This method allows an employer to avoid having to maintain hourly records associated with its employees, and permits "each employee to be credited with his or her total period of service with the employer or employers maintaining the plan, irrespective of the actual hours of service completed in any 12-consecutive-month period." *Id.*

Finally, ERISA provides for civil enforcement of its provisions and those in an employee's plan.  Under Section 502(a)(1)(B) of ERISA, a participant may bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).  Aggrieved plan participants may seek "(A) to enjoin any act or practice which

violates any provisions of [Title 29] or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of [Title 29] or the terms of the plan."  *Id.* § 1132(a)(3).

    B.      *The Hilton Hotels Retirement Plan Background*

    The Hilton Hotels Retirement Plan (the "Plan") is a defined benefit pension plan subject to ERISA.[3]  Defs.' Stmt. ¶ 1.  The Plan's initial accrual formula was based on a participant's compensation and years of service, and offset by a participant's "integrated benefits," a term that encompasses a participant's "primary social security benefit."  Pl.'s Ex. 1 § 1.2 (Hilton Hotels Retirement Plan, version dated March 30, 1995).  Beginning in 1976 and continuing until 1999, the Plan contained an accrual schedule that was supposed to comply with the 133 1/3% rule:

    5.4    <u>133-1/3 Percent rule</u>.

        The method of computing a Participant's accrued benefit under the provisions of Article IV is intended to satisfy the requirements of the 133-1/3 rule provided in Section 411(b)(1)(B) of the Code.

*Id.* § 5.4.  For this reason, when Hilton filed applications with the Internal Revenue Service for approval of its retirement plan, it indicated its compliance with the 133 1/3% rule.  *See, e.g.*, Pl.'s

---

    [3] As a preliminary matter, the Court notes that it strictly adheres to the text of Local Civil Rule 7(h)(1) (formerly 56.1 when resolving motions for summary judgment).  *See Burke v. Gould*, 286 F.3d 513, 519 (D.C. Cir. 2002) (district courts need to invoke Local Civil Rule 56.1 before applying it to the case).  The Court has repeatedly advised the parties that it strictly adheres to Rule 7(h) and has stated that it "assumes facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  [170] Order at 2 (May 31, 2005).  Thus, in most instances the Court shall cite only to Plaintiff's Statement of Material Facts ("Pl.'s Stmt.") or Defendants' Statement of Material Facts ("Defs.' Stmt.") unless a statement is contradicted by the opposing party.  Where a party objects to relevant aspects of an opposing party's proffered material fact, the Court shall cite to Plaintiff's Response to Defs.' Stmt. ("Pl.'s Resp. Stmt.") or Defendants' Response to Pl.'s Stmt. ("Defs.' Resp. Stmt."), as necessary.  The Court shall also cite directly to evidence in the record, where appropriate.

Ex. 2 at 3 (Hilton Application dated March 29, 1995) (indicating that the "[m]ethod for determining accrued benefit[s]" was the "133-1/3% Rule - Code Sec. 411(b)(1)(B)").[4]

With respect to vesting, the Plan credits participants with years of service beginning January 1, 1976, during the periods in which the employee "is employed with a Participating Employer or a Related Company."  Pl.'s Ex. 1 § 1.2 (Hilton Hotels Retirement Plan, version dated March 30, 1995) (defining "Vesting Computation Period").  By its terms, the Plan required all periods of employment between the date of hire and the date of termination to be taken into account, including leaves of absences and union service.  Defs.' Stmt. ¶ 15; Pl.'s Resp. Stmt. ¶ 15.  An employee can earn a year of vesting credit by completing 1,000 hours of service.  Defs.' Stmt. ¶ 16; Pl.'s Ex. 1 (Hilton Hotels Retirement Plan, version dated Mar. 30, 1995) (defining "Years of Benefit Service") ("a Participant shall not be entitled to any Years or fractional Years of Benefit Service for a Plan Year during which he completes less than 1,000 Hours of Service").

Under the Plan, a participant is eligible for early retirement benefits when he or she retires, has reached the age of 55, and has at least 10 years of vesting service (and has elected an early retirement benefit).  *See* Pl.'s Ex. 1 § 1.2 (Hilton Hotels Retirement Plan, version dated March 30, 1995) (defining "Early Retirement Date").  A participant is eligible for normal retirement benefits on the date:

> on which occurs the later of (a) or (b), where (a) is the date a Participant attains age 65, and (b) is the earlier of:

---

[4] The Plan was amended to "freeze" accruals effective December 31, 1996,  Defs.' Stmt. ¶ 4, which Kifafi attributes to Hilton's takeover of Bally Entertainment (and which Hilton disputes as a reason).  *See* Pl.'s Stmt. ¶ 2; Defs.' Resp. Stmt. ¶ 2.  The parties nevertheless agree that employees' years of service continued to accrue for vesting purposes.  *See* Pl.'s Ex. 4 at 2 (Nov. 19, 1996 Amendment).

> (i) the date he has completed 5 Years of Vesting Service, or
>
> (ii) the earlier of (A) the tenth anniversary of the date he commenced participation in the Plan, or (B) the fifth anniversary of the first day of the first Plan Year beginning on or after January 1, 1988.

*Id.* (defining "Normal Retirement Age").

### C.     Factual and Procedural Background

The facts of this case are inextricably intertwined with its procedural history.  Between 1976 and 1982, Kifafi was intermittently employed by Hilton and other hotels as a union employee. Defs.' Stmt. ¶ 28.[5]  On September 11, 1983, Kifafi was hired as a full-time union employee at the Capital Hilton in Washington, D.C.  *Id.* ¶ 29.  Less than one month later, he suffered a back injury that caused him to take a leave of absence.  *Id.*  This injury limited the number of hours Kifafi worked in 1983 and 1984.  *Id.*  Kifafi was terminated from the Capital Hilton in 1984, but reinstated as a nonunion employee on July 25, 1985.  *Id.* ¶ 30.  Kifafi worked in that capacity until he resigned on November 9, 1993.  *Id.*

Upon his resignation, Hilton did not notify Kifafi that he was eligible to receive a pension.  Pl.'s Stmt. ¶ 4; Defs.' Resp. Stmt. ¶ 4.  Kifafi nevertheless inquired about his eligibility for retirement benefits, which resulted in Hilton's preparation of a benefits illustration that was sent to Kifafi in July 1997.  Defs.' Stmt. ¶ 31.  The benefits illustration listed Kifafi's marital status as "not married," and indicated that Kifafi was eligible to receive a pension of approximately $74.85 per month.  *See* Pl.'s Ex. 78 at 1 (1997 Benefits Illustration).

On July 9, 1997, Kifafi's counsel wrote Hilton requesting additional information

---

[5] Kifafi objects to the use of the word "intermittently," but fails to explain why.  *See* Pl.'s Resp. Stmt. ¶ 28.  He also objects to the end date of "1982," but fails to cite to any evidence in the record supporting a different end date.  *Id*.

concerning Kifafi's benefits.  Defs.' Stmt. ¶ 32.  On December 29, 1997, Kifafi's counsel sent a

letter to the Plan's Pension Committee arguing that the terms and implementation of the Plan

violated several provisions of ERISA.  *Id.*  In particular, the letter asserted that the Plan

backloaded benefit accruals and failed to properly credit Kifafi's years of service.  *See* Defs.' Ex.

21 at 2 (12/29/97 Letter from S. Bruce to Pension Committee).

The Pension Committee responded on March 27, 1998, through counsel, concluding that

Kifafi was entitled to an additional year of vesting for 1983, but not for 1984 or 1985.  *Id.* ¶ 33.

Because the Pension Committee also concluded that Kifafi continued to fall below the 10 years

of service necessary to receive early retirement benefits even with the additional year of service

credit, it denied Kifafi's claim for early retirement benefits.  *Id.*  The Pension Committee also

denied that the terms or implementation of the Plan violated any ERISA provisions.  *See* Pl.'s

Ex. 3 at 1-12 (3/27/98 Letter from W. Jacobsen to S. Bruce).  With respect to Kifafi's argument

that the Plan unlawfully backloaded benefit accruals, the Pension Committee "determined that

the Plan satisfies the 133-1/3% rule."  *Id.* at 6.  Kifafi filed an appeal, which was denied on

September 22, 1998.  *Id.*

Kifafi filed this lawsuit on June 17, 1998.  Initially, Hilton defended the Plan as having

complied with the 133 1/3% rule.  For example, in its initial Statement of the Case submitted to

the Court, Hilton represented that:

> [t]he rate of accrual of pension benefits is set forth in the Hilton Hotels
> Retirement Plan ('Retirement Plan'), which expressly provides for accrual of
> pension benefits under ERISA § 204(b)(1)(B), 29 U.S.C. § 1054(b)(1)(B) – the
> so-called '133 1/3% rule.'  The Retirement Plan complies with the 133 1/3% rule.

Defs.' Stmt. of the Case at 2 (Oct. 15, 1998).  The documents produced to Kifafi in discovery,

11

however, demonstrated that Hilton's own consultants had performed analyses of the Plan and concluded that the Plan did not, in fact, comply with the 133 1/3% rule. For example, the Towers Perrin consulting company ("Towers Perrin") prepared a spreadsheet dated February 10, 1998, titled "411(b) Accrual Test." Pl.'s Ex. 7 at 2 (2/10/98 Accrual Test). The spreadsheet examines the Plan's benefit accrual formula and asks, "Does the Plan Pass 133% Rule?" *Id.* The answer "No" appears for the first seven years of benefit accruals reflected in the spreadsheet. *Id.* AON consulting also prepared a spreadsheet for a February 27, 1998 Hilton meeting. Pl.'s Ex. 8 at 1 (2/27/93 Meeting Spreadsheet). The spreadsheet depicts accrual rates of more than 200% under the Plan's benefit accrual formula, which is greater than the variation permissible under the 133 1/3% rule. *Id.*

Kifafi moved for class certification on November 4, 1998. After his motion had been fully briefed by the parties but prior to its resolution by the Court, Hilton amended the Plan. *See* Pl.'s Ex. 11 (Amendment 1999-1). The amendment modified the Plan's benefit accrual formula "for the purpose of eliminating any controversy regarding the proriety [sic] of the rate of benefit accruals under the Plan," and specifically referenced this lawsuit. *Id.* at 1. Unlike the previous formula which purportedly complied with the 133 1/3% rule, Hilton's new formula sought to comply with the fractional rule. *Id.* at 2-3. According to Kifafi, and not disputed by Hilton, the amendment also modified two unrelated components of the Plan that were favorable to participants: (1) the Plan previously offered 2.0% of the highest average pay for each of the first 25 years of participation but was amended to effectively reduce this amount to 1.33% at its lowest, and (2) the Plan previously calculated Social Security benefits based only on earnings

from Hilton but was amended to calculate this amount using projected earnings.[6]  Pl.'s Stmt. ¶ 27.  Significantly, the amendment made all of these changes retroactive and specified that a participant would receive benefits pursuant to the formula under the pre-amendment Plan or the post-amendment Plan, whichever produced greater benefits for that participant.  *See* Pl.'s Ex. 11 at 4 (Amendment 1999-1).

Following Hilton's amendment, Kifafi filed an Amended Complaint that contains six claims for relief.  Count I alleges that the Plan unlawfully backloaded benefit accruals and that Hilton's amendment would pay class members only a portion of the benefits that would be owed if their accrued benefits had been calculated in compliance with ERISA.  Am. Compl. ¶¶ 40-42A.  Count II alleges that Hilton failed to count all of his years of service in violation of the Plan.  *Id.* ¶¶ 43-45.  Count III alleges that Hilton failed to maintain sufficient data needed to locate and pay surviving spouses of Plan participants in violation of ERISA.  *Id.* ¶¶ 46-48.  Count IV alleges that Hilton failed to issue an individual benefit statement to Kifafi after his separation from service in violation of ERISA and Hilton's Supplemental Plan Document ("SPD").  *Id.* ¶¶ 49-51.  Count V alleges that Hilton failed to timely supply a copy of the Plan document to Kifafi in violation of ERISA.  *Id.* ¶¶ 52-53.  Count VI alleges that Hilton's failure to comply with the obligations set forth in ERISA (based apparently on the alleged violations underpinning Counts I-V) constituted a breach of fiduciary duty.  *Id.* ¶¶ 54-56.

Because Hilton amended the Plan and Kifafi had filed an Amended Complaint, the Court

---

[6] Hilton does object to Kifafi's "characterization" of these modifications, *see* Defs.' Resp. Stmt. ¶ 27, but does not offer an explanation (or contrary evidence) suggesting that Kifafi's description is inaccurate.  In fact, Hilton's Opposition clarifies that it does *not* dispute that these elements of the Plan were modified, arguing only that Kifafi "wants to have his cake and eat it too."  Defs.' Opp'n at 17.

allowed the parties an opportunity to submit additional pleadings in connection with Kifafi's

Motion for Class Certification.  After considering the parties' numerous submissions, the Court

subsequently granted-in-part and denied-in-part the Motion for Class Certification on May 11,

1999.  *See Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174 (D.D.C. 1999).  The Court granted

the motion with respect to a benefit-accrual class in connection with Count I of the Amended

Complaint, subject to a possible amendment to conform the class with the statute of limitations,

if necessary.  *Id.* at 176-78.  The Court denied the motion with respect to a "service-counting"

class in connection with Count II of the Amended Complaint, which the Court found to consist

of five sub-classes:

> [w]ith respect to [Kifafi's] (1) union-service claim and (2) his claim that the
> Defendants failed to give credit for leave of absence, Mr. Kifafi does not even
> appear to be a member of the proposed class . . . [w]ith respect to the other three
> service-counting claims, Mr. Kifafi fails to show that his individual circumstances
> give rise to a generally applicable practice that ought to be tried on a class-wide
> basis.

*Id.* at 179-80 (internal numbering added).[7]

Notwithstanding the pendency of this litigation, on September 3, 1999, Hilton submitted

the amended Plan to the IRS and requested a determination that the Plan, as amended, satisfied

the requirements of a qualified retirement plan.  Defs.' Stmt. ¶ 9.  In connection with the same,

Kifafi's counsel drafted at least three letters advising the IRS of the claims asserted in this case to

"protect the rights of [the] class."  Defs.' Ex. 6 at 4 (5/27/99 Letter from S. Bruce to C. Gold).

*See also* Defs.' Ex. 7 (7/12/00 Letter from S. Bruce to IRS); Defs.' Ex. 8 (11/1/01 Letter from S.

Bruce to L. Isaacs).  The IRS regional office handling the request referred the issues associated

---

[7] The Court subsequently indicated that it would revisit its findings if there were a basis
for doing so.  *See Kifafi v. Hilton Hotel Ret. Plan*, Mem. Op. at 3 n.2 (Mar. 30, 2005).

with Hilton's Plan amendments to its national office (the National Employee Plans Technical

Office).  Defs.' Stmt. ¶ 11.

The IRS national office issued a Technical Advice Memorandum on July 25, 2002.  *See*

Pl.'s Ex. 16 (7/25/02 Technical Advice Memorandum).  The Memorandum began by reviewing

the accrual provisions associated with Hilton's Plan and identifying the concerns articulated by

Kifafi's counsel.  *Id.* at 6.  The IRS then evaluated the pre-amendment Plan and determined that

it "fails to meet the 133 1/3 percent rule."  *Id.* at 7.  The IRS explained that:

> [u]nder the 133 1/3 percent rule the annual rate of accrual for any participant must
> be determined for each year and compared with the annual rate of accrual for any
> later plan year.  Under the Plan, the first year accrual Pre-Amendment Benefit rate
> is generally .71% of a participant's average monthly compensation . . .
>
> * * *
>
> For all except the lowest paid participants in the Plan and participants in the Plan
> with decreasing compensation, an accrual rate of 1.54% or higher will generally
> occur in at least one plan year after the first plan year and before the twenty-sixth
> plan year . . . .  Thus, because 1.54% is more than 133 1/3 percent of .71%, the
> Pre-Amendment Benefit fails to meet the 133 1/3 percent rule.

*Id.*  The IRS also found that the pre-amendment Plan violated the 3% rule and the fractional rule

(*i.e.*, it failed to comply with any of the three alternative accrual tests set forth in 29 U.S.C. §

1054 (b)(1)).  *Id.* at 6-8, 12 ("[t]he Plan benefit formula before the Amendment 1999-1 did not

satisfy the 133 1/3% accrual rule under Internal Revenue Code Section 411(b)(1)(B), nor did it

meet the fractional rule or the 3 percent method").

With respect to Hilton's post-amendment Plan, the IRS determined that the Plan still

failed to comply with the 133 1/3% rule (or the 3% rule), but that it *did* comply with the

fractional rule.  *Id.* ("[t]he Plan benefit formula after the Amendment 1999-1 does not satisfy the

133 1/3% accrual rule under Internal Revenue Code section 411(b)(1)(B) nor does it meet the 3 percent method, but it does meet the fractional rule").  Because the IRS did not believe that Hilton had previously misstated or omitted material facts at the time it had submitted applications related to the pre-amendment Plan, and because the IRS believed that Hilton had acted in good faith reliance on the IRS' determination letters, the IRS decided not to retroactively revoke the Plan's qualified status.  *Id.* at 13.  In making this determination, however, the IRS explained that Hilton agreed to further amend its Plan.  *Id.* at 12.  Among these amendments, Hilton eliminated the Plan's representation that it was complying with the 133 1/3% rule:

> Amendment 2002-1
>
> In response to concerns raised in the National Office, the Taxpayer's representative has drafted a proposed amendment ("Amendment 2002-1") providing:
>
> * * *
>
> (4) that section 5.4 of the Plan is amended to read as follows: "**5.4 Code Section 411(b)(1).**  The method of computing a Participant's accrued benefit under the provisions of Article IV is intended to satisfy the requirements of Section 411(b)(1) of the Code."

*Id.* at 12 (emphasis in original).  Finally, the IRS explained in a cover letter that its determination "relates only to the status of [the] [P]lan under the Internal Revenue Code.  It is not a determination regarding the effect of other federal or local statutes."  Pl.'s Ex. 84 (7/25/02 Letter from P. Shultz to Hilton).

Although Hilton initiated these Plan amendments to remedy perceived deficiencies with its accrual provisions, Hilton also amended the Plan during the pendency of this litigation to correct issues associated with the Plan's vesting provisions.  For example, Hilton initially

asserted that it complied fully with the Plan's vesting provisions that allowed employees to earn a

year of vesting credit by completing 1,000 hours of service:

> Defendants followed the early retirement provisions of the Retirement Plan in
> determining that only those years of employment in which Plaintiff had 1,000
> hours of employment with Hilton were credited years of service . . . . Defendants
> calculated Plaintiff's years of credited service and service hours in accordance
> with ERISA and the terms of the Retirement Plan.

Pl.'s Ex. 10 at 2-3 (10/15/98 Defs.' Statement of the Case).  *See also* Defs.' Resp. to Pl.'s Suppl.

Class Cert. Br. at 4 & n. 2 ("Hilton does not use equivalency methods to count hours of service

under the Plan [such as the 870 method] and did not do so in Plaintiff's case" and "[i]f Hilton

used an equivalency method, it would have to say so in the Plan").  Similar to the events

surrounding the Plan's accrual provisions, documents produced to Kifafi in discovery

demonstrated that Hilton had not implemented the terms of the Plan in full compliance with its

vesting provisions.  For example, an email drafted by Vera Stoicof, a benefits administrator

employed by Hilton, indicated that Hilton did not properly calculate employees' years of service

prior to their participation in the Plan:

> In past calculations with Abacus,[8] a person's Union years were not bridged for
> purposes of benefit or vesting services unless the participant met the Special
> Service Rules requirements.  However, due to the lawsuit we are reexamining this
> practice.  We have been giving vesting years to participants who go into the union
> after years of benefit service . . ., but should a participant be given vesting for
> union years prior to any benefit service, except in cases where special service
> rules apply? . . . *We have not previously given vesting prior to benefit service*
> except in Reno's special agreement, and it may alter calculations for certain
> retirees.

Pl.'s Ex. 27 at 1 (5/6/02 Email from V. Stoico to G. Trotter) (emphasis in original).  In another

---

[8] Abacus is the pension software Hilton used from 1992 to approximately 1998.  *See*
Defs.' Ex. ¶ 17 (Decl. of V. Stoicof).

example, Ms. Stoicof's email exchange with Hilton employee Greg Trotter contained a similar

description of Hilton's failure to track these hours:

> Ms. Stoicof:  [f]or as far back as we can go, no one kept track of the non-
> participating properties' employees (hours/earnings) to give them vesting.  How
> can we say the employees get vesting if that company was never participating?
>
> * * *
>
> Mr. Trotter: I recognize that many of these issues would not be a concern if,
> historically, Hilton had been able to obtain good records from the various
> employers under the Plan and that the basic form of these rules have been in the
> Plan long before any of us were involved with the Plan.  However, as I've said,
> most of the rules simply reflect legal requirements that the Plan must follow.

Pl.'s Ex. 27 at 4-5 (5/9/02 Email Exchange between V. Stoicof and G. Trotter).

Hilton again amended the Plan on December 10, 2002 (Amendment 2002-4) to change

the methods it used to calculate years of service.  A background document prepared in

connection with the amendment specifically acknowledged Hilton's failure to maintain the

records necessary to properly calculate employees' years of service:

> The pending *Kifafi v. Hilton Hotels Retirement Plan* litigation includes claims that
> the Plan failed to track and count all hours of service in determining vesting and
> eligibility for early retirement benefits as required by ERISA.  We are uncertain
> whether these claims have merit because we have to date been unable to locate
> adequate historical records to verify the claims.  To ensure that plan participants
> are provided with ERISA compliant benefits based on verifiable historical
> records, it is proposed to amend the Plan to change the method of counting hours
> worked for [the] purpose of determining years of service.

Pl.'s Ex. 39 (Undated Document titled "proposed hours counting amendment to Hilton Hotels

Retirement Plan"); Pl.'s Stmt. ¶ 90.

Whereas the Plan previously allowed participants to earn one year of vesting credit for

completing 1,000 hours of service, Defs.' Stmt. ¶ 16, Hilton's amendment replaced the 1,000

18

standard with two new counting methods.  *Id.* ¶ 17.  First, when a participant performs services

that are credited under the Plan for both vesting and benefit accruals (such as nonunion service),

the participant receives a year of vesting service for each Plan year in which the participant

completes at least 870 hours of service (or 750 hours if the participant is a salaried employee).

*Id.*  Second, when a participant performs services that are credited under the Plan for purposes of

vesting only (such as union service), the participant earns a year of vesting credit for each 365-

day period of service regardless of the employees' hours during that period (a so-called "elapsed

time method" of counting).  *Id.*  Hilton subsequently adopted a formal resolution clarifying that

its new calculating methods were to have retroactive effect.  *Id.* ¶ 18.

Following these Plan amendments, the Court held a Status Hearing with the parties on

June 24, 2003.  During the hearing, Hilton's counsel conceded that Hilton did not possess all of

the records necessary to properly calculate employees' years of service prior to the Plan's

amendments:

> THE COURT: I take it you're admitting that the plan requires this credit and that
> that has not actually occurred, whether it's because you don't have the historical
> records or whatever.  Is that accurate or not?
>
> HILTON: Not quite, Your Honor.  The plan was amended to just eliminate the
> issue of trying to figure out what these preparticipation years of service [were].  It
> went to this elapsed time method that makes it unnecessary to compute that with
> precision.
>
> * * *
>
> THE COURT: Okay.  But there was a period in there before you did the
> amendment where you had the plan, you then have the amendment at this end, and
> there's a period in here when the plan was not being implemented.  Do you agree?
>
> HILTON: Not completely, Your Honor.

THE COURT: Where it wasn't fully implemented.

HILTON: With some adverb like that, I'll agree.

* * *

HILTON: We would say it was being implemented in many situations, including Mr. Kifafi's fully.  When he made his claim, efforts were made to get the hours and we believe adjudicated correctly.  There were situations where the records weren't there and, therefore, if that is not full implementation, I would agree with that . . . .

Defs.' Ex. 27 at Tr. 23:10 - 24:24 (6/24/03 Status Hearing Transcript).

With the Court's permission, Kifafi subsequently renewed his motion to certify a vesting claims class on July 21, 2003.[9]  Kifafi explained that "this renewed motion is based on new evidence obtained in the course of discovery, which is now completed."  *Kifafi v. Hilton Hotel Ret. Plan*, 228 F.R.D. 382, 384 (D.D.C. 2005).[10]  As explained in its Memorandum Opinion, the Court certified four sub-classes in connection with the vesting violations alleged as Count II of the Amended Complaint:

(1) Plaintiff's claim that Defendants failed to credit employees with years of union service for vesting purposes;

(2) Plaintiff's claim that Defendants improperly used a 1000 hours service standard rather than an 870 hour service standard;

---

[9] Kifafi also attempted to cure deficiencies in his original class certification motion by having three other individuals move to intervene as class representatives.  The Court found that these three individuals were not proper plaintiffs and denied the motion.  *See Kifafi v. Hilton Hotel Ret. Plan*, No. 98-1517, 2004 U.S. Dist. LEXIS 28928 at *1 (D.D.C. Sept. 27, 2004).

[10] The Court permitted Kifafi to file this renewed motion, in its discretion, which is permitted under Federal Rules of Civil Procedure 54(b) (allowing a court to revisit interlocutory orders that adjudicate fewer than all the claims in a given case "at any time" prior to the Court's final judgment in the case) and 23(d) (allowing a court to "alter[] or amend[] [orders] as may be desirable from time to time" in the class action context).

(3) Plaintiff's claim that Defendants failed to credit leaves of absence; and

(4) Plaintiff's claim that Defendants failed to count the year in which employees became participants in the retirement plan for vesting purposes.

*Id.* at 386-89.

Following class certification, the Court set a briefing schedule for the parties' submission of Cross-Motions for Summary Judgment. Pursuant to that schedule, Kifafi filed a Motion for Summary Judgment ("Pl.'s Mot."), Hilton filed a Consolidated Cross-Motion for Summary Judgment and Opposition to Kifafi's Motion for Summary Judgment ("Defs.' Opp'n"), and Kifafi filed a Consolidated Opposition to Hilton's Cross-Motion for Summary Judgment and Reply in support of his Motion for Summary Judgment ("Pl.'s Reply"). Hilton also filed a Motion to Strike certain declarations submitted by Kifafi in support of his Motion for Summary Judgment, which the parties proceeded to fully brief. In connection with this briefing, Kifafi also filed a Motion for Leave to file a Sur-Reply, which was opposed by Hilton and fully briefed by the parties. The Court decided to hold the Motion to Strike and Motion to file a Sur-Reply in abeyance, considering them within the larger context of the parties' Cross-Motions for Summary Judgment. Accordingly, the Cross-Motions for Summary Judgment, the Motion to Strike, and the Motion to file a Sur-Reply, are all addressed in this Memorandum Opinion.

Finally, the Court referred the parties to mediation with Magistrate Judge Alan Kay while they continued to brief their motions. Because the Court was notified that the parties were engaged in potentially fruitful settlement negotiations with the goal of resolving the lawsuit in its entirety, the Court denied all of the parties' motions without prejudice, with leave to reinstate them if the negotiations ultimately proved to be unsuccessful. The parties were unable to reach a

settlement during their negotiations, and consequently, the Court now reaches the parties' Cross-Motions for Summary Judgment, Hilton's Motion to Strike, and Kifafi's Motion to file a Sur-Reply, all of which are now ripe for decision.

## II.  LEGAL STANDARD

Pursuant to Federal Rule of Civil Procedure 56, a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  *See also Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994).  Under the summary judgment standard, the moving party bears the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In response, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is insufficient to bar summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.  *Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C.

Cir. 1987); *Liberty Lobby*, 477 U.S. at 251 (the court must determine "whether the evidence

presents a sufficient disagreement to require submission to a jury or whether it is so one-sided

that one party must prevail as a matter of law").  "If the evidence is merely colorable, or is not

sufficiently probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v.

Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply

"show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.

Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Instead, while the movant bears the initial

responsibility of identifying those portions of the record that demonstrate the absence of a

genuine issue of material fact, the burden shifts to the non-movant to "come forward with

'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587 (citing Fed. R. Civ. P.

56(e)) (emphasis in original).

### III.  DISCUSSION

Counsel for the parties have made resolution of the issues in this case unnecessarily

difficult for two reasons.  First, counsel have shifted their burden to the Court to determine which

facts are in dispute between the parties.  Local Civil Rule 7(h)(1) provides that

> [e]ach motion for summary judgment shall be accompanied by a statement of
> material facts as to which the moving party contends there is no genuine issue,
> which shall include references to the parts of the record relied on to support the
> statement.  An opposition to such a motion shall be accompanied by a separate
> concise statement of genuine issues setting forth all material facts as to which it is
> contended there exists a genuine issue necessary to be litigated, which shall
> include references to the parts of the record relied on to support the statement.

LCvR 7(h)(1).  Despite this rule's emphasis on materiality, precision, and citations to the record,

the parties presented the Court with 250 "material" facts, a substantial segment of which are opposed by the parties for frivolous or unsupported reasons.  For example, Kifafi opposes Hilton's 62nd proffered fact with this meritless objection: "[d]ispute the second sentence [of the proffered fact] which is unintelligible because of the double negative."  *See* Pl.'s Resp. Stmt. ¶ 62.  Hilton makes a similarly well-reasoned objection to Kifafi's 11th proffered fact:  "[d]ispute plaintiff's interpretation of the [documents], the purpose for which they were created and what they demonstrate," with no citation to evidence in the record and no further explanation.  Defs.' Resp. Stmt. ¶ 11.  These types of objections not only reflect poorly on counsel, they also require the expenditure of resources that should be borne by the parties, not the Court.  *See Jackson v. Finnegan, Henderson, Farabow, Garrett & Dunner*, 101 F.3d 145, 151 (D.C. Cir. 1996) ("[LCvR 7(h)(1)] places the burden on the parties and their counsel, who are most familiar with the litigation and the record, to crystallize for the district court the material facts and relevant portions of the record") (citing *Twist v. Meese*, 854 F.2d 1421, 1425 (D.C. Cir. 1988)).

The second difficulty created by counsel is that each side has repeatedly shifted their arguments such that the Court has consistently been presented with moving targets.  For example, Kifafi has consistently demonstrated an inability to focus on the claims that he has actually asserted in his Amended Complaint, repeatedly raising new claims that are not a part of this litigation (such as various claims related to how Hilton has implemented amendments to its Plan).  For Hilton's part, it has consistently amended the Plan and sought to conflate separate inquiries associated with liability and remedies to argue that any ERISA violations should not give rise to liability because they have been mooted.  In resolving the parties' claims, the Court shall not allow Kifafi to expand his Amended Complaint, and shall not allow Hilton to conflate

liability with issues associated with remedies or the doctrine of mootness.

With these preliminary matters resolved, the Court shall now turn to the claims raised in the Amended Complaint: (A) the backloading of benefit accruals (certified as a class claim); (B) the improper calculation of vesting credit (certified as four sub-classes); (C) the failure to maintain data to locate Kifafi's spouse (an individual claim); (D) the failure to issue an individual benefit statement (an individual claim); (E) the failure to supply a copy of the Plan document (an individual claim); and (F) the breach of fiduciary duty (an individual claim).

A.    *"Backloading" Of Benefit Accruals (Count I)*

As set forth above, ERISA prevents employers from backloading benefit accruals, *i.e.* "providing inordinately low rates of accrual in the employee's early years of service . . . [and] concentrating the accrual of benefits in the employee's later years of service." *Langman*, 328 F.3d at 71.  In order to comply with ERISA, an employer must satisfy one of the three alternative tests set forth in Section 204(b) of ERISA, 29 U.S.C. § 1054(b)(1) (setting forth the 3% rule, the 133 1/3% rule, and the fractional rule).

Beginning in 1976 and continuing until 1999, the Plan expressly provided for its compliance with the 133 1/3% rule.  *See* Pl.'s Ex. 1 § 5.4 (Hilton Hotels Retirement Plan, version dated March 30, 1995) ("[t]he method of computing a Participant's accrued benefit under the provisions of Article IV is intended to satisfy the requirements of the 133-1/3 rule").  Kifafi argues that Hilton failed to comply with this rule (and failed to comply with the other two accrual rules) such that it unlawfully backloaded benefit accruals.  *See* Pl.'s Mot. at 3-10.

The record is replete with uncontested evidence that the Plan failed to comply with the 133 1/3% rule because its accrual rates varied by more than the permissible 133 1/3%.  *See, e.g.*,

Pl.'s Ex. 7 at 2 (2/10/98 Towers Perrin Accrual Test) (Hilton's consultant asking whether the

Plan passes the 133 1/3% rule and answering "No"); Pl.'s Ex. 8 at 1 (2/27/93 Meeting

Spreadsheet) (Hilton's consultant preparing a spreadsheet reflecting variations of accrual rates of

more than 200%);  Pl.'s Ex. 16 at 6-8, 12 (7/25/02 IRS Technical Advice Memorandum)

(evaluating Hilton's Plan and concluding that it "did not satisfy the 133 1/3% accrual rule"

because the accrual rates varied between .71% to 1.54%); Pl.'s Ex. 5 ¶ 10-16 (Affidavit of C.

Poulin) (Plaintiff's expert explaining his analysis of Hilton's Plan and concluding that "the

Plan's benefit formula did not meet the requirement of the 133 1/3 percent rule").

Hilton does not dispute, as a factual matter, that the Plan violated this rule.[11]  Instead,

Hilton argues that the Court should, as a legal matter, ignore the language in the Plan indicating

its intention (but failure) to comply with the 133 1/3% rule.  Specifically, Hilton argues that "a

plan sponsor's intention when drafting an ERISA plan will not be considered by courts unless the

plan language at issue is ambiguous on its face." Defs.' Opp'n at 21.  Hilton surmises that Kifafi

"has made no claim that the Plan's accrual provisions . . . are ambiguous in any way," and

therefore, the Court should simply avoid any finding that the plan violated ERISA's backloading

provisions.  *Id.*  Hilton also references the entirely uncontroversial proposition that "ERISA does

not require the adoption of the 133-1/3% Rule." *Id.* at 21-22.

The Court rejects Hilton's suggestion that the Plan's explicit anti-backloading clause and

---

[11] Hilton's counsel initially argued that the Plan complied with the 133 1/3% rule in a letter sent to Kifafi's counsel prior to initiation of this lawsuit. *See* Pl.'s Ex. 3 at 2-6 (3/27/98 Letter from W. Jacobsen to S. Bruce).  The arguments set forth in this letter have not been raised by Hilton in its summary judgment briefing and have apparently been abandoned.  As Kifafi observes in his Reply, Hilton "presents no legal arguments, offers no expert report, and introduces no other evidence in support of [the] position" that the Plan did not violate the 133 1/3% rule.  Pl.'s Reply at 6.

Hilton's representations related to the same were mere musings without consequence.  Not only

did the Plan explicitly provide for its compliance with the 133 1/3% rule, but Hilton conveniently

ignores that it represented its compliance with this rule to both the IRS, *see* Pl.'s Ex. 2 at 3

(Hilton Application dated March 29, 1995) (indicating that the "[m]ethod for determining

accrued benefit[s]" was the "133-1/3% Rule"), and this Court, *see* Defs.' Stmt. of the Case at 2

(Oct. 15, 1998) ("[t]he Retirement Plan complies with the 133 1/3% rule").  Moreover, because

the Plan failed to satisfy *any* of the three accrual methods, this is not an instance where a Plan

sponsor stated an intention to comply with one rule but the Plan in practice complied with a

different one.  Rather, Hilton's Plan failed to comply with *any* of ERISA's anti-backloading

provisions, and most significantly, with the 133 1/3% rule included among its provisions.

Hilton thus faces a circumstance where it was required to comply with the accrual method

it expressly selected, even though ERISA generally allows employers to select compliance with

any of the three alternative anti-backloading rules.  *See Curtiss-Wright Corp. v. Schoonejongen*,

514 U.S. 73, 85 (1995) ("[w]hatever level of specificity a company chooses, in an amendment

procedure or elsewhere, it is bound to that level").  The Third Circuit's decision in *Smith v.

Contini* expounds on this principle:

> we agree with the defendants and the district court that the defendants were under
> no obligation under ERISA to provide for reciprocal agreements and Pro-rata
> Pensions.  Nevertheless, once having made the determination to provide for such
> pensions, the defendants were obliged to formulate a plan providing for vesting in
> accordance with ERISA section 203(a)(2)(A), 29 U.S.C. § 1053(a)(2)(A).  Thus,
> this case represents a situation, not unusual in the law, that an actor's discretion in
> how it engages in certain conduct is circumscribed, even though it was not obliged
> to engage in the conduct in the first instance.

205 F.3d 597, 605 (3d Cir. 2000).  Accordingly, it is apparent that the Plan violated ERISA's

anti-backloading provision, 29 U.S.C. § 1054(b)(1), and in particular, violated the 133 1/3% rule.

As a result, the Court has little difficulty concluding that the Plan's participants are entitled to

receive the benefits they would have accrued had the Plan complied with 133 1/3% rule.  *Cf.*

*Carrabba v. Randalls Food Mkts., Inc.*, 145 F. Supp. 2d 763, 773 (N.D. Tex. 2000) (requiring a

backloaded plan to conform to the 133 1/3% rule where no accrual method was otherwise

specified and the plan violated all three of ERISA's anti-backloading provisions), *aff'd* 252 F.3d

721 (5th Cir. 2001).

Having made the determination that Hilton's Plan violated ERISA's anti-backloading

provision, 29 U.S.C. § 1054(b)(1), the Court shall now consider Hilton's principal argument on

summary judgment that its 1999 amendment to the Plan has mooted Kifafi's benefit accrual

claim.  Defs.' Opp'n at 30-33.  As discussed above, the 1999 amendment was implemented "for

the purpose of eliminating any controversy regarding the proriety [sic] of the rate of benefit

accruals under the Plan."  *See* Pl.'s Ex. 11 at 1 (Amendment 1999-1).  Rather than amend the

Plan to comply with the 133 1/3% rule, however, Hilton's new formula seeks to comply with the

fractional rule.  *Id.* at 2-3.  The amendment also makes two changes unrelated to any effort to

bring the Plan into compliance with ERISA's anti-backloading provision.  Pl.'s Stmt. ¶ 27.

Hilton does not contest that its two unrelated changes to the Plan resulted in lower levels

of accrued benefits than if the changes were not made, but instead argues that such a result does

not present a problem.  *See* Defs.' Opp'n at 17 ("Plaintiff wants to have his cake and eat it too; he

wants to keep all of the upward adjustments in the new benefit formula while eliminating any

downward adjustments").  Referring to the pre-amendment formula as simply "irrelevant" to

resolution of the parties' Cross-Motions for Summary Judgment, Hilton also argues that the new

28

formula offers "complete relief in that it complies with § 204(b)(1) [the anti-backloading

provision], specifically, the Fractional Rule of § 204(b)(1)(C)." Defs.' Opp'n at 30-31.

According to Hilton, "[n]othing more is required" because the Plan's participants "are entitled to

participate in a plan that complies with ERISA § 204(b)(1) [and] they are not entitled to

participate in a plan that complies with the 133-1/3% Rule." *Id.* at 31.

The Court rejects Hilton's argument for several reasons, not the least of which is that, if

accepted, it would make lawful Hilton's otherwise unlawful backloading of benefit accruals.  In

particular, Hilton's Plan violated ERISA's anti-backloading provisions for the reasons stated

above.  The 1999 Plan amendment, while purporting to bring the Plan into compliance, also

made other changes that were unfavorable to the benefits accrued by Plan participants.  The fact

that the Plan now provides that participants may receive the greater of the old (unlawful) formula

or the new (lawful but with decreased benefits) formula does not remedy Hilton's violations.

Plan participants are entitled to receive the benefits they would have accrued under the Plan's

initial benefit accrual formula, amended only to bring it into compliance with the 133 1/3% rule.

If this were not so, Hilton and all other employers that have unlawfully backloaded benefit

accruals could simply "amend away" their ERISA violations.  The Court therefore finds Kifafi's

argument on this point entirely persuasive:

> [a] company could violate ERISA's accrual rules and then, after the violation is
> discovered by a participant, 'restructure' its formula retroactively to either
> eliminate or dramatically diminish any liabilities.  Under Hilton's logic, if a
> retirement plan promised 2% of pay per year of participation but only provided
> 1% of pay in practice, only the unlawful 1% would be protected against a
> retroactive amendment."

Pl.'s Reply at 14.

Although few cases have analyzed ERISA's prohibition on backloading in factually similar circumstances (and none in this Circuit), Judge Shira Scheidlin faced a similar factual scenario in *In re Citigroup Pension Plan ERISA Litigation* and rejected the same argument as the one advanced by Hilton.  470 F. Supp. 2d 323 (S.D.N.Y. 2006), *overruled in part on other grounds, sub nom.*, *Hirt v. Equitable Ret. Plan for Employees, Managers & Agents*, 533 F.3d 102, 107 (2d Cir. 2008).[12]  In that case, Citigroup adopted a plan that purported to follow the fractional rule pursuant to 29 U.S.C. § 1054(b)(1)(C).  Under the terms of the plan, if "an individual's hypothetical account balance [turned out to be] less than the minimum amount required by section 204(b)(1)(C) of ERISA, Citigroup credits the participant the difference." *Id.* at 337.  In other words, if a participant discovered that Citigroup's plan violated ERISA's anti-backloading provisions, the plan provided that Citigroup would pay the amount necessary to bring the participant's accrued benefits into compliance.  Citigroup argued that "this supplementary contribution brings accrued pensions into compliance with the minimum required by the fractional rule," but Judge Scheindlin soundly rejected that argument. *Id.*  Finding that the plan "not only fail[ed] to guard against backloading," she held that "this lump-sum contribution, made on the eve of the benefit payout, is inadequate precisely because it *permits* the backloading

---

[12] Numerous courts have analyzed backloading claims in the context of plan conversions, where a party asserts a claim for unlawful backloading when comparing the benefits received under the two plans.  Such claims have not generally been successful. *See, e.g.*, *Register v. PNC Fin. Servs. Grp., Inc.*, 477 F.3d 56, 72 (3d Cir. 2007) ("the objective of the anti-backloading provisions, to prevent a plan from being unfairly weighted against shorter-term employees, simply is not implicated by the defendant's [plan] conversion") (internal citation and punctuation omitted); *Amara v. Cigna Corp.*, 534 F. Supp. 2d 288, 323 (D. Conn. 2008) (explaining that the plaintiff's backloading argument was "unpersuasive" because "the change in accumulation rates . . . is not the result of a specific plan provision," but is rather the result of a shift in plans).  These cases have no relevance to this one, however, which involves a claim that the Plan itself, irrespective of later amendments, was backloaded and violated ERISA's 133 1/3% rule.

that the fractional rule was designed to prevent." *Id.* (emphasis added).  She also explained that "[i]f such applications of the fractional rule were permissible, plans would be free to adopt formulas providing a mere pittance of benefit accrual over, say, the first twenty years of employment, and thereafter have benefits accrue rapidly by tacking on an additional amount . . . ." *Id.* at 338.  The same logic applies in this case, prohibiting Hilton from simply changing the Plan's formula to make accrued benefits lower for a substantial number of participants than the benefits they would have accrued had Hilton's Plan not violated ERISA's anti-backloading provision.

The Court also agrees with Kifafi that Hilton's legal argument–that Plan participants are only entitled to receive the greater of the old (unlawful) formula or the new (lawful but with decreased benefits) formula–would, if accepted, transgress ERISA's so-called "anti-cutback" rule in Section 204(g).  *See* 29 U.S.C. § 1054(g) ("[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan").  This provision "prohibits any amendment of a pension plan that would reduce a participant's 'accrued benefit.'"  *Central Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 741 (2004).[13]  Accrued benefits are considered "reduced" not only when they are decreased in size or eliminated entirely, but also when an employer imposes new "conditions" or "materially greater restrictions on the[ir] receipt."  *Id.* at 744.  *See also Bellas v. CBS, Inc.*, 221 F.3d 517, 522 (3d Cir. 2000) ("[a] plan amendment that retroactively reduced benefits promised to plaintiffs for almost seven years was precisely the sort of inequity Congress designed ERISA to prevent").

---

[13] There are two exceptions to this rule, *see* 29 U.S.C. §§ 1082(c)(8), 1441 (substantial business hardships and terminated plans), but neither exception applies in this case.

Hilton argues that it has not reduced the benefits owed to Plan participants because its 1999 amendment provided participants with the "greater of" the pre-amendment and post-amendment accrual formulas.  Defs.' Opp'n at 15.  According to Hilton, "numerous cases" have found that a Section 204(g) violation has not occurred if a post-amendment accrued benefit is not less than the pre-amendment accrued benefit, citing *Brody v. Enhance Reinsurance Co. Pension Plan*, 00-9600, 2003 U.S. Dist. LEXIS 3785, at *27-*28 (S.D.N.Y. Mar. 16, 2003).[14]  *Id.*  This argument misses the mark, however, for the same reasons discussed above.  The appropriate point of comparison is *not* what Plan participants accrued under the unlawfully backloaded pre-amendment Plan, but rather, what the Plan participants would have accrued had the pre-amendment Plan operated in compliance with the 133 1/3% rule.  Hilton's reliance on *Brody* and related cases is unpersuasive because none endorse the "greater of" method to "make lawful" an otherwise unlawful plan.[15]

Finally, the Court specifically finds that Hilton has not met its burden of demonstrating mootness in the context of controlling case law.  "Simply stated, a case is moot when the issues

---

[14] Hilton also makes the brief but erroneous argument that the IRS examined whether the anti-cutback rule was violated by the 1999 amendment and concluded that it was not, which Hilton characterizes as "conclusive and compelling."  *See* Defs.' Opp'n at 23.  This argument is decidedly inconclusive and not compelling because the IRS made no such determination.  Rather, the IRS noted without resolving Kifafi's argument that the amendment violated Section 204(g), found that the pre-amendment Plan violated ERISA's anti-backloading provision, and concluded that the post-amendment Plan complied with the factional rule when "looked at in isolation."  Pl.'s Ex. 16 at 1-8 (7/25/02 Technical Advice Memorandum).

[15] Although Hilton argues that the anti-cutback rule protects only "accrued benefits" and not the "formulas" under which the benefits are calculated, *see* Defs.' Opp'n at 17, Hilton's argument is based on its erroneous but familiar refrain that Plan participants are only entitled to receive the benefits accrued under the unlawfully backloaded pre-amendment Plan or its post-amendment plan with other changes to the benefit accrual formula.

presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (citing *Powell v. McCormack*, 395 U.S. 486, 496, (1969)).  Thus, when two conditions are satisfied: (1) "it can be said with assurance that there is no reasonable expectation that the alleged violation will recur;" and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation" – a case is moot "because neither party has a legally cognizable interest in the final determination of the underlying questions of fact and law."  *Id.*

However, "voluntary cessation of allegedly illegal conduct" rarely moots a case because it leaves the defendant "free to return to his old ways."  *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 173-74 (2000) ("[t]he appellate court erred in concluding that a citizen suitor's claim for civil penalties must be dismissed as moot when the defendant, albeit after commencement of the litigation, has come into compliance").  Because a court's finding that a case is moot would entitle the defendant to a dismissal as of right, courts have been reluctant "to grant defendants such a powerful weapon against public law enforcement" because there is "a public interest in having the legality of . . . practices settled."  *W.T. Grant Co.*, 345 U.S. at 632-33.  For this reason, the Supreme Court has emphasized that a defendant's burden to demonstrate mootness is substantial and difficult to satisfy:

> the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent:  'A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'

*Friends of the Earth*, 528 U.S. at 189 (citing *United States v. Concentrated Phosphate Export*

*Ass'n*, 393 U.S. 199, 203 (1968)).

Hilton offers two reasons to support its argument concerning mootness.  First, Hilton

reasons that Plan participants "are entitled to participate in a plan that complies with ERISA,"

and that its amendment has created an ERISA-compliant plan (despite the Plan's previous

noncompliance).  Defs.' Opp'n at 31.  Second, Hilton indicates that "there is no reasonable

expectation that [it] will again attempt to amend the Plan to revert to the old formula."  *Id.* at 32.

The Court finds that these reasons do not come remotely close to satisfying the standard for

mootness.

First, Hilton continues to suggest that it has not violated any ERISA provisions because it

has retroactively amended the Plan to bring it into compliance.  Courts have repeatedly found

that cases are not moot where, as here, a defendant has insisted upon the legality of the

challenged practices.  *See, e.g.*, *Donovan v. Cunningham*, 716 F.2d 1455, 1461-62 (5th Cir.

1983) (defendants' "bare assurances" that they did not intend to serve as ERISA fiduciaries in the

future were "insufficient to meet their burden of persuasion . . . in the face of [their] continuing

insistence that their discontinued activities were legal"); *Cf. Am. Fed'n of Gov't Employees,*

*AFL-CIO v. Brown*, 886 F. Supp. 16, 19 (1994) (case mooted where defendants had "adopted

entirely plaintiffs' view of [the] dispute").  Second, complete relief has *not* been afforded to the

class because the Plan participants are entitled to the benefits they would have accrued had the

pre-amendment Plan operated in compliance with the 133 1/3%, not a Plan that retroactively

denies them those same rates of accrual.  *See Wiley v. Nat'l Collegiate Athletic Ass'n*, 612 F.2d

473, 476 (10th Cir. 1979) (holding that case was not moot despite a subsequent amendment to

the NCAA constitution because "the amendment does not fully comport with the relief sought by

the plaintiff").

Given the foregoing, the Court finds that Hilton violated ERISA's anti-backloading

provision, 29 U.S.C. § 1054(b)(1)(C), and that Hilton's subsequent amendments to the Plan have

not mooted this violation.  Accordingly, the Court shall grant Kifafi's Motion for Summary

Judgment and deny Hilton's Motion for Summary Judgment as to Count I of the Amended

Complaint.[16]

> B.      *Vesting Claims (Count II)*

As set forth above, Section 203(b) of ERISA requires employers to count all of an

employee's years of service for determining an employee's vesting credit.  29 U.S.C. §

1053(b)(1) (requiring employers to count "all of an employee's years of service with the

employer or employers maintaining the plan").  Beginning in 1976 and continuing until the Plan

was amended in December 2002, Hilton applied the 1,000 hours standard for calculating

employees' years of service.  *See* Pl.'s Ex. 1 (Hilton Hotels Retirement Plan, version dated

March 30, 1995) (defining "Years of Benefit Service") ("a Participant shall not be entitled to any

Years of fractional Years of Benefit Service for a Plan Year during which he completes less than

1,000 Hours of Service"); *Id.*, Ex. 10 at 2-3 (10/15/98 Defs.' Statement of the Case)

("Defendants followed the early retirement provisions of the Retirement Plan in determining that

only those years of employment in which Plaintiff had 1,000 hours of employment with Hilton

were credited years of service"); Defs.' Resp. to Pl.'s Suppl. Class Cert. Br. at 4 & n. 2 ("Hilton

---

[16] Kifafi argues that the post-amendment Plan violates ERISA because (1) the fractional rule cannot be used when a plan has frozen accruals and (2) the formula violates ERISA's prohibition on age discrimination.  *See* Pl.'s Mot. at 18-20.  The Court does not reach these arguments because they are not claims that have been asserted in the Amended Complaint and they are immaterial to resolution of Count I.

does not use equivalency methods to count hours of service under the Plan and did not do so in

Plaintiff's case" and "[i]f Hilton used an equivalency method, it would have to say so in the

Plan").

      The record is replete with uncontested evidence that Hilton failed to properly implement

the 1,000 hours standard for calculating employees' vesting credit, often because it lacked the

necessary records to do so.  *See, e.g.*, Pl.'s Ex. 27 at 1 (5/6/02 Email from V. Stoico to G.

Trotter) (Hilton's benefits administrator indicating that "[w]e have not previously given vesting

[credit] prior to benefit service"); Pl.'s Ex. 27 at 4-5 (5/9/02 Email Exchange between V. Stoicof

and G. Trotter) (Hilton's benefits administrator indicating that "[f]or as far back as we can go, no

one kept track of the non-participating properties' employees (hours/earnings) to give them

vesting"); Pl.'s Ex. 39 (Undated Document titled "proposed hours counting amendment to Hilton

Hotels Retirement Plan") ("[t]he pending *Kifafi v. Hilton Hotels Retirement Plan* litigation

includes claims that the Plan failed to track and count all hours of service in determining vesting

and eligibility for early retirement benefits as required by ERISA.  We are uncertain whether

these claims have merit because we have to date been unable to locate adequate historical records

to verify the claims").  In response to the Court's questions during the June 24, 2003 Status

Hearing, Hilton's counsel even conceded that the Plan could not have fully complied with the

1,000 standard because Hilton lacked the requisite records.  *See* Defs.' Ex. 27 at Tr. 23:10 -

24:24 (6/24/03 Status Hearing Transcript) ("[w]e would say [the Plan] was being implemented in

many situations . . . [but] [t]here were situations where the records weren't there and, therefore, if

that is not full implementation, I would agree with that").

      In the context of this uncontested record evidence, it is apparent that Hilton did, in fact,

violate the terms of the Plan's vesting provisions with respect to each of the four certified sub-classes:

> (1) Plaintiff's claim that Defendants failed to credit employees with years of union service for vesting purposes;

> (2) Plaintiff's claim that Defendants improperly used a 1,000 hours service standard rather than an 870 hour service standard;

> (3) Plaintiff's claim that Defendants failed to credit leaves of absence; and

> (4) Plaintiff's claim that Defendants failed to count the year in which employees became participants in the retirement plan for vesting purposes.

*Kifafi v. Hilton Hotel Ret. Plan*, 228 F.R.D. 382, 386-89 (D.D.C. 2005).

Under the terms of the Plan, Hilton was required to credit employees' union service for purposes of vesting. *See* Pl.'s Ex. 1 § 1.2 (Hilton Hotels Retirement Plan, version dated March 30, 1995) (defining "Years of Benefit Service"). The evidence in the record indicates that Hilton did not credit these hours for purposes of vesting where, for example, an employee worked in a union position prior to working in a non-union position (as was the case with Kifafi). *See, e.g.*, Pl.'s Ex. 27 at 1 (5/6/02 Email from V. Stoico to G. Trotter) ("[w]e have not previously given vesting prior to benefit service").[17] Accordingly, the Court finds that Hilton failed to properly credit union service for vesting purposes.[18] *See* Pl.'s Mot. at 38-40.

Similarly, application of the 1,000 hours standard required Hilton to credit employees'

---

[17] Hilton argues that it has mooted any violation related to this claim (and the other vesting claims) through subsequent but retroactive Plan amendments. *See* Defs.' Opp'n at 46-49. The Court shall address Hilton's mootness arguments below.

[18] Kifafi seeks to expand this claim beyond union service to include all "non-participating service." *See* Pl.'s Reply at 38-43. Kifafi never moved to expand the scope of this sub-class and the Court never certified a "non-participating service" class. The Court declines to revisit the scope of this sub-class at this late date.

hours of service using the records in its possession, "provided that they accurately reflect the actual number of hours of service with which an employee is required to be credited . . . ." 29 C.F.R. § 2530.200b-3(a).  Employers cannot rely on records that do not allow for this calculation, and must "either develop and maintain adequate records or use a permitted "equivalenc[y]," provided that it credits "no less than the actual number of hours of service required be credited under

§ 2530.200b-2 to each employee in a computation period." *Id*.  The evidence in the record indisputably supports Kifafi's argument that Hilton failed to maintain the records necessary to implement the 1,000 hours standard.  *See, e.g.*, Pl.'s Ex. 39 (Undated Document titled "proposed hours counting amendment to Hilton Hotels Retirement Plan") ("[t]he pending *Kifafi v. Hilton Hotels Retirement Plan* litigation includes claims that the Plan failed to track and count all hours of service in determining vesting and eligibility for early retirement benefits as required by ERISA.  We are uncertain whether these claims have merit because we have to date been unable to locate adequate historical records to verify the claims").  Because application of the 1,000 hours standard is inappropriate where, as here, an employer fails to maintain the records necessary to properly credit employees with all of their service hours, the Court finds that Hilton failed to properly apply the 1,000 hours standard for vesting purposes.

The analysis with respect to leaves of absence is slightly more nuanced because the parties disagree as to what Hilton's obligations were under the Plan.  In particular, from 1977 to the end of 1994, the Plan contained a specific leave of absence provision stating that "[a] period of leave of absence or temporary layoff will be included in determining a participant's credited service."  Pl.'s Ex. 38 § 3.2(b) (Hilton Hotels Retirement Plan, version dated Sept. 23, 1991).

Based on this provision, Kifafi argues that he and all others who are similarly situated should have received credit for their leaves of absence during that period.  *See* Pl.'s Mot. at 41.

In contrast, Hilton argues that this provision does not require a participant to receive credit for years of vesting service based on their leaves of absence, but rather, that "any service credited to an employee during a leave of absence *will be added to service credited for periods of active employment* in determining whether the employee has earned a year of vesting service in that Plan year."  Defs.' Opp'n at 48.  In other words, Hilton would re-write the Plan provision as follows, with its proposed conditions in italics:

> [a] period of leave of absence or temporary layoff will be included in determining a participant's credited service, *provided the participant has a period of active employment as to which the leave of absence may be added for purposes of calculating a year of vesting service in that Plan year.*

The Plan language (or rather the absence of Plan language) simply cannot support Hilton's interpretation.  The text of the provision itself nowhere admits of the limitations advanced by Hilton, and the Plan's definition of "leave of absence" does not distinguish between absences taken in Plan years where an employee otherwise has active employment and those where the employee does not.  *See* Pl.'s Ex. 38 § 3.8 (Hilton Hotels Retirement Plan, version dated Sept. 23, 1991) (defining "leave of absence" as "an absence from active employment with an employer").  Moreover, such a reading of the Plan would conflict with how "the great majority" of pension plans operate.  *Holt*, 811 F.2d at 1537 ("[o]nce an employee participates in a pension plan, all of his or her years of service, whether completed before or after participation begins, count statutorily toward the ten years of vesting credit").

Attempting to bolster its interpretation, Hilton argues that the "Pension Committee's

interpretation of a disputed Plan provision should be upheld unless clearly unreasonable," relying

on the Supreme Court's decision in *Firestone Tire & Rubber v. Bruch*, 489 U.S. 101, 112-13

(1989).  This argument does not add anything to Hilton's position because there is nothing in the

record to suggest that Hilton's interpretation was the product of the Pension Committee's

consideration – which even Hilton acknowledges.  *See* Defs.' Opp'n at 49 n.33 ("[t]o the extent

that the Court believes that the Pension Committee failed to address this issue, it should remand

the plaintiff's claim to allow it to interpret the disputed provisions").[19]  Accordingly, because the

Court finds that Hilton improperly limited the scope of the leave of absence provision, it also

finds that Hilton violated the Plan by failing to properly credit employees' leaves of absence for

purposes of vesting.[20]

Finally, the fourth sub-class certified by the Court involves employees' first years of Plan

participation.  Kifafi claims that, between 1977 and 1994, Hilton failed to credit employees with

a year of vesting service for their first years of participation.  Pl.'s Mot. at 41-42.  The relevant

Plan provision states that "a participant shall be entitled to a year of credited service for the plan

year in which he becomes a participant in the plan."  Pl.'s Ex. 38 § 3.2(b) (Hilton Hotels

---

[19] The Court notes that the deference described in the Supreme Court's *Firestone* decision is owed where "the plan itself gives the administrator discretionary authority," *Varity Corp. v. Howe*, 516 U.S. 489, 514 (1996), and not simply because the pension committee administers the plan, as Hilton suggests.

[20] Hilton asserts that Kifafi has made an "additional claim that Hilton retroactively eliminated the 'leave of absence' rule in the 1987 Restatement of the Plan." Defs.' Opp'n (citing Pl.'s Mot. at 41).  The Court does not read Kifafi's Motion as having raised this claim, and Kifafi does not appear to address it in his Reply.  Nonetheless, the Court would note that employers are generally free to amend their plans at any time, *Curtiss-Wright Corp.,* 514 U.S. at 78, but they may not retroactively eliminate the vesting credit an employee has already accrued, *see* 29 U.S.C. § 1053(c)(1); 26 C.F.R. 1.411(a)-8(c)(1).

Retirement Plan, version dated Sept. 23, 1991).  Hilton does not dispute that this provision

should have been applied to Kifafi and other members of the sub-class, but argues that Kifafi's

argument "is devoid of factual support."  Defs.' Opp'n at 50.

The Court is not persuaded by Hilton's argument.  As Hilton acknowledges, application

of the "first year of participation" provision is based on a fact intensive inquiry:

> [a]n employee becomes a participant only upon meeting the plan's minimum
> eligibility requirements, which may take several years of employment, and in fact
> some employees never become participants.  Thus, determining when an
> employee became a participant requires examining the employee's individual
> record to determine when those requirements were satisfied.

*Id.*  To apply this provision correctly, Hilton must determine when an employee has met

minimum eligibility requirements, which in turn requires Hilton to properly apply the 1,000

hours standard:

> each . . . employee of an employer will become a participant in the plan on the
> date he meets all of the following requirements:
>
>         * * *
>
> (b)    He has completed 1,000 hours of service during the 12-month
>         period commencing on his date of hire or, if he has not completed
>         1,000 hours of service during the 12-month period, he has
>         completed 1,000 hours of service during a plan year beginning
>         after his date of hire

Defs.' Ex., 25 § 2.1 (Hilton Hotels Retirement Plan, version dated Sept. 23, 1991).  Thus,

Hilton's application of this first year provision is inextricably intertwined with Hilton's

violations of the 1,000 hours standard that the Court has described above.  Because the Court has

already found that Hilton did not comply with the Plan's 1,000 hours standard, the Court finds

that Hilton likewise failed to comply with this provision.

41

Having made the determination that Hilton violated the Plan's vesting provisions by failing to properly calculate the years of service related to each of the four certified sub-classes, the Court must now consider Hilton's principal argument on summary judgment that its subsequent amendments to the Plan have mooted these vesting violations. *See* Defs.' Opp'n at 39-51. As discussed above, Hilton amended the Plan on December 10, 2002. Pl.'s Ex. 41 at 1-2 (Amendment 2002-4). Pursuant to the Plan's amended service counting methods, when a Plan participant performs service that is credited under the Plan both for purposes of vesting and benefit accruals, the participant receives a year of vesting service for each Plan year in which the participant completes at least 870 hours of service (750 hours for salaried employees). *Id.* When a participant performs service that is credited for purposes of vesting only–such as union service–the participant earns a year of vesting service for each 365-day period of service (including partial years) regardless of the hours completed (an "elapsed time method"). *Id.* at 3-4. Accordingly, the post-amendment Plan "applies an 870/750 hour standard only to those periods for which the database maintains complete records of hours worked, but uses the elapsed time method for all other periods of employment that are credited for vesting purposes." Defs.' Opp'n at 40.

Hilton emphasizes that its new service counting methods are permitted by applicable regulations:

> [a]n ERISA plan may use the 870/750 hour standard where it maintains records of actual hours worked, but not all hours for which employees are paid (*e.g.*, paid vacation). 29 C.F.R. § 2530.200b.3(d). A plan may use the elapsed time method even if it maintains no records of hours by simply calculating vesting service based on the time elapsed between the first and last date of service.

Defs.' Opp'n at 39 (citing 29 C.F.R. § 1.410(a)-7(a)(1)(i)). Hilton then proceeds to argue, as to

each of the vesting claims in Count II of the Amended Complaint, that Kifafi has failed to advance sufficient evidence demonstrating that employees other than Kifafi have not received all of the vesting credit to which they are entitled pursuant to Hilton's new service counting methods.  *See, e.g.*, *id.* at 45 ("[Kifafi's] evidence that other class members have not received proper credit for their union service is . . . unavailing") (internal citation omitted); *id.* at 47 ("[Kifafi's] fanciful estimates of unidentified, unexplained vesting violations based on inadmissible evidence cannot establish a genuine issue of material fact regarding this claim [concerning the 1,000 hours standard]"); *id.* at 48 ("[t]here is also no evidence that Hilton failed to apply the Plan's leave of absence rule to any other employee"); *id.* at 50 ("there is no evidence that Hilton failed to apply the first year of participation rule to any other employee").

Contrary to Hilton's arguments, Kifafi does not bear an evidentiary burden to show that the vesting claims are not moot.  Rather, as a defendant alleging that its voluntary conduct has mooted the claims raised against it, *Hilton* has the heavy burden of proving that these vesting claims have become moot.  *See Friends of the Earth, Inc.*, 528 U.S. at 173-74 (2000) ("a defendant claiming that its voluntary compliance moots a case bears [a] formidible burden . . ."). Accordingly, Hilton must show that:  (1) "there is no reasonable expectation that the alleged violation will recur;" and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *County of Los Angeles*, 440 U.S. at 631.  The Court finds that Hilton has not met its burden with respect to either showing.

First, Hilton has not demonstrated that these vesting violations are moot because it has not conceded that it previously violated the Plan's vesting provisions.  *See* Defs.' Opp'n at 38 ("[Kifafi] has proffered no credible evidence that any of the four alleged service-counting

violations has occurred . . . there is simply no credible evidence that the service counting violations he alleges exist").  Throughout this litigation, Hilton has repeatedly amended the Plan to moot Kifafi's claims rather than allow adjudication of the Plan's provisions and Hilton's implementation of the same.  There is no reason offered by Hilton as to why it could not amend the Plan in the future in ways that could produce similar vesting violations.  Under such circumstances, the vesting violations cannot be considered moot.  *See Donovan*, 716 F.2d at 1461-62 (defendants' "bare assurances" that they did not intend to serve as ERISA fiduciaries in the future were "insufficient to meet their burden of persuasion" "in the face of [their] continuing insistence that their discontinued activities were legal").

Equally significant, Hilton has not shown that all of the class members have received complete relief as a result of the Plan amendments.  This is so because ERISA prohibits plan amendments that retroactively eliminate the vesting credit an employee has already accrued.  *See* 29 U.S.C. § 1053(c)(1); 26 C.F.R. 1.411(a)-8(c)(1).  Kifafi argues that the retroactive application of the Plan amendments will deprive some employees of the vesting credit to which they would otherwise have been entitled:

> [r]etroactive application of the elapsed time alternative can cause employees to lose years of service which they would have earned under an hours standard, or an equivalency based on hours.  For example, employees can earn a critical year of service for vesting by accumulating 870 hours of service before the end of a calendar year, whereas the elapsed time method operates in 'whole years' and therefore may require employment that spans over a longer period.

Pl.'s Stmt. ¶ 149 (citing 26 C.F.R. § 1.410(a)-7(d)(1)(iv)).[21]  Hilton readily concedes that, as a

---

[21] Kifafi also argues that Hilton's failure to maintain proper records prevents them from properly implementing the elapsed time method, particularly 26 C.F.R. 1.410(a)-7(a)(3) (relating to "severance from service" and "service spanning").  *See* Pl.'s Mot. at 49-50.  Kifafi provides no further description of this issue and fails to explain how the absence of records relates to this

result of its Plan amendments, some employees may have lost vesting credit:  "[it is] mathematically possible for an employee to have fewer years of vesting service under the elapsed time method than under an hours standard."  Defs.' Opp'n at 40-41.  Hilton nevertheless argues that this reduction of some employees' vesting credit would violate ERISA "only if it also reduced the participant's years of vesting service below the number needed to become vested under the Plan."  *Id.*  Hilton also argues that its amendments are "far more likely to increase the years of vesting service credited to an employee" than the previous calculation methods.  *Id.* at 41 (emphasis in original omitted).

The Court is not persuaded by Hilton's arguments.  In order to demonstrate mootness, Hilton would have to show that members of the vesting sub-classes have not had their years of service reduced by application of the amendments – which Hilton has not shown by arguing that it is "far more likely" that some may have received more credit.[22]  At bottom, there is nothing in the record demonstrating that complete relief has been afforded the sub-classes because, as even Hilton acknowledges, some members of the sub-classes may have lost vesting credit based on

_____

regulation.  In any event, Hilton explains that the dates of termination and rehire is all it needs to implement the provision, both of which are recorded in its database.  *See* Defs.' Opp'n at 40 n.27.

[22] Bolstering Kifafi's position that some employees have not received complete relief, the Court notes that Kifafi identified individuals whose union service had not been credited in violation of the Plan's vesting provisions in a declaration produced in 2002.  *See* Pl.'s Reply at 35.  Only after Kifafi identified these individuals does it appear that Hilton corrected their records.  *Id.*  Moreover, at the time of the parties' briefing, Hilton admitted that it had not even fully implemented the amendments to the Plan.  *See, e.g.*, Defs.' Stmt. ¶¶ 24, 22 ("[in addition to] a group of 7,326 former employees (or beneficiaries) for whom further investigation is needed to determine if they are entitled to an increase in payment due to the 1999 Amendment," an additional 230 records "remain for which further review is needed to determine whether these participants have been provided notice [of their vesting eligibility]").

application of the Plan amendments.[23]

One final matter remains.  Kifafi asserted the vesting violation claims in Count II both individually and as a representative for the class.  Unlike the Court's resolution of the other class members' claims above, the Court finds that there is clear and undisputed evidence that Kifafi's individual vesting claims have become moot.

With respect to Kifafi's union service, Kifafi argues that "he should have received years of vesting credit for the period after a 1983 injury during which he was on 'leave' until he was able to resume active work in a non-union job in July 1985."  Pl.'s Mot. at 41.  It is undisputed that Hilton has now credited Kifafi with 2.3 years of vesting service for that time period.[24]  *See* Defs.' Stmt. ¶ 48; Pl.'s Resp. Stmt. ¶ 48.  Because Kifafi also had his leave of absence during this period, Kifafi has now also received credit for years of service during his leave of absence. *See* Defs.' Stmt. ¶ 54; Pl.'s Resp. Stmt. ¶ 54.  With respect to the 870 hours standard, Kifafi concedes that his individual claim has now been redressed by Hilton.  *See* Defs.' Stmt. ¶ 51 ("Plaintiff has received a year of vesting service for 1985, a year in which he completed only 962 hours of service"); Pl.'s Resp. Stmt. ¶ 51 ("Admitted").  Finally, with respect to Kifafi's first year

---

[23] Kifafi's Motion raises numerous other vesting-related claims, including claims related to Hilton's implementation of the Plan amendments, none of which were included in the Amended Complaint.  *See, e.g.*, Pl.'s Mot. at 42-52 (relating to pre-age 21 service, early retirement vesting requirements, and other vesting-related issues).  The Court again rejects Kifafi's attempt to expand the scope of the Amended Complaint to encompass claims that were not included therein.

[24] While Kifafi does not dispute that Hilton has now credited him with years of service during that period, he argues that he should have received 3 years instead of 2.3 years of credit if Hilton had applied the elapsed time method correctly.  *See* Pl.'s Resp. Stmt. ¶¶ 34, 48.  Kifafi provides no further explanation to support his argument, and he fails to make any showing that the difference between the 2.3 and 3 years of service would be material in any way.

of participation in the Plan in 1985, Hilton has credited Kifafi with a year of service for that year. *See* Defs.' Stmt. ¶ 59; Pl.'s Resp. Stmt. ¶ 59.

In accordance with the foregoing, the Court shall grant-in-part Kifafi's Motion for Summary Judgment on Count II as to the vesting claims of the four certified sub-classes, but deny-in-part Kifafi's Motion as to his individual vesting claims.  The Court shall also grant-in-part Hilton's Motion for Summary Judgment as to Kifafi's individual vesting claims, and deny-in-part Hilton's Motion as to the vesting claims of the four certified sub-classes.

C.      *Statute of Limitations for Class Claims*

On May 11, 1999, the Court certified the benefit-accrual class in connection with Count I of the Amended Complaint, subject to a possible amendment to conform the class in connection with the statute of limitations, if necessary.  *See Kifafi v. Hilton Hotels Ret. Plan*, 189 F.R.D. 174, 176-78 (D.D.C. 1999).  Although Hilton raised a statute of limitations argument in its Opposition to Kifafi's Motion for Class Certification, the Court held that "resolution of the statute of limitation issue at the class certification stage would impermissibly intrude upon the merits of [Kifafi's] claim[s]," and therefore reserved resolution of the issue until the parties had the opportunity to brief it in the context of their dispositive motions.  *Id.* at 178.

Renewing the same statute of limitations argument, Hilton argues that the benefit-accrual class definition previously adopted by the Court "must be adjusted to exclude time-barred claims of absent class members."  Defs.' Mot. at 36.  Hilton makes a similar argument in a footnote with respect to the vesting sub-classes.  *Id.* at 39 n.25.  The Court finds that Hilton's statute of limitations arguments lack merit.

Kifafi's class claims are brought under Section 502 of ERISA, 29 U.S.C. § 1132, which

47

does not contain a limitations period.  Where, as here, Congress fails to provide a statute of limitations, a court must borrow the most analogous limitations period from the state in which the court sits.  *Connors v. Hallmark & Son Coal Co.*, 935 F.2d 336, 341 (D.C. Cir. 1991).  Because employee benefit plans are contracts, courts in this jurisdiction have borrowed the statute of limitations provision for breach of contract actions in the District of Columbia.  *Id.* That provision–Section 12-301(7) of the District of Columbia Code–contains a three-year limitations period.

In addition, the D.C. Circuit has instructed that courts should apply the "discovery" rule to determine when a cause of action accrues; thus, "a claim for relief does not accrue until the plaintiff discovers, or with due diligence should have discovered 'the injury that is the basis of the action.'"  *Id.* (quoting *N. Cal. Retail Clerks Unions & Food Employers Joint Pension Trust Fund v. Jumbo Markets, Inc.*, 906 F.2d 1371, 1372 (9th Cir. 1990)).  In most instances, therefore, a plaintiff's ERISA claim will not begin to accrue until "'there has been a repudiation by the fiduciary which is clear and made known to the beneficiaries.'"  *Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 134 (2d Cir. 2001) (quoting *Miles v. New York State Teamsters Conf. Pension Plan*, 698 F.2d 593, 598 (2d Cir. 1983) (emphasis in original omitted)).

For example, in *Connors v. Hallmark & Son Coal Co.*, certain coal companies were sued for their failure to report and pay pension fund contributions due under certain national industry wage agreements.  Although the district court had found those claims to be time-barred, the D.C. Circuit explained that the payment of the pension fund involved information that, "by its nature, [was] accessible in the first instance only to the mine operators" and that others were "dependent" on the defendants' "honesty and accuracy."  *Id.* at 342-43.  Despite numerous audits

48

of this information, the Court explained that the failure to report and pay pension funds was the

type of "hidden injury" for which the discovery rule was most appropriate, and that the plaintiffs'

claims "accrued only at the time when . . . [they became] aware of the defendants' alleged

inaccuracies." *Id.* at 343.

In this case, Hilton argues that the class definitions must be limited to bar the claims of

class members who "either (1) received a benefits statement prior to three years before the

commencement of this action on June 17, 1998, or (2) began receiving benefits prior to June 17,

1995." Defs.' Opp'n at 38. Hilton reasons that there was a "clear repudiation" at the time that

these class members began to receive notice of their benefits. *Id.*

Although Hilton has failed to proffer the benefits statements as exhibits, conspicuously

absent from Hilton's argument is any assertion that these statements provided class members

with notice of the information associated with Hilton's backloading of their benefit accruals or

violations of the Plan's vesting provisions. It would seem highly unlikely that such information

was conveyed, as Hilton has insisted prior to and during this litigation that the terms and

implementation of the Plan did not violate any ERISA provisions. *See* Pl.'s Reply at 27 ("[i]t is

difficult to find a 'clear repudiation' by a party who throughout the period before the suit was

filed, and even after it was filed, maintained that it complied with the backloading rules"). It is

also apparent that the mere receipt of benefits could not have conveyed such information.[25]

---

[25] Hilton cites several cases for the erroneous proposition that causes of action accrue
when a class member receives his or her benefits. *See* Defs.' Opp'n at 38 (citing *Carollo v.
Cement & Concrete Workers Pension Plan*, 964 F. Supp. 677, 689 (E.D.N.Y. 1997); *Laurenzano
v. Blue Cross & Blue Shield Ret. Income Trust*, 134 F. Supp. 2d 189, 208-210 (D. Mass. 2001)).
In fact, the district courts in these cases did *not* determine when the plaintiffs' causes of action
accrued because, even "assuming" they accrued when the plaintiffs received their benefits, the
plaintiffs' claims were untimely.

Absent any showing that class members received information putting them on notice of their claims, and any indication that Hilton made a "clear repudiation" with respect to those claims, the Court cannot find that the class members' claims are barred by the statute of limitations. *Compare Romero v. Allstate Corp.*, 404 F.3d 212, 223 (3d Cir. 2005) ("when an ERISA plan is amended but the fact that the amendment actually affects a particular employee or group of employees cannot be known until some later event, the cause of action of the employee will not accrue until such time as the employee knew or should have known that the amendment has brought about a clear repudiation of certain rights that the employee believed he or she had under the plan") *with Union Pac. R.R. Co. v. Beckham*, 138 F.3d 325, 331 (8th Cir. 1998) (finding that a claim accrued when the employer distributed a "fact sheet" explaining how an amendment would affect the accrual of pension benefits and providing specific examples demonstrating how service would be allocated when determining benefits, and where plaintiff read the fact sheet and believed the amendment was "unfair" and "improper" at the time of the amendment). Accordingly, the Court finds that modification of the class definitions to exclude claims based on the statute of limitations is unnecessary and inappropriate.[26]

---

[26] Hilton included a footnote in its Opposition suggesting that the class members' claims with respect to Hilton's vesting violations were not tolled between May 11, 1999 (when the Court initially declined to certify the vesting violation sub-classes) and March 30, 2005 (when the Court ultimately did so). *See* Defs.' Opp'n at 39 n.25. Beyond Hilton's failure to include any legal or factual support for this argument, the Court rejects it because, as indicated above, the Court advised the parties that it would subsequently reconsider class certification with respect to these violations if, after discovery, certification became appropriate. Tolling the statute of limitations for the claims of the putative class members under these circumstances serves the purposes of Federal Rule of Civil Procedure 23 (governing class actions) and encourages judicial economy by eliminating the need for the putative members of those sub-classes to file individual claims while the parties engaged in discovery and the Court subsequently considered certification.

D.      *Kifafi's Remaining Individual Claims (Counts III - VI)*

Kifafi's four remaining individual claims received cursory attention in the parties'

briefing, and none requires extended discussion here.

First, Kifafi claims that Hilton violated ERISA by failing to maintain information

associated with his spouse.  *See* Pl.'s Mot. at 56-58.  Pursuant to Section 209 of ERISA, "every

employer shall . . . maintain records with respect to each of his employees sufficient to determine

the benefits due or which may become due to such employees."  29 U.S.C. § 1059.  According to

Kifafi, Hilton violated this provision because he has been married for over thirty years and has

indicated as such on "numerous employment forms," Pl.'s Mot. at 56-57, but the records in

Hilton's pension database did not reflect that he was married.  Even assuming this claim were

factually cognizable,[27] it would fail because Section 209 of ERISA does not provide employees

with a private right of action.  *See* 29 U.S.C. § 1059(b) (requiring employers who fail to comply

with this requirement to "pay to the Secretary a civil penalty of $10 for each employee with

respect to whom such failure occurs").  While the Court is certainly authorized to award

"appropriate equitable relief" for ERISA violations, Kifafi has not demonstrated that any

equitable relief is appropriate given that he has not shown any harm associated with a failure to

maintain data concerning his spouse.[28]  Accordingly, the Court shall deny Kifafi's Motion for

Summary Judgment as to Count III and grant Hilton's Motion for Summary Judgment as to

---

[27] The regulation requires the "employer" to maintain such records, and Kifafi is basing this claim on the absence of such information in Hilton's pension database, without any showing that Hilton otherwise failed to maintain the information.

[28] Kifafi's Reply also argues that the names of spouses for the majority of Plan participants are missing in Hilton's pension database.  The Court rejects Kifafi's attempt to convert this individual claim into a class claim as to which no class was ever certified.

Count III.

Kifafi's next claim fails for the same reason.  Kifafi argues that Hilton failed to provide him with an individual benefit statement upon termination as required by ERISA Sections 105(c) and 209(a)(1), 29 U.S.C. §§1025(c), 1059(a)(1).  It is undisputed that Kifafi has now received an individual benefit statement.  Defs.' Opp'n at 58; Pl.'s Reply at 55.  In addition to the fact that Section 209 does not create a private cause of action, Hilton argues that any further equitable relief would be inappropriate because Kifafi has now received all the relief to which he is entitled.  *See* Defs.' Opp'n at 58.  The Court agrees.  *See Pierce v. Sec. Trust Life Ins. Co.*, 979 F.2d 23, 30 (4th Cir. 1992) ("case law establishes that a plan participant 'must show reliance and prejudice in order to recover for an employer's failure to comply with ERISA's statutory requirements") (quoting *Govoni v. Bricklayers, Masons & Plasterers Int'l Union of Am., Local No. 5 Pension Fund*, 732 F.2d 250, 252 (1st Cir. 1984)); *Colin v. Marconi Commerce Sys. Employees' Ret. Plan*, 335 F. Supp. 2d 590, 605 (M.D.N.C. 2004) ("[b]eneficiaries cannot recover on claims under ERISA's notice provisions absent a showing that they were harmed as a result of the notice failure") (citing *Ellis v. Metro. Life Ins. Co.*, 126 F.3d 228, 238 (4th Cir. 1997)).  Kifafi also failed to respond to this argument, and is therefore deemed to have conceded the point.  *See* Pl.'s Reply at 55 (seeking to expand this claim to include "thousands of participants" but failing to respond to Hilton's argument that Kifafi is no longer entitled to any relief on this claim because he has now received his individual benefits statement).  Accordingly, the Court shall deny Kifafi's Motion for Summary Judgment as to Count IV and grant Hilton's Motion for Summary Judgment as to Count IV.

Kifafi's third remaining individual claim is based on Hilton's failure to timely send him a

copy of the Plan document.  Pursuant to Section 502(c)(1) of ERISA,

> Any administrator . . . who fails or refuses to comply with a request for any
> information which such administrator is required by this title to furnish to a
> participant or beneficiary . . . by mailing the material requested to the last known
> address of the requesting participant or beneficiary within 30 days after such
> request may in the court's discretion be personally liable to such participant or
> beneficiary in the amount of up to $100 a day from the date of such failure or
> refusal.

29 U.S.C. § 1132(c)(1).  In this case, Kifafi's counsel sent Hilton a request on August 7, 1997,

for the "complete Plan document."  Pl.'s Ex. 80 at 1 (8/7/97 Letter from S. Bruce to V. Stoicof).

Hilton apparently sent a copy of the Supplemental Plan Document to Kifafi's counsel by mistake.

*See* Defs.' Ex. 37 at 1 (notes of S. Baker).  Once Hilton was made aware of this mistake, it sent a

copy of the correct Plan document to Kifafi's counsel on November 7, 1997 (*i.e.*, 61 days late).

On this record, the Court declines to exercise its discretion to fine Hilton for this

approximate 61 day delay, which appears to have been the result of a mistake and not bad faith,

and which does not appear to have harmed Kifafi in any way.[29]  Although Plaintiff references an

investment of "time, effort and money to gain access" to the Plan document, Pl.'s Reply at 56,

the Court finds that any harm that arose as a result of Kifafi's counsel having to ask for the Plan

document a second time is a *de minimis* harm that does not warrant a fine on this record.

Accordingly, the Court shall deny Kifafi's Motion for Summary Judgment as to Count V and

grant Hilton's Motion for Summary Judgment as to Count V.

Kifafi's final claim is that Hilton breached its fiduciary duties based on the violations

---

[29] While there is no requirement that the Court make a finding of bad faith or prejudice to
fine a defendant under this ERISA provision, courts have often considered such factors.  *See,
e.g.*, *Gorini v. AMP Inc.*, 94 Fed. App'x. 913, 919-20 (3d Cir. 2004) (explaining that courts may
consider "(1) bad faith or intentional conduct of the plan administrator, (2) length of delay, (3)
number of requests made, (4) documents withheld, and (5) prejudice to the participant").

described above.  This claim must be dismissed because a plan participant cannot proceed with a breach of fiduciary duty claim under Section 502(a)(3) when relief is available under other remedial sections of ERISA.  *See Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) ("where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be appropriate"); *Ogden v. Blue Bell Creameries U.S.A., Inc.*, 348 F.3d 1284, 1287 (11th Cir. 2003) ("an ERISA plaintiff who has an adequate remedy under Section 502(a)(1)(B) cannot alternatively plead and proceed under Section 502(a)(3) . . . [and] an ERISA plaintiff that *had* an adequate remedy under Section 502(a)(1)(B) cannot assert a Section 502(a)(3) claim after his Section 502(a)(1)(B) claim has been lost"); *Mauser v. Raytheon Co. Pension Plan for Salaried Employees*, 239 F.3d 51, 58 (1st Cir. 2001) ("[t]he Supreme Court has . . . limited the applicability of an individual claim for breach of fiduciary duty to those participants who are unable to avail themselves of other remedies").  Although Hilton raised this argument in its Opposition, *see* Defs.' Opp'n at 53-55, Kifafi failed to respond to–and therefore conceded–the point.  Accordingly, the Court shall deny Kifafi's Motion for Summary Judgment as to Count VI and grant Hilton's Motion for Summary Judgment as to Count VI.

     *E.*     *Remedies*

     Kafafi's Amended Complaint seeks declaratory and equitable relief.  *See* Am. Compl. at 18-20.  The parties have expressed divergent views as to what equitable relief the Court should order.  Kifafi proposes a specific change to the benefit accrual formula described by his expert witness, as well as the appointment of an outside party administrator to perform an audit of Hilton's records and oversee implementation of the equitable relief to be ordered by the Court.

*See* Pl.'s Mot. at 29-32, 54-56.  In contrast, Hilton proposes that the "proper remedy" for backloading is to allow the plan sponsors to re-draft the benefits formula, Defs.' Opp'n at 34, and Hilton is silent with respect to a proposed remedy for its vesting violations.

On the present record, the Court is reluctant to order particular equitable relief without the benefit of a full briefing by the parties that takes into account the Court's legal rulings set forth above.  Accordingly, the Court shall issue instructions in its Order accompanying this Memorandum Opinion that sets a schedule for further proceedings in this case.

       *F.*      *Defendants' Motion to Strike and Plaintiff's Motion to File a Sur-Reply*

As discussed above, Hilton filed a [183] Motion to Strike certain declarations submitted by Kifafi in support of his Motion for Summary Judgment, as to which Kifafi subsequently filed a [194] Motion for Leave to file a Sur-Reply.  The Court decided to hold the Motion to Strike and Motion to file a Sur-Reply in abeyance, considering them within the larger context of the parties' Cross-Motions for Summary Judgment.  Having now done so, the Court shall deny Hilton's Motion to Strike because the Court has found the declarations immaterial to its resolution of the parties' arguments on summary judgment, and has therefore not relied on them. Because the Court finds that the briefing related to the Motion to Strike is sufficient for the Court to resolve Defendants' Motion to Strike, the Court shall also deny Kifafi's Motion to file a Sur-Reply.

## IV.  SUMMARY OF CONCLUSIONS

For the reasons set forth above, the Court finds that Hilton violated ERISA's anti-backloading provision, 29 U.S.C. § 1054(b)(1)(C), and that Hilton's subsequent amendments to the Plan have not mooted this violation.  The Court finds that Hilton violated the Plan's vesting

provisions with respect to union service, leaves of absences, first years of participation, and the 1,000 hours standard, and that Hilton's subsequent amendments to the Plan have *not* mooted these violations as to the four sub-classes but *have* mooted the violations as to Kifafi individually.  The Court finds that modification of the class definitions to exclude claims based on the statute of limitations is unnecessary and inappropriate.  Finally, the Court finds that Kifafi is not entitled to relief on his claims that Hilton (1) failed to maintain information associated with Kifafi's spouse, (2) failed to provide Kifafi with an individual benefit statement upon termination, (3) failed to timely send Kifafi a copy of the Plan document, and (4) breached its fiduciary duties.

Accordingly, the Court shall GRANT-IN-PART Kifafi's [177] Motion for Summary Judgment as to Count I and the class claims as to Count II, and DENY-IN-PART Kifafi's Motion for Summary Judgment as to his individual claims in Count II, and Counts III, IV, V, and VI. The Court shall GRANT-IN-PART Hilton's [180] Cross-Motion for Summary Judgment as to Kifafi's individual claims in Count II, and Counts III, IV, V, and VI, and DENY-IN-PART Hilton's Cross-Motion for Summary Judgment as to Count I and the class claims in Count II. The Court shall also DENY Hilton's [183] Motion to Strike, and DENY [194] Kifafi's Motion for Leave to file a Sur-Reply.  An appropriate Order accompanies this Memorandum Opinion.

Date:   May 15, 2009

    _/s/_____
    **COLLEEN KOLLAR-KOTELLY**
    United States District Judge