# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMAL J. KIFAFI, individually and on
behalf of all others similarly situated,

      Plaintiff,

      v.

HILTON HOTELS RETIREMENT PLAN,
*et al.*,

      Defendants.

Civil Action No. 98-1517  (CKK)

## MEMORANDUM OPINION
(September 7, 2010)

      This action is brought by Plaintiff Jamal J. Kifafi, on behalf of himself and similarly

situated individuals, to recover for violations of the Employee Retirement Income Security Act of

1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*, in the Hilton Hotels Retirement Plan

(the "Plan"). Defendants are the Plan, the individual members of the Committee of the Plan, the

Hilton Hotels Corporation, and individual Hilton officers or directors (collectively, "Defendants"

or "Hilton"). On May 15, 2009, this Court granted-in-part Plaintiff's motion for summary

judgment, finding that Defendants had violated ERISA's anti-backloading provision, 29 U.S.C.

§ 1054(b)(1)(C), and had violated the Plan's vesting provisions with respect to the rights of four

certified subclasses. *See Kifafi v. Hilton Hotels Retirement Plan*, 616 F. Supp. 2d 7 (D.D.C.

2009) (*Kifafi III*). Having found that Defendants violated ERISA, the Court requested that the

parties submit briefs regarding the equitable relief appropriate to remedy the violations. Plaintiff

filed a [211] Brief on Equitable Relief, to which Defendants filed a [219] Response Brief on

Equitable Relief, and Plaintiff filed a [223] Reply Brief on Equitable Relief. Defendants have

filed a [224] Motion for Leave to File Sur-Reply on Equitable Relief and for Expert Discovery in Advance of Remedies Hearing, to which Plaintiff has filed an Opposition, and Defendants have filed a Reply.

The parties' briefs on equitable relief reflect a number of significant disagreements about the proper scope of equitable relief that should be ordered by the Court. The parties have filed competing proposals to remedy the benefit accrual and vesting violations previously found by the Court, and the parties also dispute how each party's proposal should be applied to the certified classes. This Memorandum Opinion sets forth the Court's ruling as to a number of the issues disputed by the parties. However, a final order of equitable relief cannot be issued until the parties further confer about the proper means of implementing this Court's rulings and a hearing is held to resolve certain disputed factual issues.

As explained below, the Court shall generally endorse Defendants' proposal for remedying the backloading violations, but the Court rejects Defendants' contention that relief should be limited to participants who separated from service after 1987. With respect to Defendants' failure to credit union service for purposes of vesting, the Court shall order Defendants to credit union but not other non-participating service; the Court shall require Hilton to search its corporate records for information relating to class members' union service and permit class members to submit claims based on union service not reflected in records. With respect to Defendants' violation of the 1000 hours of service standard, the Court shall adopt the parties' proposal to apply the 870/750 hours worked standard with hours equivalencies but reject Plaintiff's proposal to apply equivalencies to periods of time for which there are no records of hours of service. With respect to Defendants' failure to credit the first year of participation, the

Court shall reject Plaintiff's proposal to credit participants with a year of service for the first year in which there is any record of participating service. With respect to Defendants' failure to credit leaves of absence, the Court shall not order additional discovery of corporate records as requested by Plaintiff. The Court declines to order additional discovery of Hilton's records except with respect to union service, as mentioned above. The Court also does not see the need to appoint a class action administrator to oversee the implementation of final relief, but the parties should develop a more limited mechanism for monitoring Hilton's implementation of remedies. The Court shall not approve lump sum payments in lieu of future benefits owed to participants, nor shall it include a *cy pres* provision in its final order. Other disputed issues of fact, such as the alleged application of unlawful equivalencies or elapsed time methods or discrepancies between versions of the Plan's database, shall be decided at a final remedies hearing.

## I. BACKGROUND

The factual and procedural history of this case was thoroughly discussed by the Court in its Memorandum Opinion issued on May 15, 2009. *See* 616 F. Supp. 2d at 10-21. The Court incorporates that discussion herein and assumes familiarity with that opinion. Nevertheless, the Court shall briefly summarize its prior ruling and the relevant background facts.

The Hilton Hotels Retirement Plan (the "Plan") is a defined benefit pension plan subject to ERISA. Benefits under the Plan accrue according to a formula based on an employee's average compensation and years of service, with an offset for the employee's Social Security benefits. *See* 616 F. Supp. 2d at 13-14. ERISA prevents employers from "backloading" benefits, i.e., using a benefit accrual formula that postpones the bulk of an employee's accrual to his later

years of service. *Id.* at 11. In order to prevent backloading, ERISA requires defined benefit plans to satisfy one of three alternative minimum accrual rules, known as the "3% rule," the "133 1/3% rule," and the "fractional rule." *Id.* at 11-12; *see* 29 U.S.C. § 1054(b)(1). Beginning in 1976 and continuing until 1999, the Plan contained an accrual schedule that was supposed to comply with ERISA's "133 1/3% rule." 616 F. Supp. 2d at 14. In 1999, after this lawsuit was filed, Hilton amended the Plan's benefit accrual formula seeking to comply with the fractional rule. *Id.* at 16. The 1999 amendment (Amendment 1999-1) also changed two unrelated aspects of the Plan that lowered benefits for participants. *Id.* Following briefing on summary judgment, this Court held that the pre-amendment Plan failed to comply with *any* of the three minimum accrual rules and that the pre-amendment Plan was required to comply with the 133 1/3% rule. *Id.* at 24. The Court concluded that "the Plan's participants are entitled to receive the benefits they would have accrued had the Plan complied with the 133 1/3% rule." *Id.* at 24. The Court also concluded that the 1999 amendment to the Plan did not moot the ERISA violation found by the Court. *Id.* at 25-28. The Court's ruling applies to a certified class of current and former Hilton employees (the "benefit-accrual class").[1]

The Court also found that Defendants had violated ERISA with respect to the vesting of benefits under the Plan, i.e., the time of service required for an employee to obtain a right to his

---

[1] The benefit-accrual class is defined as follows:

all former and current employees of Hilton Hotels Corporation who were employed by Hilton Hotels Corporation after January 1, 1976 and have, or may obtain, a vested right to pension benefits from the Hilton Hotels Retirement Plan, and whose Hilton Hotels' pension benefits have been, or will be, reduced as a result of the Defendants' failure to accrue retirement benefits at the annual rates that ERISA requires.

*Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999) (*Kifafi I*).

or her accrued benefits.[2]  Employees who terminated after January 1, 1989 need five years of service to become vested; employees who terminated prior to that date needed ten years of service.  ERISA requires employers to count all of an employee's years of service for calculating his or her years toward vesting, even if they occur prior to participation in the retirement plan.  29 U.S.C. § 1053(b)(1); 616 F. Supp. 2d at 12.  ERISA generally requires an employee with 1000 hours of service during a twelve-month period to be credited with one year of service.  29 C.F.R. § 2530.200b-1.  In calculating the 1000 hours of service, the employer must count not only hours worked but also hours "during which no duties are performed . . . due to vacation, holiday, illness, incapacity . . . layoff, jury duty, military duty or leave of absence."  *Id.* § 2530.200b-2(a). If an employer's existing records do not allow it to properly calculate an employee's hours of service, the employer may "use a permitted equivalenc[y]."  *Id.* § 2530.200b-3(a).  One such equivalency focuses on "hours worked," in which an employee who works 870 hours is credited with 1000 hours of service.  *Id.* § 2530.200b-3(d).

Beginning in 1976 and continuing until the Plan was amended in December 2002, Hilton applied the 1000 hours standard for calculating employees' years of service.  616 F. Supp. 2d at 29.  By its terms, the Plan required all periods of employment between the date of hire and the date of termination to be taken into account, including leaves of absences and union service.  *Id.*

---

[2] As the Court previously explained, vesting and accrual are distinct but related concepts. 616 F. Supp. 2d at 10.  "Vesting" concerns when an employee has a right to pension, whereas "accrual" refers to the amount of benefits to which an employee is entitled.  *Id.* at 10-11. "Because 'vesting is tied to length of employment' and the accrual of benefits 'depends upon participation in the plan,' it is possible for employees to 'earn credit toward vesting without accumulating any pension benefits.'"  *Id.* at 11 (quoting *Holt v. Winpisinger*, 811 F.2d 1532, 1537 (D.C. Cir. 1987)).

at 14.  The Court found that Defendants had violated the Plan's vesting provisions with respect to four certified subclasses: (1) they failed to credit employees' union service for purposes of vesting[3]; (2) they failed to properly apply the 1000 hours standard because they kept inadequate records; (3) they failed to credit employees' leaves of absence; and (4) they failed to count the year in which employees became participants in the Plan for vesting purposes.  616 F. Supp. 2d at 29-32.  Accordingly, the Court ruled that the members of these vesting subclasses should be awarded the vesting credit to which they are entitled.

## II.  LEGAL STANDARD

Section 502(a)(1)(B) of ERISA allows a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  Pursuant to this provision, the Court may order that participants' benefits be recalculated consistent with the terms of the Plan.  *See Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006) ("The relief that the plaintiffs seek, recalculation of their benefits consistent with the terms of the Plan, falls comfortably within the scope of § 502(a)(1)(B).")

ERISA also has a "catchall" provision, Section 502(a)(3), which allows a participant, beneficiary, or fiduciary to "(A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the

---

[3] Although there was evidence in the record to suggest that Hilton failed to credit other types of nonparticipating service for purposes of vesting, the Court declined to expand the scope of the subclass beyond employees' union service for the reasons stated in that opinion.  616 F. Supp. 2d at 30 n.18.

plan." 29 U.S.C. § 1132(a)(3); *Varity Corp. v. Howe*, 516 U.S. 489, 507, 511 (1996). Where relief is otherwise available under Section 502(a)(1)(B), equitable relief under Section 502(a)(3) will not be "appropriate." *Varity Corp.*, 516 U.S. at 515. However, where a plan does not conform with the requirements of ERISA, relief under the catchall provision may be appropriate. The phrase "appropriate equitable relief" encompasses those categories of relief typically available in equity, such as injunction, mandamus, and restitution, but it does not include compensatory or punitive damages. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256-58 & n.8 (1993); *id.* at 258 n.8 ("'Equitable' relief must mean *something* less than *all* relief.") Thus, courts have found that equitable relief is appropriate in ERISA cases where it places participants "in basically the same financial position in which they would be if the employer had complied with the minimum requirements necessary for the [plan] to satisfy the accrual and vesting provisions of ERISA." *Carrabba v. Randalls Food Markets, Inc.*, 145 F. Supp. 2d 763, 770-71 (N.D. Tex. 2000), *aff'd*, 252 F.3d 721 (5th Cir. 2001) (per curiam).

### III. DISCUSSION

The parties have each filed briefs in support of their separate proposals for remedying the minimum accrual rate and vesting violations previously found by the Court. After Plaintiff filed its Reply Brief on Equitable Relief, Defendants filed a Motion for Leave to File Sur-Reply on Equitable Relief and for Expert Discovery in Advance of Remedies Hearing. Defendants ask the Court for permission to file a Surreply, which they attached to their motion, in order to rebut certain arguments raised by Plaintiff in his Reply regarding Defendants' proposed remedies. Plaintiff opposes this request, arguing that Defendants' motion is untimely and that the Surreply merely restates arguments that were or could have been raised in Defendants' Response Brief on

Equitable Relief. While the Court notes that surreplies are generally disfavored, Plaintiff's Reply Brief does contain detailed criticisms of Defendants' proposals as well as a supplemental declaration from its expert, to which Defendants should be permitted to respond. Moreover, Plaintiff has failed to identify any prejudice suffered by any delay in filing,[4] which occurred while the parties were in mediation. Therefore, the Court shall grant Defendants' motion for leave to file a Surreply, and the Court shall consider the Surreply in ruling on the appropriate equitable relief.

With respect to Defendants' request for discovery in advance of a remedies hearing, the Court agrees with Plaintiff that discovery is not warranted at this time. The Court has not yet determined that there are material factual issues in dispute that require a remedies hearing. *Cf. United States v. Microsoft Corp.*, 253 F.3d 34, 101 (D.C. Cir. 2001) (holding that courts must conduct an evidentiary hearing to resolve disputed factual issues in determining appropriate relief). The parties have submitted separate proposals for equitable remedies that rely on the declarations of experts who disagree about the propriety of the other party's proposals under ERISA. This Court shall make a legal ruling about what equitable relief is appropriate based on its prior decision as to liability, relying on facts that are not in dispute. The Court shall then hold a remedies hearing to resolve any factual disputes as to methodology, if necessary. Accordingly, the Court shall deny Defendants' motion for expert discovery.

The parties agree that all relief should be provided in the form of benefits to be provided from Hilton's tax-qualified plan. However, the parties disagree regarding the benefit calculations that should be required to remedy the minimum accrual rate and vesting violations previously

---

[4] Defendants' motion was filed 63 days after Plaintiff's Reply Brief was filed.

found by the Court.  The Court shall address each of their proposals below.

        *A.      Remedies for the Minimum Accrual Rate Violation*

The parties agree that the cause of the unlawful "backloading" of benefits under the Plan[5] is the fact that the Plan's benefit formula includes an offset for Social Security benefits that is disproportionately large during an employee's early years of plan participation.  Generally speaking, the Plan's benefit formula provides that the amount of benefits payable at retirement age is equal to 2%[6] of the employee's average monthly compensation (as defined by the Plan) multiplied by the number of years of service for that employee, minus an offset for "Integrated Benefits," which includes, *inter alia*, an estimate of the Social Security benefits that the worker will receive at retirement.  *See* Hilton Hotels Retirement Plan (As Amended and Restated Effective January 1, 1987), Decl. of Jonathan K. Youngwood, Ex. B ("1987 Plan")[7] § 4.1.[8]  Thus, the amount of benefits an employee accrues each year under the Plan depends in part on his estimated Social Security benefits.  Due to the payment structure of the Social Security program, the Plan's offset for Social Security payments is relatively high during an employee's early years and relatively low during the employee's later years.  The result is that the accrual rates during

---

[5] In discussing the remedies for benefit-accrual class, the Court refers to the Plan in effect prior to the 1999 amendment, unless otherwise noted.

[6] The parties agree that for workers who separated from service prior to 1982, the rate is 1.5%.

[7] The 1987 Plan was actually signed on December 29, 1994 and made effective as of January 1, 1987.

[8] The Plan defines "Integrated Benefits" as including 50% of the estimated primary Social Security benefit that will be available to the employee at retirement based on the employees' earnings.  *See* 1987 Plan at 19.  "Integrated Benefits" may also include certain amounts earned under other pension plans or programs.  *See id.* at 19-20.

the early years of the Plan are very low compared to later years, violating the 133-1/3% rule.

The parties agree that for purposes of remedying the backloading violations in the Plan, the maximum annual accrual rate under the Plan is 1.91% of the employee's average monthly compensation ("AMC").[9] To comply with the 133 1/3% rule, the annual accrual rate in any given year cannot be more than 133 1/3% of the annual accrual rate in any previous year. Therefore, the minimum accrual rate allowable under the Plan is 1.91% divided by 133 1/3%, which is 1.4325%.[10]

Plaintiff's proposed remedy, stated most simply, is to increase the benefits paid to participants so that any annual accrual rate below 1.4325% will be raised to 1.4325%, and all annual accrual rates at or above 1.4325% remain unchanged. Plaintiff's actuarial expert, Claude Poulin, has calculated a schedule of revised benefits for members of the benefit-accrual class based on this proposed remedy. Plaintiff's proposal calls for participants to receive a "base benefit increase" that varies based on the year the participant separated from the Plan, with certain adjustments. *See* Pl.'s Br., Decl. of Claude Poulin ("Poulin Decl.") ¶¶ 5-18. Mr. Poulin contends that different base benefit amounts are necessary to account for changes in the Social Security wage base and schedule each year. *See* Pl.'s Reply, Supp. Decl. of Claude Poulin ("Supp. Poulin Decl.") ¶ 23. According to Mr. Poulin's calculations, 22,015 participants who are

---

[9] The maximum accrual rate is somewhat less than 2% because the Social Security offset will always be greater than zero (and in this case, the parties agree, it will always be at least .09% of AMC).

[10] For participants who separated before 1982, Defendants contend that the maximum accrual rate was 1.41%, requiring a minimum accrual rate of 1.0575% in order to comply with the 133 1/3% rule. Plaintiffs agree that the maximum rate is no higher than 1.5% but have not stated whether they agree with Defendants' 1.41% figure.

currently vested should receive benefit increases to remedy the backloading violation. Poulin Decl. ¶ 22. Plaintiff relies on a complex set of schedules and adjustments to ensure that each participant's benefits are adjusted accordingly.

Defendants' proposed remedy is simpler and rather more elegant. Defendants propose amending the benefits formula by capping the Social Security offset at .5676% of AMC, thereby mathematically ensuring that the annual accrual rate never falls below the required minimum of 1.4325%.[11] Under this approach, Plan participants will receive an increase if, as a result of the original offset, they received a benefit that was less than what would have accrued had the Plan ensured that the annual accrual rate could not fall below 1.4325% during the first 25 years of service.[12] Defendants propose providing these participants with "true up" payments to remedy the deficiencies to date and increase their annuity payments going forward. However, Defendants note that not all participants will receive an increase under their proposed remedy because some participants would not have accrued higher benefits even if they had a minimum annual accrual rate of 1.4325% during their first 25 years of service. *See* Defs.' Br. at 9. Many of these participants, Defendant argues, "outgrow" the backloading that occurs during their early years of service. *See id.* at 14-15. Some other highly paid participants never had annual accrual rates of less than 1.4325%. *Id.* at 12-14; Decl. of Ian H. Altman ("Altman Decl."), Ex. 2 (Chart 2C).

Although they sound similar, the parties' proposals are distinctly different. Plaintiff's

---

[11] For participants who terminated before 1982, Defendants propose capping the offset at .4425% of AMC.

[12] The benefits formula changes slightly after 25 years of service, and the parties' proposals account for this change.

proposal essentially freezes the Plan's existing accrual rates and then seeks to add benefits to early years until the minimum annual accrual rate reaches 1.4325%. By contrast, Defendants' proposal changes the benefits formula in a way that shifts benefits accrued in later years to earlier years. The result is that under Defendants' plan, the annual accrual rate decreases slightly during some later years to make up for the fact that there are higher accrual rates in early years. This happens purely by mathematical operation of Defendants' modified benefits formula.

In his Reply, Plaintiff argues that Defendants' proposed remedy does not satisfy the 133 1/3% rule because it employs an "average rate of accrual" methodology that is explicitly rejected by ERISA regulations. *See* Pl.'s Reply Br. at 5-11. Plaintiff (and his expert, Mr. Poulin) point to an example in the Treasury Regulations in which the rate of accrual is 2% for the first five years, 1% for the next five years, and 1.5% for each following year. *See* 26 C.F.R. § 1.411(b)-1(b)(2)(iii) (Example 3). Although the average rate of accrual under such a scheme "is not less rapidly than ratably," it nevertheless fails the 133 1/3% rule because 1.5% is more than 133 1/3% of the lowest rate, 1%. *Id.* However, Defendants' proposed solution caps the Social Security offset so as to ensure that the minimum accrual rate in any given year is never less than 1.4325% (or 1.0575% for participants who separated before 1982). Therefore, it does not, in fact, rely on an "average rate of accrual" methodology. Plaintiff also relies on the IRS's Technical Advice Memorandum ("TAM") issued in 2002, which analyzed the Plan and found that it failed to comply with the 133 1/3% rule because the initial rate of accrual under the Plan is generally .71%. *See* Supp. Poulin Decl., Ex. 4 (TAM). Plaintiff argues that the IRS's analysis contradicts Defendants' assertion that some highly paid participants never had rates of accrual below 1.4325%. *See* Pl.'s Reply at 8-9. However, Defendant's expert, Ian Altman, correctly explains

that the IRS's analysis was based on Social Security calculations in 1996, which cannot be applied retroactively to prior years when determining compliance with the 133 1/3% rule. *See* Supp. Expert Report of Ian Altman ¶ 5.

Plaintiff's criticism of Defendants' proposal is founded on his view that because the Plan violated the 133 1/3% rule, every Plan participant must be owed some remedy. But the backloading violation in the Plan does not affect all participants equally. As the Court explained in its decision on liability,

> The primary purpose of [minimum accrual rates] is to prevent attempts to defeat the objectives of the minimum vesting provisions by providing undue "backloading," i.e., by providing inordinately low rates of accrual in the employee's early years of service when he is most likely to leave the firm and by concentrating the accrual of benefits in the employee's later years of service when he is most likely to remain with the firm until retirement.

*Langman v. Laub*, 328 F.3d 68, 71 (2d Cir. 2003) (quoting H.R. Rep. No. 93-807 (1974)). Thus, by preventing the backloading of benefits, ERISA protects employees who work only a short period from vesting with only a minimal amount of accrued benefits. *See Hoover v. Cumberland, Maryland Area Teamsters Pens. Fund*, 756 F.2d 977, 982 n.10 (3d Cir. 1985). But employees who stayed in the Plan for a longer period of time eventually accrued those benefits that were denied to them in earlier years of service. The term "backloading" is quite appropriate to explain this phenomenon, as the benefits that did not accrue in early years of service are loaded into the back end of an employee's years of service. As Hilton describes it, longer-term employees "outgrow" the violation of the 133 1/3% rule that would have affected them if they had separated in early years. Thus, although Hilton's proposed remedy provides additional benefits to workers who were shortchanged because they terminated after a relatively brief period

of service, it does not provide additional benefits to longer-term workers who made up any initial deficiency through their longevity with Hilton. That is not to say that there was no ERISA violation with respect to these longer-term workers. But those workers suffered no decrease in benefits as a result of the violation and therefore are not entitled to equitable relief. *See Mertens*, 508 U.S. at 256-58 & n.8 (holding that equitable relief under ERISA does not include compensatory damages to fully remedy all injuries). Indeed, as Hilton points out, such workers are not even a part of the benefit-accrual class, which is limited to employees whose benefits "have been, or will be, reduced as a result of the Defendants' failure to accrue retirement benefits at the annual rates that ERISA requires." Plaintiff's proposal improperly provides a windfall to many of these participants whose benefits were not reduced by backloading.

Therefore, the Court endorses Hilton's proposed remedial benefits formula, which is easier to implement and properly compensates individuals whose benefits were reduced as a result of Defendants' failure to comply with the 133 1/3% rule. The Court shall require the parties to recalculate benefits for the benefit-accrual class based on Defendants' formula and attempt to resolve any disagreements about the specific amounts owed to particular class members.

The Court must also address Defendant's contention that equitable relief should be limited to Plan participants who separated from service after December 29, 1994 (or, alternatively, January 1, 1987). Defendants argue that this is appropriate because the Plan did not explicitly provide for compliance with the 133 1/3% rule until an amendment was signed on December 29, 1994 (and made retroactive to January 1, 1987). In essence, then, Defendants ask the Court to provide no remedy for 6096 participants whose benefits were calculated under an

unlawfully backloaded plan.  That is not an equitable result.  It is true that Plan participants could

not have relied on the Plan's purported compliance with the 133 1/3% rule until the 1994

amendment was signed.  However, the pre-amendment Plan did not comply with *any* of the three

minimum accrual tests under ERISA, and it is appropriate for the Court to reform the Plan so as

to comply with ERISA.  *See Carrabba v. Randalls Food Mkts., Inc.*, 145 F. Supp. 2d at 773

("Due to the absence of an accrual method in the plan, the court is called upon to select for use in

the calculations of the awards to be made to the participants against defendant one that, in equity,

most appropriately recognizes the objectives of the [plan] in an ERISA context.")  The 1994

amendment explicitly adopted the 133 1/3% rule, and it did so without substantially changing the

benefits formula that existed previously.[13]  By contrast, when Hilton amended the Plan in 1999 to

comply with the fractional rule, it made substantial modifications to the benefits that would be

paid to participants.  616 F. Supp. 2d at 16.  The parties have never urged the Court to consider

the 3% rule.  *Id.* at 11 n.2.  For these reasons and the reasons stated in the Court's prior decision

on liability, the Court finds it is appropriate to conform the pre-amendment Plan to the 133 1/3%

rule, including participants who separated before 1987.

      *B.*     *Remedies for Vesting Violations*

      The parties have filed separate proposals to remedy the vesting violations previously

found by the Court.  Unfortunately, the parties have agreed on little, and the number of disputes

---

[13] The benefits formula in the 1976 Plan provided that the normal retirement benefit is
equal to 1.5% of an employee's final average earnings multiplied by his years of service, minus
his Integrated Benefits.  *See* Hilton Hotels Retirement Plan (As Amended and Restated Effective
January 1, 1976), Decl. of Jonathan K. Youngwood, Ex. A ("1976 Plan") § 4.1.  The benefits
formula in the 1987 Plan is virtually the same, except with a 2% rate and slightly altered
definitions for the input variables.  *See* 1987 Plan § 4.1.  By contrast, the 1999 Amendment
significantly altered this benefits formula so as to comply with the fractional rule.

remained to be resolved by the Court is substantial. The Court shall address what appear to be the parties' largest disagreements regarding vesting remedies.

### 1.    Remedies for Failure to Credit Union Service

This Court previously determined that under the terms of the Plan, Hilton was required to credit employees' union service for purposes of vesting, yet it failed to do so. Defendants propose to remedy this violation by crediting any union service that is reflected in the Plan records. Plaintiff, however, argues that Defendants should be required to credit all years of non-participating service. Plaintiff argues that it is necessary to credit all non-participating service, not just union service, because ERISA requires that an employer credit all years of service toward vesting. Pl.'s Br. at 21. Accordingly, Plaintiff proposes to credit participants with vesting service for any period of time between their original date of hire according to corporate records and their date of hire according to Plan records. *Id.* at 25. Additionally, Plaintiff proposes to credit participants with vesting service for any period of time they were employed by a "Participating Employer" or Affiliate. *Id.* at 25-26.

The Court previously ruled that it would not expand Plaintiff's union service claim to include all "non-participating" service because Kifafi never moved to expand the scope of the subclass and the Court never certified a "non-participating service" subclass. 616 F. Supp. 2d at 30 n.18. Having declined to expand the claim at the liability stage, the Court will not do so now at the remedy stage. Thus, the Court agrees with Defendants that the objective of any injunctive relief should be to compensate individuals with vesting credit for years of union service. The relevant question with respect to the remedy, however, is whether Hilton's records of union service are accurate enough to be relied upon on their own or whether non-participating service

16

should be used as a proxy for union service because the records are inadequate.

Plaintiff claims that the Plan's records of union service are not reliable because they are not coded to show union service that occurred before an employee became a participant or after an employee's participation ended. *See* Pl.'s Reply, Supp. Decl. of Allison C. Pienta ("Supp. Pienta Decl.") ¶ 24. In other words, where Plan records indicate pre- or post-participation service, Plaintiffs contend that there is no way to tell whether or not the employee was in a union position. Plaintiff cites a number of examples of employees who served at unionized Hilton properties but whose years of service are not credited in Plan records. *See* Supp. Pienta Decl. ¶ 25; Pl.'s Mot. for Summ. J., Ex. 54 (Supp. Decl. of Martha Anderson).[14] These examples were found by Plaintiff based on Plan participants' responses to a questionnaire. Supp. Pienta Decl. ¶ 25. Plaintiff also cites the example of Kifafi, whose union service was not reflected in his pension records. Plaintiff contends that "Hilton has declined to produce any corporate records that would show whether employees were in union positions." Pl.'s Reply at 30.

Therefore, Plaintiff argues that there are only two viable remedial options: either (1) count all years of non-participating service identified in the Plan's records (which would capture union service as well as some non-union service); or (2) establish a claims procedure to identify

---

[14] Plaintiff also cites the example of Diann McKinney, whose "Service Date" is listed as "4/13/1979" but whose participation in the Plan does not begin until 1985. *See* Pl.'s Mot. for Summ. J., Ex. 66. Plaintiff argues that Ms. McKinney served in a union position from 1979 to 1985 and that this union service is not reflected in the records. *See* Pl.'s Reply at 29-30. However, Ms. McKinney's declaration actually states that she was a "full-time, non-union employee" for Hilton from 1979 to 1986. *See* Pl.'s Mot. for Summ. J., Ex. 50 (Decl. of Diann McKinney) ¶ 2. Therefore, Ms. McKinney's example does not support Plaintiff's position. There appear to be other mistakes in Plaintiff's examples, as well. For example, at least one participant referenced in Ms. Pienta's supplemental declaration is identified as having worked in a non-union location. *See* Supp. Pienta Decl. ¶ 25; Pl.'s Mot. for Summ. J., Ex. 54 (Supp. Decl. of Martha Anderson), Ex. E, line 12.

individuals whose years of service were not credited by Hilton. The first option would not be inequitable for Hilton, Plaintiff contends, because ERISA already requires all non-participating years to be counted for vesting purposes. *See Holt v. Winpisinger*, 811 F.2d at 1537. Plaintiff argues that the second option would likely result in incomplete relief for the subclass because of the likelihood of low response rates. *See* Pl.'s Reply at 30.

Although Defendants filed a surreply in order to respond to the claims raised in Plaintiff's reply brief, Defendants failed to directly address the adequacy of Plan records with respect to union service in light of Plaintiff's cited examples. Defendants' expert, Ian Altman, contends in his report that there are a number of reasons why the date of hire would precede the first date of service in Plan records, such as an error in recording a hire date or a period of service for which benefits were earned and distributed before a re-hire. *See* Defs.' Br., Expert Report of Ian H. Altman, FSA ("Altman Report") at 22 n.3 & ¶ 56. Therefore, he argues that a discrepancy between a hire date and service date does not support a claim for uncounted union service hours. *See* Altman Report ¶ 56 ("Without evidence of hours worked as a union employee, it is unreasonable to award vesting for phantom service.")

The Court does not agree with Defendants that no credit can be awarded for union service where the records do not explicitly show that an employee had eligible union service. As the Court noted in its decision on liability, there is evidence in the record that Hilton never "kept track of nonparticipating properties' employees (hours/earning) to give them vesting." *See* 616 F. Supp. 2d at 19 (citing Pl.'s Ex. 27 at 4 (5/9/02 Email Exchange between V. Stoicof and G. Trotter)). In light of this record evidence and the examples cited by Plaintiff in its Reply Brief on Equitable Relief of employees whose union service was not reflected in the Plan's records, the

Court cannot conclude that Defendants' proposed remedy—crediting union service solely as reflected in Plan records—is adequate to remedy the violation found by the Court.

However, based on the present record, the Court also cannot conclude that Plaintiff's proposed remedy—crediting participants with vesting credit for all years of non-participating service reflected in Plan records (which would presumably include some union service and some other non-participating service)—is an equitable result. It is not clear to the Court, based on the parties' submissions, why the Plan has records of some union service but not other union service. It is also not clear how many participants who did not have any union service would become vested under Plaintiff's proposed remedy, making it difficult to determine whether the benefits to such persons would be purely incidental to relief for the subclass or constitute an end-run around the Court's class certification ruling.

Because there is uncertainty about whether there are corporate records that would indicate union service beyond what the Plan records show, the Court shall order Defendants to conduct a search of their corporate records. Defendants shall be required to identify and produce any records that demonstrate, with respect to the potential subclass members identified by Plaintiff,[15] whether or not those subclass members had union service that is not reflected in Plan records. Defendants shall be required to certify by affidavit that they have conducted a thorough search for any such records. Once that search is complete, Defendants shall administer a claims procedure that will notify all subclass members for whom union service has not been identified that they may submit a claim if they believe they have union service that is not reflected in the

---

[15] Initially, Plaintiff identified 962 participants who it believed would become vested if union and non-participating service were credited. It appears that Defendants agree that at least 183 of these individuals should become vested. *See* Altman Report, Ex. 5.

records.[16]  The parties shall confer regarding the standards for claim administration and jointly propose a procedure to be approved by the Court.  Defendants shall bear the cost of administering the claims procedure.  Alternatively, if Defendants prefer to avoid the costs of searching corporate records and establishing a claims procedure, they may agree to Plaintiff's proposal to credit all non-participating service.

## 2.    Remedies for Violations of the 1000 Hours of Service Standard

This Court previously determined that Hilton violated the terms of the Plan's vesting provisions by using a 1000 hours of service standard when it failed to maintain the records necessary to implement it.  Under ERISA regulations, when a plan fails to keep records adequate to determine all of the hours that an employee should be credited (which includes hours for which the employee was entitled to be paid as well as hours for vacation, holiday, illness, leave of absence, etc.), the plan may use an "equivalency."  *See* 29 C.F.R. § 2530.200b-3(a).  Under the "hours worked" equivalency, an employee is credited with a year of service if he has 870 hours worked during a twelve-month period (or 750 for a salaried employee).  *Id.* § 2530.200b-3(d). Alternatively, a plan may use an equivalency based on periods of employment, such that for each month of employment in which the employee would otherwise be credited with at least one hour of service, the employee is credited with 190 hours of service.  *Id.* § 2530.200b-3(e)(1)(iv).

Defendants' proposed remedy calls for the 870/750 "hours worked" equivalency to be applied in lieu of the 1000 hours of service standard where an employee's records are sufficient

---

[16] The Court anticipates that class counsel may seek to obtain records of union service directly from the unions.

to indicate the hours worked.[17]  Where records of hours worked are unavailable (or where a

record indicates 500 hours of service as a placeholder[18]), Defendants propose to use the 190

hours of service per month equivalency, and participants whose hours are calculated under the

190-hour equivalency shall be credited with a year of service if they have 870 hours during the

year (750 for salaried employees).[19]  ERISA regulations permit these equivalencies to be used in

combination.  *See* 29 C.F.R. § 2530.200b-3(e)(7).  Defendants' expert maintains that the 190-

hour equivalency may be used because the Plan has records that shows participants' months of

service.  *See* Altman Report ¶ 49.

    Plaintiff does not object to Defendants' proposal in principle.[20]  However, Plaintiff

---

[17] Effective January 1, 2003, the Plan was amended so as to enable participants to earn years of vesting service under the 870/750 "hours worked" standard for each year in which they are earning years of benefit service.  *See* Pl.'s Mot. for Summ. J., Ex. 41 (Amendment 2002-04) at 1.  For periods in which participants would not be earning years of benefit service (such as union service), the Plan amendment calls for an "elapsed time" method to applied to determine vesting credit.  *Id.* at 3; *see* 26 C.F.R. § 1.410(a)-7.

[18] According to Defendants' expert, Hilton recorded "500 hours" as a placeholder in 725 employees' records to indicate that the employee was hired mid-year or left mid-year and did not work enough hours to be credited with a year of service.  *See* Altman Report ¶ 49.  Plaintiff disputes that those participants would not have been credited with a year of service had their hours been properly counted.  In any event, the parties now agree that because records of hours of worked were not actually kept with respect to these participants, an equivalency must be used to determine whether they are entitled to a year of vesting service.  Accordingly, the Court expects Hilton to apply a time-based equivalency to all entries with a "500 hours" placeholder.

[19] As defined in the regulations, the 190 hours per month equivalency credits an employee with hours of *service* rather than hours *worked*.  However, Defendants' proposal effectively treats the equivalent 190 hours as hours worked, meaning that an employee needs only 870 (or 750) hours instead of 1000 hours to earn a year of vesting credit.  This is consistent with the example described in 29 C.F.R. § 2530.200b-3(e)(8).

[20] Although it was initially unclear as to whether Plaintiff supported the application of the 870/750 "hours worked" equivalency where existing records were sufficient to determine the number of hours worked, Plaintiff has clarified that it does not object to this standard.  *See* Pl.'s

contends that the Plan's records are inadequate or insufficient to apply Defendants' proposal. As with his union service claim, Plaintiff argues that if the equivalencies are applied only to the records as they were kept by Hilton, members of the subclass will be deprived of vesting credit for months of service for which Hilton failed to keep adequate records. Therefore, Plaintiff proposes modifications to account for Hilton's failure to keep proper records of participants' service. The Court shall discuss each of Plaintiff's specific proposals below.[21]

a.    Credit for time after the last record of service.

There are some participants whose last record of service, i.e., the last date for which any hours are recorded, does not match up with their date of termination of employment ("DOTE"). For these participants, Plaintiff proposes to have the Court presume that the employee had at least one hour of service in each month between the last record of service and the DOTE, even though Plan records do not indicate any hours of service. If the Plan records do not indicate any DOTE and there is no other explanation of an absence in the employee's records, Plaintiff would have the Court presume that the employee worked until the end of the last calendar year for which there is any record of employment or earnings. Plaintiff would also seek an audit of termination dates of "12/31" to determine whether they are actual termination dates or merely placeholders in the records. *See* Pl.'s Br. at 24-25.

Plaintiff provides no clear explanation as to why the Court should assume that there were

_____

Reply at 24.

    [21] The Court notes that the parties have made it very difficult to identify the specific points on which the parties agree or disagree. The parties' briefs on equitable relief largely attack each other's proposals without setting forth with clarity why a participant should or should not be awarded vesting credit in a particular circumstance. The Court has done its best to understand the major points of contention and make a ruling based on the evidence in the record.

additional hours of service for employees between their last record of service and their date of termination of employment. Plaintiff refers to the Plan Manual, which defines the termination date as "the date the employee terminated from the active status (vested term, retirement, death, etc."; and it says that "[i]f the employee is still working, then this date is blank." *See* Pl.'s Reply, Ex. 3 (Pension Admin. Manual) at 6; Pl.'s Reply at 18. Plaintiff apparently concludes that an employee remains on active status until the date of termination and therefore should be credited with vesting service during that time. The relevant question, however, is not whether the individual continued to be *employed*, but whether the employee had any additional hours of service. ERISA defines an "hour of service" as "each hour for which an employee is paid, or entitled to payment." 29 C.F.R. § 2530.200b-2(a)(1). Thus, an employee may remain on the payroll for a period of time without having any hours of service by, for example, taking unpaid leave. Plaintiff has not provided the Court with any reasonable basis for presuming that an employee worked (or was otherwise entitled to be paid) at least one hour for every month that he was an employee.

In his motion for summary judgment, Plaintiff argued that Hilton improperly used a 1000 hours standard "in years where its pension database contains records of hours." *See* Pl.'s Mot. for Summ. J. at 40. Plaintiff pointed to evidence in the record that Hilton had failed to credit pay after termination, such as accrued vacation and lump sum severance payments. *Id.* The Court agreed with Plaintiff in its decision on liability. *See* 616 F. Supp. 2d at 30. Defendants' proposal remedies this violation by relying instead on the 870/750 hours worked standard. Applying that standard necessarily means that where there are no hours worked by an employee, there will be no vesting credit awarded. In other words, Plaintiff cannot assume that wherever the Plan

records show no hours of service, records of hours worked are "unavailable."  Plaintiff's proposal to "assume" that there are hours worked until the end of employment where the Plan records show none more closely resembles the "elapsed time" method for determining vesting credit, which is an alternative to counting hours of service (with or without equivalencies) that does not require plans to keep detailed records of employee hours.  *See* 26 C.F.R. § 1.410(a)-7 (defining "elapsed time" method).

As the Court previously explained, Hilton amended the Plan in 2002 to retroactively apply the elapsed time method to periods of non-participating service.  616 F. Supp. 2d at 19-20. The Court found that this amendment did not moot Plaintiff's claim that the 1000 hours standard had been violated because it was mathematically possible that a participant would earn more vesting credit under an hours standard than the elapsed time method.  *Id.* at 34.  Accordingly, the Court held that participants must be awarded vesting credit under an hours standard if it would result in more credit awarded than under the elapsed time method.  *Id.*  Hilton has never proposed applying the elapsed time method to periods of time when employees were participating in the Plan (and their hours were recorded), and this Court's rulings do not require it to do so.  Plaintiff's proposal resembles a hybrid between the elapsed time method and the hours worked standard, as it would require Hilton to count the hours worked (where there are hours shown) and count at least one "presumed hour" for every other month that elapses (where there are no hours shown).  *See* Altman Report ¶ 44.  In other words, Plaintiff is trying to get the best of both worlds by taking the upside of each method without the downside of either.  That is not an equitable remedy.

It is possible that the Plan failed to record hours leading up to the date of termination of

24

employment and that Plaintiff's proposal would remedy that failure. But it is also possible (and more likely) that Plaintiff's proposal would drastically overcompensate members of the subclass by awarding them vesting service for periods of time in which they performed no service. Unlike Plaintiff's union service claim, Plaintiff has not even proffered examples of participants who should be entitled to this relief. Therefore, the Court declines to endorse Plaintiff's proposal to presume that a participant had at least one hour of service in each month before his date of termination of employment (or, if there is no DOTE, the end of the calendar year).

> b.    Credit for time between the initial service date and the first year of participation.

Plaintiff also contends that its presumption of at least one hour of service per month should apply to participants whose "Service Date" reflected in the Plan records does not coincide with the first year of participation in the Plan. *See* Pl.'s Reply at 24. Plaintiff wants to credit participants with 190 hours for each month between the "Service Date" (which reflects the beginning of an employee's service with Hilton) and the first year of participation in the Plan. Defendants' expert, Ian Altman, admits that "[t]he date active service commences–the 'service date' reflected on the plan records–is the correct starting point for counting service." Supp. Altman Report ¶ 29. However, this period of time would be non-participating service. As explained in the previous section, the Court shall only order equitable relief with respect to periods of union service.

> c.    Credit for time after properties stopped reporting service to the Plan when accruals were frozen in 1996.

Plaintiff claims that "it is indisputable that the Plan's records of hours necessarily stop once a property stops reporting service to the Plan, even if the individual continues to be

employed," and that "much of the reporting of service to the Plan stopped once benefit accruals were frozen at the end of 1996." Pl.'s Reply at 26. In her supplemental declaration, Allison C. Pienta claims that there are 37 individuals who have employment termination dates after Hilton properties stopped reporting service to the Plan. *See* Supp. Pienta Decl. ¶ 18. According to Ms. Pienta, the Plan's records for these individuals show "1000" or "500" hour entries or no entries at all after 1996, indicating that the property was no longer actually reporting service under the Plan. *Id.* However, in each of the four examples cited by Ms. Pienta in her supplemental declaration, it appears that the participants were in fact credited with vesting service after 1996, and they would not be entitled to any additional service if the 190-hours standard were applied according to Plaintiff's presumption of at least one hour each month until the date of termination. *See* Supp. Pienta Decl., Ex. Grp. 1(e).

Defendants' expert, Ian Altman, states in his supplemental report that properties only stop reporting service to the Plan when they become disassociated from Hilton, such as through closure or a sale. *See* Supp. Altman Report ¶ 31. At that point, Mr. Altman says, employees are no longer entitled to credit under the Plan because the property is no longer a part of Hilton. *Id.* Therefore, he contends there is no reason to credit vesting service after a property stops reporting. *Id.* Mr. Altman provides no evidentiary basis for this assertion, and Plaintiff did not have an opportunity to rebut this contention, as it was raised for the first time in the supplemental report filed with Defendants' Surreply. Therefore, the record is unclear as to whether properties stopped reporting service altogether after 1996 (or any other time) or whether Hilton failed to track any vesting service during this time. Hilton's use of "1000" and "500" hour placeholders in the records cited by Ms. Pienta suggests that even if exact service hours were not being reported

after 1996, some measure of vesting service was being credited to participants.

At this stage, because Plaintiff has failed to identify any participants who were deprived of vesting credit to which they were entitled after 1996, the Court declines to order Defendants to provide additional vesting credit based on hours of service after 1996.

> d.    Credit for time between the corporate hire date and the hire date reflected in the Plan's records.

Plaintiff proposes that participants who have earlier original dates of hire in corporate records than Plan records receive years of service credit for the time in between the conflicting dates, to be determined according to the agreed-upon equivalencies. *See* Pl.'s Reply at 25.  In other words, where corporate records show that a participant was hired on a date that is earlier than the Plan's hire date, Plaintiff would have the Court presume that the participant had at least one hour of service for each month in between the conflicting dates.  Plaintiff points to a Hilton press release showing that one particular participant was hired in October 1973, but Plan records show a hire date of September 1, 1975. *See* Pl.'s Reply at 25; Pl.'s Mot. for Summ. J., Ex. 45. Plaintiff also points to a 1998 report on Plan data indicating that for a number of participants, the date of hire is earlier than the first record of earnings. *See* Pl.'s Mot. for Summ. J., Ex. 52 (Data Clean-up Project July 20, 1998) at 3.  Neither party has provided an adequate explanation as to why there would be any discrepancy in hire dates.  To the extent that earlier corporate hire dates would reflect earlier periods of non-participating service, the Court has already addressed this issue in the context of Plaintiff's union service claim.  To the extent that an earlier corporate hire date would reflect a period of participating service for which Hilton has failed to provide vesting credit, that time period falls within the scope of the claim that Hilton failed to comply with the

1000 hours standard by failing to keep track of hours necessary to implement it.

Plaintiff concedes that he has not made any calculations based on discrepancies between corporate hire dates and Plan hire dates because corporate records were not produced during discovery. *See* Pl.'s Reply at 25. Accordingly, Plaintiff has failed to identify any members of the vesting class who would become vested if hours of service were presumed between the earliest corporate hire date and the Plan's earliest record of service. Rather, Plaintiff speculates that "the corporate records of hire dates are, in fact, likely to show additional service." *Id.* If that is the case, it was Plaintiff's obligation to uncover that evidence during discovery and bring it to the Court's attention. Plaintiff's core claim with respect to this subclass is that Hilton improperly used a 1000 hours service standard rather than an 870/750 hours standard; Plaintiff now seeks to order additional discovery to find out whether Hilton failed to count any hours of participating service that predate the Plan's earliest record of service. Plaintiff shall not be afforded a second bite at the apple to expand his claim. There is no evidence that participants are entitled to vesting credit for the period between the earliest hire date in corporate records and the Plan's hire or service date. Therefore, the Court shall not order Hilton to provide vesting credit for this period of time.

e.    Unlawful equivalencies applied to salaried employees.

Plaintiff contends that Hilton has applied an unlawful equivalency of 36 hours per week to certain salaried employees in order to produce years in which the hours fall short of 750, thus depriving them of years of vesting credit. *See* Pl.'s Reply at 24; Supp. Pienta Decl. ¶ 7. Plaintiff cites three examples of salaried participants who would be credited with a year of vesting if the proper equivalency were applied (45 hours per week of service, *see* 29 C.F.R. § 2530.200b-

3(e)(1)(ii)) to the number of weeks of service indicated by Plan records. Defendants dispute this, claiming that these three participants were credited with service based on the actual number of hours that they worked, not based on application of an equivalency. *See* Defs.' Surreply at 21 & n.24; Supp. Altman Report ¶ 32. Defendants point out that the number of hours credited for two of the three individuals cited by Plaintiff is not an even multiple of 36 hours, thus refuting Plaintiff's contention that a 36-hour equivalency was used. Defendants' expert also cites other examples from the database suggesting that actual hours were tracked for exempt employees. *See* Supp. Altman Report ¶ 32. The parties dispute whether the Plan recorded actual hours worked for exempt (i.e., salaried) employees. If Defendants are correct that these participants' records show actual hours worked, it is not necessary to apply an equivalency, as urged by Plaintiff. It is unclear why Plaintiff assumes that hours were not kept for these employees. Nevertheless, this is a disputed issue of fact impacting methodology that the Court must resolve at a remedies hearing.

f. Records from "Services Prior" table.

Plaintiff contends that there are 181 individuals who, according to the "Services Prior" table in an earlier version of the database, should be vested because they have sufficient hours to earn additional years of vesting credit. *See* Pienta Decl. ¶¶ 2(A), 4; Supp. Pienta Decl. ¶¶ 16-17. Plaintiff argues that these individuals' records of service were dropped or revised in Hilton's current "Services" table to show lesser years of service. Ms. Pienta states in her declaration that there were close to three thousand downward revisions to years of benefit service[22] for non-

---

[22] Ms. Pienta does not state that there were downward revisions to years of *vesting* service. *See* Pienta Decl. ¶ 5. There may have been reductions in years of benefit service without reducing the years of vesting service.

vested participants between the "Services Prior" and "Services" tables. Pienta Decl. ¶ 5. In response, Defendants do not provide an explanation for these discrepancies and state that they need more information from Plaintiff to determine its claim. *See* Altman Report ¶ 54. Defendants do state that they reviewed 80 records for participants whose sole claim is based on "Services Prior" records and determined that 38 of those participants should be vested for a variety of reasons. *Id.*

In her supplemental declaration filed with Plaintiff's Reply, Ms. Pienta provides documentation for four participants who appear to have additional years of vesting service in "Services Prior" records but which are not reflected on current Plan records. *See* Supp. Pienta Decl., Grp. 1d. These years of service appear to be after dates of termination in 1996. Defendants do not address this issue in their Surreply. Based on the records presented to the Court, it appears that the individuals identified by Plaintiff should be entitled to additional vesting credit. However, because there is no explanation from Defendants for the discrepancy in the records, the Court is reluctant to make a finding with respect to these individuals. If Hilton has made downward revisions to a participant's years of vesting service during the pendency of this litigation, it is required that there be a valid reason for doing so. To the extent that Plaintiff can identify years of vesting service for participants reflected on earlier records, the Court expects Hilton to credit the participant with those years of vesting service unless it provides a valid explanation for any change in the records. The Court shall resolve any discrepancies during a remedies hearing.

g. Elapsed time.

Plaintiff contends that Hilton has failed to count actual hours for certain participants,

relying instead on an elapsed time method that has left some participants with fractional years of vesting service. *See* Pienta Decl. ¶ 2(A); Supp. Pienta Decl. ¶ 9. Plaintiff contends that there are at least 218 participants who should be vested when their hours are counted properly with equivalencies instead of using the elapsed time method. Defendants' expert, Ian Altman, reviewed the 124 participants whose sole claim was in this subclass and determined that 96 should be vested. *See* Altman Report ¶ 53. Thus, Defendants agree that hours should be counted for participants. In her supplemental declaration, Ms. Pienta identifies a number of additional participants who appear to be entitled to vesting credit *See* Supp. Pienta Decl., Grp. 1b. Defendants fail to address these additional examples in their Surreply. Therefore, the Court expects Defendants to credit participants for service based on the hours reflected in the Plan records and the proper equivalencies, not the elapsed time method.

### 3. First Year of Participation

Plaintiff proposes that "the first year of participation shall be counted for vesting in all cases (even if the recorded number of hours of service is low or zero)." Pl.'s Br. at 26. As this Court previously explained, an employee becomes a participant in the Plan only upon meeting the Plan's minimum eligibility requirements, which includes completing 1000 hours of service within the 12-month period following his date of hire or during any subsequent plan year. 616 F. Supp. 2d at 32. Accordingly, the Court found that "Hilton's application of this first year provision is inextricably intertwined with Hilton's violations of the 1000 hours standard." *Id.* Because an employee does not become a Plan participant until he has obtained the necessary hours for a year of service, Plaintiff's request is, on its face, tautological. However, the Plan records appear to show that some participants have low numbers of hours of service during their

first year of participation.  These participants have less than the requisite number of hours during the first year that is marked "P" for participating service.  Plaintiff contends that there are over 1300 individuals who have not been credited with a year of vesting service for this first year of participation and who would become vested if they were given this credit.  *See* Pl.'s Reply at 26.

Defendants dispute Plaintiff's interpretation of the "P" code in Plan records, noting that the "P" indicates only that the hours of service are participating service, not that the employee is a participant.  *See* Defs.' Surreply at 22; Supp. Altman Report ¶ 34.  Defendants point to the Plan Manual, which shows that the "P" code is one of three codes used to indicate that service is participating service.  *See* Pl.'s Reply, Ex. 3 (Pension Admin. Manual) at 22-23.  It is clear from the Plan Manual, as well as from the Plan records that have been provided by the parties, that the "P" code does not automatically indicate that an employee is a Plan participant.  As the Court noted in its decision on liability, an individual only becomes a participant when he has met the minimum hours requirements for eligibility.  Therefore, a participant should not automatically be credited with a year of vesting service for the first year in which he has any hours of participating service.

### 4. Leaves of Absence

This Court previously found that Hilton had violated the Plan by failing to properly credit employees' leaves of absences for purposes of vesting.  Plaintiff has identified 99 individuals who should be vested based on leaves of absences in Plan records that were not credited, and Defendants have agreed to vest those 99 individuals.  *See* Defs.' Br. at 35.  However, Plaintiff also contends that there are leaves of absence in corporate records that were not transmitted to the Plan, and Plaintiff urges the Court to compel Defendants to disclose corporate records

showing leaves of absences.  *See* Pl.'s Br. at 26-27; Pl.'s Reply at 34-35.[23]  The only example

cited of an individual who was not credited with vesting service for a leave of absence is Mr.

Kifafi, whose leave of absence was not reflected in Plan records.  *See* Pl.'s Reply at 34; 616 F.

Supp. 2d at 15.  Plaintiff also points to documents showing how Hilton coded various leaves of

absence in corporate records (e.g., maternity, military, disability) that are not reflected in the Plan

records.  *See* Pl.'s Mot. for Summ. J., Ex. 29 (Decl. of Martha L. Anderson & Hilton Human

Resources Employee Master Data Dictionary).

 Defendants do not directly address Plaintiff's claim that corporate records would show

additional leaves of absence not reflected in Plan records.  However, Plaintiff has failed to

demonstrate that corporate records would be likely to show additional leaves of absence that

would result in the vesting of additional members of the subclass.  As the Court noted above with

respect to alleged discrepancies between corporate hire dates and Plan hire dates, it was

Plaintiff's obligation to obtain evidence of violations during discovery, not to merely raise the

possibility of additional violations.  Defendants have conceded that it is proper, based on the

Court's prior ruling, to credit vesting service for leaves of absences identified in Plan records.  It

is too late at this stage of the litigation for Plaintiff to seek recovery for additional violations for

which it has no direct evidence.

    5. <u>Fixing "Revisions" to the Plan Database</u>

 Plaintiff argues that the Court must take certain steps to "reverse Hilton's revisions of

---

[23] Plaintiff contends that "[l]eaves of absence before participation began and after it ended are never recorded in the Plan's records."  Pl.'s Reply at 34.  However, because the Court shall not be ordering relief with respect to non-participating service (except for union service), any omissions during this time period are immaterial.

records" since 2002. *See* Pl.'s Br. at 27. Specifically, Plaintiff argues that Hilton has applied forfeiture codes to individual records based on the improper application of break-in-service rules, causing some individuals to lose credit for years of vesting service to which they are entitled. *Id.* Additionally, Plaintiff contends that Hilton has mistakenly removed other years of vesting service and misapplied the Plan's 10-year vesting rule to participants with at least one hour of service after 1988, when a 5-year vesting rule was adopted. *Id.* at 27-28. Defendants contend that Plaintiff has failed to provide any basis for this claim and that the Court's order does not prevent Hilton from revising the Plan records to fix errors in the pension database. Defs.' Br. at 31.

The parties' briefs on equitable relief do not provide an adequate basis for this Court to make any ruling regarding Defendants' changes to Plan records. It is Plaintiff's burden to show that the particular equitable relief it seeks is appropriate, and Plaintiff has failed to show that Defendants have misapplied the break-in-service rules or the Plan's vesting rules to the detriment of any members of the vesting subclasses. Accordingly, the Court declines to adopt Plaintiff's proposed remedy at this time with respect to Defendants' revisions to the Plan database.

C.       *Collection of Plan Data and Corporate Records*

Plaintiff contends that in order to remedy the violations of the Plan previously found by the Court, the Court must order Hilton to produce additional corporate records relating to the Plan. *See* Pl.'s Br. at 29-30. Specifically, Plaintiff seeks to compel the production of corporate personnel records of (a) original dates of hire; (b) leaves of absence; (c) marital records; (d) employment with former Participating Employers/Affiliates that participated in the Plan; and (e) employment records for any Related Companies including "Managed Properties" that never participated in the Plan. *Id.* at 30. Plaintiff contends that such production is required by

Magistrate Judge Alan Kay's October 31, 2001 Order, which required production of electronic databases and programs within 30 days. Plaintiff contends that Defendants have "never provided" some of this information and were obliged to provide it on a continuing basis.

Defendants argue that it is too late for Plaintiff to complain about Defendants' alleged failure to produce documents pursuant to Magistrate Judge Kay's order. The parties agree that in August 2005, Hilton provided Plaintiff with a copy of its entire pension database containing data on over 140,000 participants. Hilton also provided an updated pension database to Plaintiff in October 2009. The Court agrees with Defendants that Plaintiff should have sought to compel further production during discovery or, alternatively, before the briefing on equitable relief was completed. The Court has already addressed several aspects of Plaintiff's request for additional records; the Court shall not order additional production beyond what has been previously discussed.

D.     *Appointment of a Class Action Administrator*

Plaintiff argues that the Court should appoint a Class Action Administrator to carry out the terms of the equitable relief that will be ordered by the Court. In addition to an administrator, Plaintiff would have the Court appoint an oversight committee. Plaintiff contends that a Class Action Administrator is necessary to ensure that corporate records have been completely produced and ensure that Hilton complies with the Court's order. *See* Pl.'s Br. at 35-36; Pl.'s Reply at 44-50. Defendants argue that there is no need for a Class Action Administrator because the parties have already calculated the benefits to be paid to the class members and Hilton is capable of implementing any remedy ordered by the Court. Defendant contends that an administrator would be intrusive and remove authority from Hilton to administer the Plan. *See*

35

Defs.' Surreply at 24.

The Court is not inclined at this point to appoint a Class Action Administrator in this case. The Court is not convinced that a Class Action Administrator will ultimately be necessary to implement the equitable relief in this case, which consists primarily of recalculated benefits for class members and reformation of the Plan. Based on the Court's rulings, the parties should be able to agree on the benefit calculations for each class member to be incorporated in the final judgment. Plaintiff argues that Hilton should not be trusted to implement the remedies in this case because of its history of violations. *See* Pl.'s Reply at 49. The Court shares Plaintiff's concern. Defendants' proposal does not provide for this Court's continuing jurisdiction or establish any protocols for monitoring compliance. While Plaintiff's proposal is too intrusive, Defendants' proposal is too lax. Therefore, once the remaining issues are resolved at a remedies hearing, the Court shall urge the parties to jointly propose a more limited monitoring plan to ensure that Defendants comply with the Court's remedial order. This may involve regular reporting to Class Counsel or to an independent third party monitor selected by the parties.

E.      *Payment Provisions*

Under Defendants' proposed remedy, class members who are entitled to additional benefits (either because of the change in benefits formula or because they are newly vested) shall receive "true up" payments reflecting benefits owed to them to date and increased annuity payments in the future reflecting their additional benefits. *See* Defs.' Br. at 9. Plaintiff does not disagree with these aspects of Defendants' proposal but offers several additional proposals. For example, Plaintiff argues that all benefit increases of less than $5 per month should be discharged with a lump sum payment rather than a series of future benefit payments. *See* Pl.'s Br. at 30-32.

36

Plaintiff also proposes that prejudgment and post-judgment interest be applied at a uniform rate of 6%. *See id.* at 32-33. Plaintiff also proposes a specific procedure to notify class members of increased benefit obligations due in the future. *Id.* at 33-34. Defendants do not specifically address Plaintiff's proposals.

With respect to Plaintiff's suggestion that benefit increases of less than $5 per month be discharged with a lump sum distribution, it is unclear why this would be administratively cost effective. If a participant is entitled to monthly pension benefits, Hilton already bears the administrative cost of distributing that benefit; it would not make sense to separate out the "increased" benefit owed due to this litigation as a lump sum payment. There may be some administrative savings with respect to participants who are newly vested and will receive less than $5 per month in benefits. However, participants may prefer an annuity to a lump sum payment, even if the monthly payment received is small; Plaintiff's proposal does not consider this possibility. Accordingly, the Court is not inclined to allow a lump sum payment option to replace future periodic payments. The Court has no problem with lump sum payments for benefits that are past due, as both parties' proposals contemplate.

The D.C. Circuit has held that prejudgment interest on unpaid ERISA benefits is presumptively appropriate. *Moore v. CapitalCare, Inc.*, 461 F.3d 1, 13 (D.C. Cir. 2006). Accordingly, the Court agrees with Plaintiff that interest should be awarded to compensate participants for the time value of their benefits, particularly in light of the protracted nature of this litigation. The decision on how to calculate prejudgment interest is subject to the Court's discretion. *Forman v. Korean Air Lines Co.*, 84 F.3d 446, 450 (D.C. Cir. 1996). The Court shall not decide an appropriate interest rate without input from Defendants on this issue. Accordingly,

37

the Court shall reserve this issue for later determination.

With respect to notice, Plaintiff proposes that participants who are not immediately due benefits be provided with notice of the original and increased benefit obligations and how benefits may be claimed, including return envelopes for participants to submit additional contact information. *See* Pl.'s Br. at 33-34. Defendants have not raised any specific objections to these procedures, and the Court does not foresee any problems with Plaintiff's notice proposal.

F.      *Cy Pres Provision*

Plaintiff proposes that the Court's remedial order include a *cy pres* provision to govern the distribution of benefits to class members and beneficiaries who cannot be located within three years. *See* Pl.'s Br. at 37-38. Pursuant to § 4.11 of the Plan, if a participant or beneficiary cannot be located within three years of the date on which benefits are payable, his or her benefit is forfeited, although it may be reinstated if a claim is later asserted by the participant or beneficiary. *See* 1987 Plan § 4.11. The *cy pres* doctrine, as used in the class action context, permits unclaimed funds to be distributed to the "next best" class, thus maximizing the number of individuals compensated. *See Democratic Central Comm. v. Wash. Metro. Area Transit Comm'n*, 84 F.3d 451, 455 (D.C. Cir. 1996). Generally speaking, *cy pres* provisions are warranted in situations where "identifying, locating, and notifying" class members would be difficult. *See id.* at 456. Here, however, the class members have all been individually identified, and there is no evidence that Hilton will have difficulty locating them. Moreover, any benefits forfeited under § 4.11 would remain in the Plan fund to be paid out to other participants, which is arguably the "next best" class. This is not the type of case for which the *cy pres* doctrine was intended. Therefore, the Court shall not include a *cy pres* provision in its order of equitable

relief.

G.    *Attorneys Fees and Incentive Awards*

Plaintiff indicates that he intends to apply for an incentive award of $50,000 for the named plaintiff, Jamal Kifafi, as well as for attorneys' fees and expenses.  *See* Pl.'s Br. at 37-40. The Court shall reserve any decision as to attorneys' fees and incentive awards until after a final judgment is entered in this case.

H.    *Further Proceedings in this Action*

Based on the Court's rulings as stated above, the parties should confer in an effort to determine what issues remain disputed.  To the extent there are disputes remaining regarding the proper equitable relief for the minimum accrual rate and vesting violations, the Court shall require further briefing and hold a hearing to decide disputed issues of material fact.  Plaintiff should identify each class member whom it believes (and Defendants dispute) should be provided with additional benefits or vesting service, and Defendants shall provide a legal and factual basis for the benefit and vesting determinations it makes with respect to each disputed class member's remedy.  Once the parties have filed these additional briefs and supporting schedules, the Court shall schedule a hearing to resolve any final factual disputes.  This hearing will not consider individual class member claims but class claims and issues impacting the methodology.

//

//

//

//

## IV.  CONCLUSION

The Court has reviewed the parties' submissions on remedies and made rulings on the major issues contested by the parties.  With respect to the backloading violation, the Court shall generally adopt Defendants' proposed revision to the benefits formula but reject Defendants' contention that relief should only be provided to participants who separated from service after 1987.  With respect to Defendants' failure to credit union service for purposes of vesting, the Court shall order Defendants to credit union but not other non-participating service, and the Court shall require Hilton to search its corporate records for information relating to class members' union service and permit class members to submit claims based on union service not reflected in records.  With respect to Defendants' violation of the 1000 hours of service standard, the Court shall adopt the parties' proposal to apply the 870/750 hours worked standard with hours equivalencies but reject Plaintiff's proposal to apply equivalencies to periods of time for which there are no records of hours of service.  With respect to Defendants' failure to credit the first year of participation, the Court shall reject Plaintiff's proposal to credit participants with a year of service for the first year in which there is any record of participating service.  With respect to Defendants' failure to credit leaves of absence, the Court shall not order additional discovery of corporate records.  The Court declines to order additional discovery of Hilton's records except with respect to union service, as mentioned above.  At this time, the Court does not see the need to appoint a class action administrator to oversee the implementation of final relief, but the parties should develop a more limited mechanism for monitoring Hilton's implementation of remedies.  The Court shall not approve lump sum payments in lieu of future benefits owed to participants, nor shall it include a *cy pres* provision in its final order.  Other

disputed issues of fact, such as the alleged application of unlawful equivalencies or elapsed time methods and discrepancies between versions of the Plan's database, shall be decided at a final remedies hearing.  An appropriate Order accompanies this Memorandum Opinion.


Date:   September 7, 2010


                                                      _/s/_____
                                                      **COLLEEN KOLLAR-KOTELLY**
                                                      United States District Judge