# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JAMAL J. KIFAFI, individually and on
behalf of all others similarly situated,

      Plaintiff,

      v.

HILTON HOTELS RETIREMENT PLAN,
*et al.*,

      Defendants.

Civil Action No. 98-1517  (CKK)

## MEMORANDUM OPINION
(August 31, 2011)

This action is brought by Plaintiff Jamal J. Kifafi, on behalf of himself and similarly

situated individuals, to recover for violations of the Employee Retirement Income Security Act of

1974, as amended ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, in the Hilton Hotels Retirement Plan

(the "Plan").  Defendants are the Plan, the individual members of the Committee of the Plan, the

Hilton Hotels Corporation, and individual Hilton officers or directors (collectively, "Defendants"

or "Hilton").  On May 15, 2009, this Court granted-in-part Plaintiff's motion for summary

judgment, finding that Defendants had violated ERISA's anti-backloading provision, 29 U.S.C.

§ 1054(b)(1), and had violated the Plan's vesting provisions with respect to the rights of four

certified subclasses.  *See Kifafi v. Hilton Hotels Retirement Plan*, 616 F. Supp. 2d 7 (D.D.C.

2009).  Having found that Defendants violated ERISA, the Court ordered the parties to submit

briefs regarding the equitable relief appropriate to remedy the violations.  On September 7, 2010,

the Court issued a ruling that addressed the parties' proposed remedies.  *See Kifafi v. Hilton

Hotels Retirement Plan*, 736 F. Supp. 2d 64 (D.D.C. 2010).  Among other things, the Court

endorsed Defendants' plan to remedy the backloading violation by amending the Plan's benefits formula and ordered Hilton to search its corporate records for information relating to class members' union service, which must be credited for vesting purposes. Following the Court's ruling, the parties submitted additional briefs regarding final equitable relief.

The Court held a hearing on July 28 and 29, 2011 to address the remaining remedial issues. Following the hearing, the parties submitted additional briefing regarding two discrete issues that were raised at the hearing. This Memorandum Opinion sets forth the Court's rulings and incorporates the discussion held on the record during the hearing. The rulings described below reflect the Court's judgment and discretion about the proper scope of equitable relief for the ERISA violations previously found by the Court.

## I. BACKGROUND

The history of the case is most thoroughly laid out in the Court's prior opinions, most significantly its opinion on summary judgment, *see Kifafi v. Hilton Hotels Retirement Plan*, 616 F. Supp. 2d 7 (D.D.C. 2009), and its most recent opinion regarding equitable remedies, *see Kifafi v. Hilton Hotels Retirement Plan*, 736 F. Supp. 2d 64 (D.D.C. 2010). The Court assumes familiarity with these opinions. Nevertheless, the Court shall review the facts of this case insofar as they are relevant to the issues discussed herein.

The Hilton Hotels Retirement Plan (the "Plan") is a defined benefit pension plan subject to ERISA. Benefits under the Plan accrue according to a formula based on an employee's average compensation and years of service, with an offset for the employee's Social Security benefits. *See* 616 F. Supp. 2d at 13-14. ERISA prevents employers from "backloading" benefits, i.e., using a benefit accrual formula that postpones the bulk of an employee's accrual to his later

years of service. *Id.* at 11. In order to prevent backloading, ERISA requires defined benefit plans to satisfy one of three alternative minimum accrual rules, known as the "3% rule," the "133 1/3% rule," and the "fractional rule." *Id.* at 11-12; *see* 29 U.S.C. § 1054(b)(1). Beginning in 1976 and continuing until 1999, the Plan contained an accrual schedule that was supposed to comply with ERISA's "133 1/3% rule." 616 F. Supp. 2d at 14. In 1999, after this lawsuit was filed, Hilton amended the Plan's benefit accrual formula seeking to comply with the fractional rule. *Id.* at 16. The 1999 amendment (Amendment 1999-1) also changed two unrelated aspects of the Plan that lowered benefits for participants. *Id.* Following briefing on summary judgment, this Court held that the pre-amendment Plan failed to comply with *any* of the three minimum accrual rules and that the pre-amendment Plan was required to comply with the 133 1/3% rule. *Id.* at 24. The Court concluded that "the Plan's participants are entitled to receive the benefits they would have accrued had the Plan complied with the 133 1/3% rule." *Id.* at 24. The Court also concluded that the 1999 amendment to the Plan did not moot the ERISA violation found by the Court. *Id.* at 25-28. The Court's ruling applies to a certified class of current and former Hilton employees (the "benefit-accrual class").[1]

The Court also found that Defendants had violated ERISA with respect to the vesting of benefits under the Plan, i.e., the time of service required for an employee to obtain a right to his

---

[1] The benefit-accrual class is defined as follows:

> all former and current employees of Hilton Hotels Corporation who were employed by Hilton Hotels Corporation after January 1, 1976 and have, or may obtain, a vested right to pension benefits from the Hilton Hotels Retirement Plan, and whose Hilton Hotels' pension benefits have been, or will be, reduced as a result of the Defendants' failure to accrue retirement benefits at the annual rates that ERISA requires.

*Kifafi v. Hilton Hotels Retirement Plan*, 189 F.R.D. 174, 176 (D.D.C. 1999).

or her accrued benefits.[2] Employees who terminated after January 1, 1989 need five years of service to become vested; employees who terminated prior to that date needed ten years of service. ERISA requires employers to count all of an employee's years of service for calculating his or her years toward vesting, even if they occur prior to participation in the retirement plan. 29 U.S.C. § 1053(b)(1); 616 F. Supp. 2d at 12. ERISA generally requires an employee with 1000 hours of service during a twelve-month period to be credited with one year of service. 29 C.F.R. § 2530.200b-1. In calculating the 1000 hours of service, the employer must count not only hours worked but also hours "during which no duties are performed . . . due to vacation, holiday, illness, incapacity . . . layoff, jury duty, military duty or leave of absence." *Id.* § 2530.200b-2(a). If an employer's existing records do not allow it to properly calculate an employee's hours of service, the employer may "use a permitted equivalenc[y]." *Id.* § 2530.200b-3(a). One such equivalency focuses on "hours worked," in which an employee who works 870 hours is credited with 1000 hours of service. *Id.* § 2530.200b-3(d).

Beginning in 1976 and continuing until the Plan was amended in December 2002, Hilton applied the 1000 hours standard for calculating employees' years of service. 616 F. Supp. 2d at 29. By its terms, the Plan required all periods of employment between the date of hire and the date of termination to be taken into account, including leaves of absences and union service. *Id.*

---

[2] As the Court previously explained, vesting and accrual are distinct but related concepts. 616 F. Supp. 2d at 10. "Vesting" concerns when an employee has a right to a pension, whereas "accrual" refers to the amount of benefits to which an employee is entitled. *Id.* at 10-11. "Because 'vesting is tied to length of employment' and the accrual of benefits 'depends upon participation in the plan,' it is possible for employees to 'earn credit toward vesting without accumulating any pension benefits.'" *Id.* at 11 (quoting *Holt v. Winpisinger*, 811 F.2d 1532, 1537 (D.C. Cir. 1987)).

at 14. The Court found that Defendants had violated the Plan's vesting provisions with respect to four certified subclasses: (1) they failed to credit employees' union service for purposes of vesting[3]; (2) they failed to properly apply the 1000 hours standard because they kept inadequate records; (3) they failed to credit employees' leaves of absence; and (4) they failed to count the year in which employees became participants in the Plan for vesting purposes. 616 F. Supp. 2d at 29-32. Accordingly, the Court ruled that the members of these vesting subclasses should be awarded the vesting credit to which they are entitled.

On September 7, 2010, the Court issued a Memorandum Opinion addressing the parties' competing proposals for equitable relief appropriate to remedy the backloading and vesting violations found by the Court. With respect to the backloading violation, the Court generally endorsed Defendants' proposal to amend the benefits formula by capping the Social Security offset at a certain level, mathematically ensuring that the annual accrual rate never falls below a required minimum. *See* 736 F. Supp. 2d at 71-73. The Court ordered the parties to recalculate benefits for the benefit-accrual class based on Defendants' formula and attempt to resolve any disagreements about the specific amounts owed to particular class members. *Id.* at 73.

With respect to the vesting violations, the Court's prior remedial order addressed a series of disputes between the parties. The Court rejected Plaintiff's proposal to count all periods of non-participating service as union service, and the Court also rejected Defendants' proposal to award credit for union service only where the Plan records indicate union service. The Court

---

[3] Although there was evidence in the record to suggest that Hilton failed to credit other types of nonparticipating service for purposes of vesting, the Court declined to expand the scope of the subclass beyond employees' union service for the reasons stated in that opinion. 616 F. Supp. 2d at 30 n.18.

ordered Defendants to conduct a search of their corporate records for information that would indicate union service by subclass members identified by Plaintiff. *See* 736 F. Supp. 2d at 75-76. The Court also ordered the parties to develop a joint proposal for a claims procedure to be administered by Defendants to subclass members who may have union service. *Id.* The Court determined that there were disputed issues of fact regarding the Plan's application of unlawful equivalencies to salaried employees, and this issue would need to be addressed at the remedies hearing. *Id.* at 80-81. The Court also indicated that it appeared that additional vesting credit was due to individuals identified in a "Services Prior" table in the Plan database. *Id.* at 81. The Court ruled that Defendants should credit participants for service based on the hours reflected in the Plan and the proper equivalencies, not based on an elapsed time method. *Id.* at 82. The Court also declined to rule on Plaintiff's claim that Hilton had improperly revised the Plan records since 2002, finding that the parties had not adequately addressed this issue in their briefs.

## II.  LEGAL STANDARD

Section 502(a)(1)(B) of ERISA allows a participant or beneficiary to bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Pursuant to this provision, the Court may order that participants' benefits be recalculated consistent with the terms of the Plan. *See Frommert v. Conkright*, 433 F.3d 254, 270 (2d Cir. 2006) ("The relief that the plaintiffs seek, recalculation of their benefits consistent with the terms of the Plan, falls comfortably within the scope of § 502(a)(1)(B).")

ERISA also has a "catchall" provision, Section 502(a)(3), which allows a participant, beneficiary, or fiduciary to "(A) enjoin any act or practice which violates any provision of this

subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3); *Varity Corp. v. Howe*, 516 U.S. 489, 507, 511 (1996). Where relief is otherwise available under Section 502(a)(1)(B), equitable relief under Section 502(a)(3) will not be "appropriate." *Varity Corp.*, 516 U.S. at 515. However, where a plan does not conform with the requirements of ERISA, relief under the catchall provision may be appropriate. The phrase "appropriate equitable relief" encompasses those categories of relief typically available in equity, such as injunction, mandamus, and restitution, but it does not include compensatory or punitive damages. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256-58 & n.8 (1993); *id.* at 258 n.8 ("'Equitable' relief must mean *something* less than *all* relief.") Thus, courts have found that equitable relief is appropriate in ERISA cases where it places participants "in basically the same financial position in which they would be if the employer had complied with the minimum requirements necessary for the [plan] to satisfy the accrual and vesting provisions of ERISA." *Carrabba v. Randalls Food Markets, Inc.*, 145 F. Supp. 2d 763, 770-71 (N.D. Tex. 2000), *aff'd*, 252 F.3d 721 (5th Cir. 2001) (per curiam).

### III. DISCUSSION

A.    *Remedies for the Backloading Violation*

1.    Benefits Formula for Participants Who Separated After 1981

The parties agree that based on the Court's prior rulings, Hilton shall cap the Social Security offset so that the minimum accrual formula for participants who separated from service after 1981 is as follows: 1.4325% of Average Monthly Compensation ("AMC") multiplied by Years of Benefit Service ("YBS") up to a maximum of 25 years, plus 0.375% of AMC multiplied

by YBS in excess of 25 years, up to 45 years. The parties further agree that AMC should be capped at $12,500 per month in accordance with applicable tax laws. As explained below, the parties disagree on whether further adjustments to this formula are necessary.[4]

### 2. Benefits Formula for Participants Who Separated Before 1982

The Plan's benefit formula was slightly different for participants who separated from service prior to 1982. For those participants, the Plan generally provides that the amount of benefits payable at retirement age is equal to 1.5% of the employee's AMC multiplied by YBS, minus the Social Security offset. The parties initially disagreed about the proper remedial formula for these participants, but they now agree that the Social Security offset should be capped so as to ensure that the minimum accrual rate is 1.125% of AMC (calculated by dividing the maximum 1.5% by 133 1/3%). Accordingly, the Court shall order this remedy that is agreed upon by the parties.

### 3. Benefit Offset for New York Hotel Association or Union Benefits

Plaintiff contends that Hilton should not be permitted to implement an offset for benefits earned by participants from the New York Hotel Association ("NYHA") or a union during periods of concurrent service, as the Plan currently provides. Plaintiff argues that these offsets simply create another backloading violation that, if left unremedied, would effectively nullify the Court's other remedies for the backloading violation. However, offsets for benefits earned from the NYHA or a union during concurrent periods of service were not a part of Kifafi's claims as

---

[4] Defendants initially argued that the benefit accrual formulas should be adjusted to correct an "anomaly" that occurs when participants work past normal retirement age. *See* Defs.' Br. at 9-12. However, Defendants have withdrawn this argument and no longer seek to adjust the formula with respect to years of service beyond normal retirement age. *See* Defs.' Surreply at 13.

litigated during summary judgment.  In Plaintiff's brief in support of his motion for summary judgment, he argued that "an offset of benefits earned from another plan based on a *non-concurrent* period of service is not permissible."  Pl.'s [177] Mot. for Summ. J. at 15 (emphasis added).  Plaintiff acknowledged that "[a]lthough years of union service are required to count for vesting, they do not generally count for purposes of benefit computations." *Id.* at 35.  Plaintiff explicitly stated that "ERISA's accrual rules do not allow benefits from another plan to be offset unless the benefits are based on 'concurrently operating' periods." *Id.* at 35.  Therefore, Plaintiff conceded at the summary judgment stage that offsets based on concurrent periods of service in another plan are permissible, and the Court did not make any finding of liability with respect to these offsets.

During the remedies hearing, Plaintiff argued that his concession was limited to concurrent periods of service in another plan offered by the same employer, i.e., Hilton.  In other words, Plaintiff concedes that participants' benefits could be offset by the benefits earned in another Hilton plan but not by the NYHA or union plans because they were not offered by Hilton.  Plaintiff relies on Revenue Ruling 76-259, which explained that a benefit offset based on an employer-provided profit-sharing plan would not violate ERISA's anti-backloading provision. *See* Rev. Rul. 79-259, 1976-2 C.B. 111.  Plaintiff reads Revenue Ruling 76-259 as providing only a limited exception for offsets based on other employer-provided plans.  But the ruling can also be interpreted as saying that benefits can be tested for backloading on a gross basis (before offsets for other plans), which would support Hilton's practice.  The IRS has never ruled that offsets for benefits earned in multiemployer plans such as the NYHA must be taken into account when assessing compliance with ERISA's anti-backloading rules.  In fact, when the IRS

examined the Plan in 2002 for compliance with the 133 1/3% rule, it examined only the Social Security offset and did not object to Plan's offsets for NYHA or union benefits. *See* Suppl. Poulin Decl., Ex. 4 (Technical Advice Memorandum), ECF No. 223-10.

Several courts have recognized that when an employee is enrolled in two pension plans for concurrent periods of service, ERISA does not prohibit offsets as long as they are explicitly prescribed in the plan. *See, e.g.*, *Potter v. Eaton Corp.*, 9 F.3d 1553, 1993 WL 438764, at *2 (9th Cir. Oct. 28, 1993) (Table) ("[T]he action of the administrators in applying the offset provision of the Eaton Plan did not deprive Potter of any vested interest in the Eaton Plan or of any interest in the Union Plan, it merely precluded double payment for the same years of employment with Eaton."); *accord Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504 (1981) (holding that ERISA permits offsets of pension benefits based on workers' compensation awards). Hilton's offsets for union or NYHA benefits in concurrent periods of service are designed to prevent participants from earning two pensions for the same period of service; they do not reduce participants' benefits under the Plan or shift those benefits to later years, which is what ERISA's anti-backloading rules are aimed at preventing. Therefore, the primary purpose of the anti-backloading rules—protecting employees who work for only a short period of time from vesting with a minimal amount of accrued benefits—would not be served by preventing Hilton from applying the offsets for NYHA and union benefits earned in concurrent periods of service as prescribed by the Plan.

Accordingly, the Court rejects Plaintiff's proposal to declare that the offsets based on concurrent periods of NYHA/union service are in violation of ERISA's anti-backloading rules, and therefore the Court's remedial order shall not include such a provision.

B.    *Remedies for Vesting Violations*

The parties have raised four issues with respect to the remedies for the vesting violations previously found by the Court.   The Court shall discuss them below.

1.    <u>Search for Records of Union Service</u>

In its earlier ruling on remedies, the Court ordered Defendants to conduct a search of their corporate records to determine whether there are any records that would indicate union service by 962 participants who were identified by Plaintiff as having enough union and non-participating service to become vested.  The Court further ordered Defendants to administer a claims procedure that will notify those subclass members for whom union service has not been identified that they may submit a claim if they believe they have union service that is not reflected in the records.  Defendants have now conducted a search for records and proposed a claims procedure for approval by the Court.  Plaintiff contends that Defendants' search was inadequate and that Defendants' proposed claims procedure is unduly burdensome for potential claimants.

Hilton's search efforts are documented in an affidavit submitted by Azalea Black, a senior paralegal assigned to Hilton's Labor & Employment Department.  *See* Aff. of Azalea Black ("Black Aff.") ¶ 1.  At the request of Hilton's counsel, Black searched Hilton's corporate records for evidence of union service by employees.  *Id.* ¶ 2.  According to Black, Hilton's owned and managed properties record union service using both payroll and personnel records.  *Id.* ¶ 4. Personnel records directly reflect union service by recording when an employee works in a union position; payroll records indirectly reflect union service by showing deductions from earnings to pay union dues and other union-related deductions.  *Id.*  Hilton maintains both types of records in

a centralized human resources database using the "PeopleSoft" platform; Hilton previously used a database system known as "Infinium." *Id.* ¶ 5. Defendants clarified during the remedies hearing that the Infinium records are no longer available. Records from the Infinium database were transferred to the PeopleSoft database in two phases in 1997 (for Hilton-branded hotels) and 2001 (for Hilton's other hotel brands). *Id.* However, during the transition, only the employment records of employees actively employed with Hilton were transferred into the PeopleSoft database. *Id.* Therefore, Hilton's PeopleSoft database does not contain records for employees who left Hilton before 1999. *Id.* In addition to searching the records in the PeopleSoft database, Black contacted 24 union properties still associated with Hilton at which potential class members may have had union service and reviewed storage logs for Hilton's off-site records in order to identify payroll or personnel records that could indicate union service. *Id.* ¶ 7. In total, Black searched for records relating to 44 current or former union properties. *Id.*

Of the 962 participants previously identified by Plaintiff, 152 have records in the PeopleSoft database. *Id.* ¶ 12. The only payroll or personnel records Black identified covering periods prior to participants' termination dates that indicate union service by the participants identified by Plaintiff are payroll records for the Pasadena Hilton covering the late 1980s and early 1990s. *Id.* ¶ 9. A search of these records revealed that one participant had union service at the property. *Id.* Defendants agree that this participant should be vested.

Plaintiff argues that Defendants' search is inadequate because it did not uncover employer contribution reports to union pension and health and welfare plans, such as through the Hotel Employees and Restaurant Employees International Union ("HEREIU") reporting system. However, Black states in her affidavit that none of the Hilton properties where class members

worked used the HEREIU reporting system except for the Chicago Hilton, which did not begin

using it until 2010, after all subclass members terminated their service.  Black Aff. ¶ 11.  Hilton

has stated that it is unaware of any other employer contribution reports that would be available

for searching.  Plaintiff also asks the Court to order Hilton to subpoena records from union plans

to indicate whether participants had union service.  The Court had previously indicated that class

counsel may seek to obtain records of union service directly from the unions whose members are

likely to be a part of the class.  *See* 736 F. Supp. 2d at 76 n.16.  However, after discussion during

the remedies hearing, the Court concludes that securing the information directly from the class

members is the better proposal.

      With respect to the notice to be sent to all potential claimants, the parties' primary

disagreement is over who should receive the notice.  The parties agreed during the remedies

hearing that Hilton should send a notice to the 962 participants previously identified by Plaintiff

(except for those that have already been vested).  However, Plaintiff argues that the notice should

also be sent to approximately 9700 participants whose records show a service date or a hire date

that precedes the first year of participation in the Plan.[5]  Although a gap between a service or hire

date and the first year of participation does not necessarily indicate union service, Plaintiff

contends these individuals may have had union service during this period that was not reflected

in the Plan's records.  Because Defendants failed to keep adequate records of union service, the

Court finds that it is appropriate to require Defendants to provide a notice to all those individuals

who could become vested if the time between their service date or hire date and their first year of

---

[5] Plaintiff did not identify these participants in its briefs on equitable relief; rather, it
proffered at the remedies hearing that there were approximately 9700 participants who fit into
this category.

participation in the Plan were credited for vesting purposes. Plaintiff shall promptly identify the participants who should receive notice and provide this information to Hilton, which shall be responsible for sending the notice to these participants.

The parties also disagree about the notice claims form. During the remedies hearing, the parties agreed to adopt a notice claims form similar to that employed in the *Forbush v. J.C. Penney Co.* class action settlement. *See Forbush v. J.C. Penney Co.*, 994 F.2d 1101 (5th Cir. 1993). In post-remedies hearing briefing, Defendants have provided a revised notice and claims form that is far simpler than the one they originally proposed. Plaintiff argues that the form drafted by Defendants is "difficult," but he fails to identify any particular infirmity. The Court is satisfied that Defendants' proposed form is better; it is fairly straightforward and asks for specific information that is targeted to the determination of union service. The Court shall therefore direct the parties to use Defendants' proposed form, as modified by the Court. Plaintiff also argues that Hilton should not be entrusted to administer the notice claims process, but the Court is not persuaded that it is appropriate at this time to appoint a claims administrator for the specific purpose of mailing and processing the claims forms. The Court shall require Defendants to share with Plaintiff the information received from any claimants so that Plaintiff may challenge Defendants' decisions regarding whether they should credit additional vesting service.

2.     Vesting Service for 195 Participants Based on the Court's Prior Rulings

In its prior ruling on remedies, the Court ordered Plaintiff to identify each class member who, based on the Court's rulings, should be provided with additional benefits or vesting service, and then Defendants would be required to provide a legal and factual basis for its determination with respect to each class member. Plaintiff initially identified 195 such individuals, and

14

Defendants eventually produced a supplemental expert report from Constance Hiatt that explains Defendants' decisions with respect to each of these individuals. During the remedies hearing, the parties indicated that Defendant had agreed to vest at least 65 of these individuals, and the parties identified three categories of individuals about whom there remained disputes: (1) 58 individuals whom Plaintiffs believe should be vested due to Hilton's improper application of equivalencies for salaried employees; (2) 21 individuals whom Plaintiffs believe should be vested based on pre-ERISA service; and (3) 22 individuals whom Plaintiffs believe should be vested for a variety of individualized reasons. During the remedies hearing, the parties agreed to submit supplemental briefing regarding the second category of individuals, and they agreed to try and resolve their disputes regarding the third category. In a Joint Status Report filed on August 22, 2011, the parties indicated that for 7 of the 22 individuals in the third category, the parties' disputes will be resolved by the union service claims procedure. The parties also indicated that Plaintiff had withdrawn his claim with respect to 3 of the remaining 15, leaving 12 individuals whose vesting status remains disputed by the parties. The Court shall discuss each category below.

3.    Application of Equivalencies to Salaried Employees

The parties continue to dispute whether the Plan records show the application of equivalencies to at least 58 salaried employees. *See* 736 F. Supp. 2d at 80-81. Plaintiff contends that for certain salaried employees, the Plan records do not show actual hours worked and instead use improper equivalencies.[6] *See* Suppl. Pienta Decl. ¶ 16. Plaintiff argues that a 190-hour

---

[6] Plaintiff initially argued during the first round of briefing on remedial issues that Hilton improperly used a 36-hour equivalency. Now, Plaintiff argues that Hilton used a variety of equivalencies depending on location, including a 35.5 hours equivalency at corporate headquarters. *See* Pl.'s Br. at 23; Suppl. Pienta Decl. ¶ 16.

equivalency should be applied to these participants. *Id.* ¶ 17.

Defendants' actuarial expert, Constance Hiatt, states that Hilton's policy was to report hours for salaried employees based on the hours the employees were regularly scheduled to work, i.e., the hours for which such employees worked and were entitled to be paid. *See* Hiatt Rep. ¶ 25. Hiatt states that based on her interviews with three former Hilton employees who worked in payroll and accounting, no property ever reported hours for exempt employees using a 36 hour or 35.5 hour equivalency, as suggested by Plaintiff. *Id.* Hiatt states that most salaried employees were scheduled to work 40 hours a week (although some were scheduled for 35 hours a week), and therefore the records of these employees' hours are based on these hours. *Id.* Accordingly, a salaried employee who was scheduled to work 40 hours a week and who did not have unpaid leave or overtime would have records showing 2080 hours for the year. *Id.* ¶ 28.

During the remedies hearing, Plaintiff argued that it did not make sense for Hilton to record hours worked for its salaried employees because there would have been no reason to do so, and therefore the records must be based on equivalencies. But Defendants explained that for whatever reason,[7] Hilton did record hours worked for salaried employees. Plaintiff informed the Court during the remedies hearing that he was relying on the statements made by Constance Hiatt in her report to support his claim that improper equivalencies were applied, but the Court disagrees with Plaintiff's interpretation of the report. Although some of the Plan records identified by Plaintiff do show some confusing numbers for reported hours,[8] Plaintiff has not

---

[7] Defendants' counsel conceded that he would be speculating as to the reason why Hilton recorded hours worked for salaried employees.

[8] For example, several participants who worked at the Los Angeles office have 1848 hours recorded annually for several years, which amounts to just over 35.5 hours per week. *See*

presented the Court with any credible evidence to suggest that Hilton applied improper equivalencies to salaried employees. Therefore, the Court shall not require Defendants to award vesting service to the at least 58 individuals identified by Plaintiff who are affected by this claim.

4. <u>Vesting Credit for Pre-ERISA Service</u>

The parties disagree about whether 21 participants should be vested based on the application of ERISA rules to years of vesting service that occurred prior to effective date of ERISA on January 1, 1976. Hilton contends that it is proper to use an elapsed time method for counting this pre-ERISA service because the Plan provides that service before ERISA's effective date is counted according to the pre-ERISA rules in place prior to January 1, 1976. Plaintiff contends that Hilton is misapplying ERISA's rules about changes in computation periods with respect to these 21 participants and that their pre-ERISA service should be counted according to ERISA rules. Plaintiff also contends that Hilton failed to apply the ERISA rules until 1977.

This issue was raised for the first time during the remedies hearing. Plaintiff attempts to lay the blame on Defendants for putting forth an "untimely proposal to use the elapsed time method to count vesting service before 1977." Pl.'s Post-Hr'g Reply Br. at 2. But Defendants' "proposal" has always been to follow the Plan except where necessary to remedy the violations previously found by the Court. Plaintiff may or may not have a valid concern about Defendants' calculation of pre-ERISA vesting service, but this was never a part of Plaintiff's claims in this case. The Court determined that Hilton violated the terms of the Plan's vesting provisions with

---

Pienta Decl. ¶ 16 & Ex. 2. This suggests that these participants worked exactly 28 hours above and beyond a full 35-hour workweek every year for several years, a figure that seems unusual and which Hilton cannot explain. Nevertheless, the Court is not persuaded that it is necessarily the result of an improper equivalency.

respect to the four certified subclasses by: (1) failing to credit employees with years of union service for vesting purposes; (2) improperly using a 1,000 hours service standard rather than an 870 hour standard; (3) failing to credit leaves of absence; and (4) failing to count for vesting purposes the year in which employees became participants in the Plan. *See* 616 F. Supp. 2d at 29-32. Plaintiff's claim that Defendants are improperly crediting pre-ERISA vesting service does not fall within these class claims, and therefore the Court finds that it is not appropriate to address this issue in its remedial order.

5.    <u>Remaining Individual Disputes</u>

The parties indicate that there are at least 12 individuals whose vesting status remains disputed by the parties. These disputes cannot be easily resolved by the Court without an individualized assessment of the Plan's records for each individual. The Court also anticipates that there will be further individualized disputes about vesting service following the administration of the union service claims process described above. It is also possible that the parties will have further disputes about individual participants' benefit amounts once Hilton recalculates benefits pursuant to the rulings contained in this Memorandum Opinion. Although the parties have suggested that the Court appoint a special master to resolve such individualized disputes, the Court is not persuaded that this task "cannot be effectively and timely addressed by an available . . . magistrate judge of the district." Fed. R. Civ. 53(a)(1)(C). Therefore, the Court declines to appoint a special master at this time.

Whenever the parties disagree about the calculation of benefits or vesting service with respect to any individual participant pursuant to the Court's rulings, the parties shall confer in an attempt to resolve their disputes. If they are unable to resolve these disputes, the Court shall

require the parties to proceed before a magistrate judge, who shall make a report and recommendation as to the calculations for each disputed participant, subject to review by this Court. The parties' disputes shall be limited to issues that were determined by this Court in the liability and remedy phases of this litigation; the parties shall not be permitted to raise new issues that the Court has not previously addressed. The Court shall retain jurisdiction for a period of two years to review such disputes about individual participants; the Court finds that a two-year period of time is sufficient in light of the finite number of class members affected and the nature of the parties' disputes.

C.    *Revisions to the Plan Database Between 2005 and 2009*

Plaintiff complains that the 2009 version of the Plan database contains several significant changes from the 2005 version of the database that are either improper or unexplained. In particular, Plaintiff complains that Hilton has: (1) removed 1098 vested participants from the 2005 version of its database without adequate explanation; (2) reduced the average monthly compensation to zero for 262 vested participants; (3) reduced the average monthly compensation by more than one dollar for 501 other vested participants; (4) reduced the years of benefit service by more than 0.1 years for 608 participants; (5) increased benefits for 6395 participants due to changes prior to the 1999 Plan amendment and for 8390 participants due to the 1999 Plan amendment without adequate notice. Although the parties have reached an agreement with respect to some of these disputes, the record indicates that the changes about which Plaintiff complains are the result of routine corrections to the Plan database and are not the result of any effort by Hilton to avoid responsibility for the backloading and vesting violations found by the Court. Accordingly, the Court need not make rulings about these issues in the context of the

final remedial order.  Nevertheless, the Court shall briefly summarize the parties' disputes.

### 1.    Construction and Validation of the Plan Database

The current Plan database is the result of a project launched by Hilton in 1999 to construct a new consolidated relational database containing all relevant employment and pension records needed to administer the Plan.  *See* Decl. of Renaud Vachon ("Vachon Decl.") ¶ 5.  Prior to creating this new database, Hilton relied on multiple sources to obtain the information needed to make vesting and benefit determinations.  *Id.*  Hilton retained Towers Perrin, the Plan actuary, to create the database, which in turn subcontracted the project to Renaud Vachon.  *Id.* ¶ 6.  The process of collecting the raw data from the various sources and combining it into the database continued until approximately 2003.  *Id.*  Throughout that process and afterward, Vachon examined the data to validate it and identify information that was either missing or incorrect.  *Id.*  Vachon validated the database by reviewing individual participants' records and making corrections where appropriate, such as by correcting data that was incorrectly copied from paper files, filling in missing data such as union or NYHA benefit information, and merging duplicate entries.  *Id.* ¶ 7.  Vachon reviewed individual records for each participant whose benefits were calculated differently using the newly constituted database.  *Id.* ¶ 9.

This validation process occurred from approximately 2003 to 2009.  *Id.* ¶ 7.  Vachon spent over 5800 hours creating and validating the database between 2002 and 2009, including over 2000 hours validating the database from 2006 to 2009.  *Id.* ¶ 9.  Vachon states that due to the individualized nature of the data validation inquiry, it is difficult to systematically describe or document the corrections that were made during this process.  *Id.* ¶ 11.  However, one systematic change was made with respect to union and NYHA benefits, which were not included during the

initial loading of the Plan database. *Id.* ¶ 12. The estimates of union and NYHA benefits were also updated to reflect the actual union or NYHA benefits once a participant reached retirement. *Id.* ¶ 13. Another systematic correction was made for participants who had multiple records in the same year; Vachon states that he reviewed each record to ensure that records were ordered chronologically. *Id.* ¶ 14. A third systematic correction was made to merge duplicate entries. *Id.* ¶ 15.

Based on the corrections made by Vachon between 2005 and 2009, Vachon avers that the 2009 version of the Plan database is more accurate than the 2005 version of the database. *Id.* ¶ 17. Plaintiff was provided with extracts of the databases in 2005 and 2009 that included only those participants who had received or will receive a benefit.

2. Revisions to the Plan Data

Based on the changes between the 2005 and 2009 extracts, Plaintiff complains that Hilton has removed 1098 participants from the class, reduced 262 vested participants' benefits to zero, reduced average monthly compensation for 501 individuals, and reduced years of benefit service for 608 individuals. Hilton now agrees that 315 out of the 1098 removed participants should be a part of the class and that the 262 vested participants' benefits were mistakenly identified as zero by the program that created the extract.[9] Hilton explains that 451 out of the 1098 removed participants were deceased with no beneficiaries yet identified. Although Hilton contends that its normal practice is to locate a beneficiary before attempting to calculate a benefit, Hilton agreed during the remedies hearing to calculate the benefits that would be owed to these beneficiaries if

_____

[9] Defendants re-collected the earnings histories for the 262 participants and provided a revised extract file to Plaintiff on January 12, 2011. *See* Decl. of Jonathan Youngwood, Ex. B.

they are located.

Hilton contends that the remaining 332 participants identified by Plaintiff were properly removed from the database either because they were determined not to be vested or because they died while in service but without a beneficiary.[10] Hilton also points out that it added 248 participants to the 2009 extract based on its revisions to the database. Hilton also contends that changes made with respect to the 501 participants with reduced average monthly compensation and the 608 participants with reduced years of benefit service were appropriately made as a result of the data validation efforts undertaken between 2005 and 2009. Plaintiff argues that there should have been an audit trail for any changes made to the database so that the changes could be easily tracked and verified. However, this has never been required by the Court as part of this litigation.

### 3. Notice and Payment of Increases in Benefits

Plaintiff also complains that Hilton has not produced evidence demonstrating that it gave notice to the thousands of participants whose benefits were increased between 2005 and 2009, either as the result of changes to the "pre-amendment" benefits or implementation of the 1999-1 Amendment. In response, Defendants contend that they have in fact notified and paid increased benefits between the 2005 and 2009 versions of the database. Defendants have provided a declaration from Javier Hernandez of Aon Hewitt, an actuarial consulting firm hired by the Plan, explaining the notice and payment of such increased benefits. *See* Decl. of Javier Hernandez ("Hernandez Decl."). Hernandez explains that when a correction to the Plan database was made

---

[10] The parties also agree that some of their disputes about these participants are based on their differing positions on contested issues that will be resolved by the Court's rulings.

by Renaud Vachon as part of the data validation efforts, Vachon would notify Aon Hewitt of the change and Aon Hewitt would notify the recipient of the increase or decrease in benefits. *Id.* ¶ 25 & Ex. H. According to Hernandez, all benefit recipients whose benefits were modified as a result of data validation efforts have been notified of the changes. *Id.* ¶ 25.

Hernandez also explains that the Plan began notifying and paying participants due increased benefits resulting from the 1999-1 Amendment in 2007. *Id.* ¶ 17. However, some participants who started receiving benefits before 2007, including named Plaintiff Jamal Kifafi, had their benefits calculated under the 1999-1 Amendment if those benefits exceeded the original benefit formula. *Id.* ¶ 24. Benefit increases for annuitants were implemented between July and September 2007; annuitants were notified of their benefit increases approximately one month prior to implementation. *See id.* ¶ 18 & Ex. D. When annuitants received their benefit increase, they received a lump sum payment (including interest) to compensate them for lower benefits between the effective date of the Plan amendment and the lump sum payment. *Id.* ¶ 18. According to Hernandez, the Plan has notified and paid all 406 annuitants who received a benefit increase under the 1999-1 Plan Amendment. *Id.*

Hernandez also states that nearly all benefit recipients who elected to receive lump sum payments instead of annuities have been notified and paid any benefit increases due to the 1999-1 Amendment. *Id.* ¶ 19. Hernandez states that notifying lump sum recipients has been more difficult because many distributions were made years ago and the Plan may no longer have current contact information for them. *Id.* The Plan has retained Pension Benefit Information Participant Research Services ("PBI") to locate lump sum recipients, and PBI has been able to locate 3079 of the 3876 participants due an increased benefit as a result of the 1999-1

Amendment.  *Id.*  Aon Hewitt mailed each lump sum recipient a notice of benefits form; the form asked the recipient to confirm his or her birth date and indicate how he or she would like to receive payment.  *Id.* ¶ 20.  Hernandez states that notices have been mailed to all but 137 lump sum recipients, and 2302 recipients have properly returned the election form and are now receiving increased benefits.  *Id.* ¶¶ 21-22.

Hernandez further states that the Plan has notified the Social Security Administration of the changes in benefits for plan years 2006 through 2008 by filing a Form 5500 Schedule SSA with the Internal Revenue Service.  *Id.* ¶ 27.  Filings for later plan years have been deferred until the IRS issues a replacement form.  *Id.*  Defendants also contend that notification of benefit changes to the Social Security Administration is voluntary.  Plaintiff disputes this and asks that the Court order an audit of the Plan's records from a qualified CPA firm to ensure that all notices and payments have been properly made.  However, the Court agrees with Defendants that this is unnecessary because the Plan is already audited every year, and a second audit would be repetitive and unnecessary.

### 4.    Conclusion Regarding Plan Database Changes Between 2005 and 2009

Ultimately, Plaintiff's complaints about the changes between the 2005 and 2009 versions of the Plan database fall outside the scope of the claims in this litigation.  Although the Court must ensure that Hilton does not use trickery to avoid awarding relief to class members for the backloading and vesting violations, Plaintiff is effectively asking the Court to take control over all aspects of the Plan until all remedial payments are doled out.  The Court declines to take such a drastic step.  As Defendants point out, the Plan provides an administrative procedure through which participants and beneficiaries can submit claims for benefits.  *See* Decl. of Jonathan K.

Youngwood In Support of Defs.' Unresolved Remedial Issues Response Br. ("Youngwood Decl."), Exhibit A (Hilton Hotels Retirement Plan (As Amended and Restated Effective January 1, 2007)) ("2007 Plan") § 6.4. To the extent that Hilton's validation efforts have improperly resulted in decreased benefits, participants and beneficiaries may utilize this mechanism to challenge any miscalculations. Because there is no evidence of a direct correlation between the changes made as a result of data validation efforts and the benefit and vesting violations previously found by the Court, the Court declines to adopt Plaintiff's proposal that the database be re-audited. To the extent that Hilton has improperly misapplied this Court's remedial order, the Court shall require the parties to confer regarding their disputes and resolve them through the process outlined by the Court above in section B.5.

D.     *Administrative Issues*

The parties have a series of disagreements over various issues relating to the method of administering payments and other administrative issues. The Court shall address each of these issues below. However, the Court shall begin by briefly explaining how participants typically receive their benefits under the Plan.

1.     Background

The normal retirement age under the Plan is age 65. When vested participants separate from service, Hilton sends them a letter advising them of their right to receive pension benefits at age 65 or, if they are eligible, a reduced early retirement benefit beginning at age 55.[11] *See* Defs.' Submission of Suppl. Materials, Ex. A. As these participants approach age 65, Hilton sends

_____

[11] Participants are generally eligible for early retirement benefits if they have ten years of vesting service.

them a letter advising them that they may begin drawing their pension at age 65. *See id.*, Ex. C.

Participants who are still employed with Hilton as they approach age 65 are informed that they

may begin receiving their pension at age 65 or defer receiving a benefit until they terminate their

employment, which would result in an actuarially increased benefit. *See id.*, Ex. B. Hilton also

sends out periodic notices to vested participants informing them of the value of their pension at

age 65 and providing information about the Plan. *See* Hernandez Decl., Ex. F. A participant

does not begin receiving benefits until he or she specifically requests them.

Generally speaking, participants receive their pension benefits in the form of an annuity.

However, if the present value of an annuity is less than $5000, Hilton may decide to pay the

participant in a lump sum rather than an annuity.[12] Participants generally do not have the option

of choosing to receive a lump sum if the present value of their annuity is greater than $5000.

The normal form of retirement benefit for a participant who is not married when he or she

starts receiving benefits is a single life annuity. *See* 2007 Plan § 4.5(a). For participants who are

married when they start receiving benefits, the normal form of the retirement benefit is a

qualified joint and survivor annuity that pays an annuity for the life of the participant with a

survivor annuity for the life of the surviving spouse that pays 50% of the value of the

participant's annuity. *Id.* A married participant may waive his or her right to a joint and survivor

annuity and elect instead to receive a single life annuity. *Id.* § 4.5(b). However, the participant's

spouse must consent in writing to such an election, and the spouse's consent must specify the

form of benefits to be paid and any contingent annuitant. *Id.* The spouse's consent may not be

---

[12] During the remedies hearing, Defendants explained that if the present value of an annuity is less than $1000, Hilton requires the participant to receive a lump sum; if the present value is between $1000 and $5000, the participant may choose to receive a lump sum.

revoked. *Id.* Participants may also elect certain optional forms of benefits in lieu of a single life annuity. *See id.* § 4.8.

### 2. Back Payments for Annuitants

The parties agree that for current annuitants and the surviving spouses or heirs of deceased annuitants, back payments should be calculated based on the date when the annuity commenced. However, the parties disagree about whether back payments should be made to participants who could have been annuitants—i.e., those who are newly vested as a result of the Court's rulings, those who previously elected to receive a lump sum payment, and those who have not yet begun receiving benefits. Plaintiff contends that the Court should assume that these participants would have elected to receive their increased benefits at the earliest possible date (which typically will be at age 65) and order that back payments be made to these participants dating back to that period. However, Plaintiff has not explained why the Court should make that assumption; it is just as plausible that participants would have elected to defer receiving benefits until a later date. The factors a participant is likely to consider in deciding when to receive benefits are myriad, and there is no basis in the record for the Court to make a reasoned judgment as to when most participants would have chosen to start their benefits.[13]

Moreover, except for newly-vested participants, Plaintiff's proposal would effectively disregard participants' earlier decisions about when to start receiving pension benefits. Plaintiff

---

[13] Plaintiff modified his proposal during the remedies hearing to recommend that the Court set a "default" rule based on the assumption that an annuity would be taken as soon as possible and to allow participants to change that decision if they preferred not to take a lump sum. The Court declines Plaintiff's invitation to give participants a choice about receiving a back payment. Besides the fact that this may create problems of adverse selection, it introduces yet another step into an already complicated remedial scheme, which the Court deems unnecessary.

argues that this is appropriate because these participants did not know they would be entitled to receive increased benefits when they started receiving their pensions. But the same could be said for current annuitants, and Plaintiff is not proposing to let them change the date on which they started their annuities for purposes of receiving a back payment. Therefore, the Court disagrees that it is appropriate to assume that participants who chose to receive benefits at a certain date would have made a different decision at the time based on any increased benefits they are now entitled to receive.

Defendants' proposal is simply to provide participants who could have been annuitants with an annuity starting at the present time (or at a future date if participants elect to defer it) and not make any back payments (which would be paid in a lump sum). Defendants explain that these participants will receive a current annuity that is actuarially equivalent to the one they would have received had they elected to receive it at the earliest possible date; they will simply be getting larger annuity payments in the future instead of a lump sum for back payments. Therefore, on an actuarial basis, there is no harm to participants by requiring them to commence a new annuity in the present rather than award payments based on a hypothetical past. Accordingly, the Court endorses Defendants' proposal, which is consistent with the existing procedures in the Plan.

### 3. Lump Sum Payments

The parties disagree over the procedures that should be followed for administering lump sum payments. Hilton's proposal—which is based on its current procedures—is to distribute lump sum payments for past unpaid annuity payments regardless of the amount of the lump sum, and to increase the amount of the annuity for future payments. Plaintiff claims that this practice

violates 29 U.S.C. § 1055(g), which imposes a $5000 cap on lump sum distributions for the present value of an annuity without the annuitant's consent. *See* 29 U.S.C. §§ 1053(e), 1055(g). However, the $5000 limit is aimed at lump sum distributions of the present value of future distributions, not back payments that are remedial in nature. Therefore, there is no compelling reason to limit lump sum distributions to $5000 as long as the distribution accounts for past payments owed. To the extent that Defendants are making lump sum payments for future distributions in excess of $5000, those payments would violate § 1055(g).

Plaintiff also proposes that lump sum distributions be calculated without a "pre-retirement mortality discount," which is part of the Plan's existing provisions. Plaintiff argues that ERISA prohibits the use of a pre-retirement mortality discount to calculate lump sum distributions, and therefore it should not be applied to the lump sum distributions that are required as part of the Court's remedial order. Defendants disagree with Plaintiff, arguing that the Plan's existing provisions are compliant with ERISA, specifically 26 U.S.C. § 417(e). Plaintiff conceded during the remedies hearing that he did not challenge this aspect of the Plan in his amended complaint. At this time he seeks to have different rules applied to the class members than other Plan participants for whom lump sum distributions must be calculated. The Court declines to expand the scope of Plaintiff's claims at the remedial stage of the litigation, and therefore the Court shall not address Plaintiff's argument that the Plan's application of a pre-retirement mortality discount violates ERISA. Hilton shall calculate lump sum distributions in accordance with the Plan's existing provisions.[14]

_____

[14] Plaintiff also proposed that lump sum distributions be calculated with a 4.5% interest rate. However, Defendants explained that the Plan's provisions, together with 26 U.S.C. § 417(e), prescribe a method for determining the appropriate interest rate. Plaintiff's proposal to

4.     Payments to Surviving Spouses and Beneficiaries

Plaintiff has made a variety of proposals to address payments that must be made to surviving spouses and beneficiaries when a participant is deceased.  The parties agree that surviving spouses of participants who died after retiring should be awarded increased benefits in a lump sum payment.  However, the parties disagree over how these lump sums should be calculated.  During the remedies hearing, it became clear that the parties' dispute centers around whether or not participants' elections to receive a single life annuity instead of a qualified joint and survivor annuity should be honored with respect to the increased benefits that are now owed by Hilton.  Because this issue was not clearly addressed in the parties' briefs on equitable relief, the Court asked the parties to submit supplemental briefing, and the Court has reviewed the parties' supplemental briefs.

Hilton's position is that surviving spouses should not be paid a qualified joint and survivor annuity if the deceased annuitant previously selected a single life annuity (or other optional form of benefit) with the spouse's consent.  That is consistent with the Plan, which states that a spouse's consent to waive a survivor annuity is irrevocable.  Plaintiff argues, however, that a spouse's prior consent to waive a survivor annuity is only valid with respect to the specific value of the pension at the time the consent was given.  Plaintiff argues that the spouse did not consent to waive a survivor annuity with respect to any *increased* benefit that results from the Court's remedial order, and therefore the Court should follow the statutory presumption and award a survivor annuity to the surviving spouses of deceased participants.

---

uniform interest rate of 4.5% is arbitrary, and the Court sees no reason not to follow the Plan's existing provisions.

Plaintiff argues that spousal consent should be construed strictly, relying on *Lasche v. George W. Lasche Basic Profit Sharing Plan*, 111 F.3d 863 (11th Cir. 1997), where the Court held that the spouse's consent was ineffective because it was not properly witnessed. *Id.* at 866-67. But the issue before the Court involves spouses who validly consented to waive their right to a survivor annuity.

While it is certainly true that spouses did not specifically give their consent with respect to any increased amount of benefits that may be required by this Court's rulings, the Court is not convinced that their prior consent to waive a survivor annuity should be deemed invalid. Benefits may be increased for any number of reasons, such as a plan amendment or a correction in the plan data, and ERISA does not provide for—let alone require—a new election period with respect to an increase in benefits. ERISA regulations state that "[n]o consent is valid unless the participant has received a general description of the material features, and an explanation of the relative values of, the optional forms of benefit available under the plan . . . ." 26 C.F.R. § 1.417(e)-1(b)(2)(i). Therefore, although Hilton may be required to disclose the actual benefit to participants, *see id.* § 1.417(a)(3)-1(d)(2)(ii), the regulations do not make disclosure of the actual benefit amount a condition for valid consent.

Plaintiff's proposal would undoubtedly be beneficial for the surviving spouses of participants who died unexpectedly early after receiving retirement benefits. But it may not be as beneficial for all surviving spouses. Furthermore, the Court notes that Plaintiff has not proposed to let the spouses of *living* participants take a survivor annuity for increased benefit amounts where they previously waived their right to a survivor annuity. Therefore, Plaintiff's proposal treats the surviving spouses of deceased participants differently than the living spouses of living

participants, despite the fact that they are otherwise similarly situated. The Court is not persuaded that this is appropriate. Accordingly, the Court endorses Hilton's proposal to pay increased benefits in accordance with participants' prior elections as to the form of benefit.

The parties agree that the surviving spouses of deferred vested participants who died before electing any annuity should be paid the present value of the original and increased deferred benefit obligations discounted from the earliest retirement age. The parties also agree that the surviving spouses and heirs of deceased participants who previously received lump sum distributions should be paid the present value of the increased benefit discounted from the earliest retirement age in a lump sum distribution. These proposals are consistent with the Plan's existing provisions. *See* 2007 Plan §§ 4.7, 4.13(e)(4).

### 5.     Locating Participants, Spouses, and Beneficiaries

The parties disagree over the extent to which Defendants must seek to locate participants, spouses, and other beneficiaries for whom Hilton presently does not have contact information. According to the declaration of Javier Hernandez, Hilton's Plan administrators have worked in conjunction with PBI to locate these individuals. *See* Hernandez Decl. ¶ 13. Plaintiff essentially contends that Hilton should be able to do better than it is presently doing with its location efforts. However, Plaintiff has not offered any better alternative options for locating these participants. Accordingly, the Court declines to order Hilton to take additional steps beyond utilizing PBI to locate these individuals.

### 6.     Pre- and Post-Judgment Interest

The parties agree in their briefs that the appropriate rate for pre-judgment interest is 6% per year in accordance with D.C. Code § 28-3302. However, the parties disagree over whether

pre-judgment interest should be simple or compound. "[T]he determination whether to award simple or compound interest is a matter largely within the discretion of the district court." *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed. Cir. 1995). Plaintiff argues that compound interest is the most appropriate mechanism for ensuring adequate relief for older class members who have been denied benefits for many years. *See McKesson Corp. v. Islamic Republic of Iran*, 752 F. Supp. 2d 12, 22 (D.D.C. 2010) ("Prejudgment interest at a compound rate is appropriate under federal law where simple interest is insufficient to make plaintiffs whole."). The Supreme Court recently noted that it is "heresy" in the actuarial world not to account for the time value of money, *see Conkright v. Frommert*, 130 S. Ct. 1640, 1650 (2010), and other courts have noted that compound interest is more likely to provide complete compensation. *See, e.g.*, *Am. Nat'l Fire Ins. Co. ex rel. Tabacalera Contreras Cigar Co. v. Yellow Freight Sys., Inc.*, 325 F.3d 924, 938 & n.11 (7th Cir. 2003) (describing compound interest as "the norm" in federal-question cases). Accordingly, the Court finds that it is appropriate to compound prejudgment interest annually at a rate of six percent.

Post-judgment interest is governed by 28 U.S.C. § 1961. That statute provides that "[s]uch interest shall be calculated from the date of entry of judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding[] the date of the judgment." 28 U.S.C. § 1961(a).

## IV. CONCLUSION

The Court has now reviewed the parties' submissions on remedies and made final rulings on the issues contested by the parties. As explained above, the Court shall not preclude Hilton

from applying offsets for NYHA or union benefits earned in concurrent periods of service. The Court shall require Hilton to send a notice and claims form regarding potential union service to all participants whose service date or hire date precedes their first year of participation in the Plan. The Court rejects Plaintiff's claim that Hilton has applied improper equivalencies to salaried employees. The Court declines to remedy any violations based on pre-ERISA service because it is outside the scope of Plaintiff's claims in this action. The Court also declines to order Hilton to produce additional records or reverse changes that were made as part of its data validation efforts between 2002 and 2009. The Court rejects Plaintiff's proposal to award back payments based on the assumption that participants would have elected to receive benefits at the earliest possible retirement date. The Court also endorses Defendants' proposal to award lump sum distributions in accordance with the Plan's existing provisions. The Court shall not require Hilton to presume a qualified joint and survivor annuity for participants who previously elected a different form of benefit. The Court shall award prejudgment interest at a rate of six percent, compounded annually.

The Court shall publish a final remedial order that contains the Court's rulings with respect to equitable relief as expressed in this Memorandum Opinion and the Court's September 7, 2010 Memorandum Opinion. Defendants have indicated that they will need to amend the Plan to implement the Court's rulings. After Defendants have drafted the Plan amendment, the Court shall adopt the Plan amendment as part of a subsequent implementation order. The Court shall require Defendants to revise their benefit and vesting calculations in accordance with the Court's ruling and provide that information to the Plaintiff for review. In the event that the parties disagree about the calculation of benefits or vesting service with respect to any individual

participants pursuant to the Court's rulings, the parties shall confer in an attempt to resolve their disputes. If they are unable to resolve these disputes, the Court shall require the parties to proceed before a magistrate judge, who shall make a report and recommendation as to the calculations for each disputed participant, subject to review by this Court. The parties' disputes must be limited to issues that were determined by this Court in the liability and remedy phases of this litigation; the parties shall not be permitted to raise new issues that the Court has not previously addressed. Other disputes about individual participants' benefits may be resolved through the Plan's internal claims procedures.

The Court declines Plaintiff's request to adopt the specific vesting and benefit determinations for each class member in its final remedial order. The Court's final remedial order accompanies this Memorandum Opinion.


Date: August 31, 2011

                                          _/s/_____
                                          **COLLEEN KOLLAR-KOTELLY**
                                          United States District Judge