# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JAMAL J. KIFAFI, individually and on
behalf of all others similarly situated,

    Plaintiff,

      v.

HILTON HOTELS RETIREMENT PLAN,
*et al.*,

    Defendants.

**Civil Action No. 98-1517 (CKK)**

## MEMORANDUM OPINION
(February 4, 2015)

This action was brought by Plaintiff Jamal J. Kifafi, on behalf of himself and similarly

situated individuals, to recover for violations of the Employee Retirement Income Security Act

("ERISA") of 1974, as amended, 29 U.S.C. §§ 1001 *et seq.*, in the Hilton Hotels Retirement Plan

(the "Plan"). Defendants are the Plan, the individual members of the Committee of the Plan, the

Hilton Hotels Corporation, and individual Hilton officers or directors (collectively, "Defendants"

or "Hilton"). On May 15, 2009, this Court granted-in-part Plaintiff's motion for summary

judgment, finding that Defendants had violated ERISA's anti-backloading provision, 29 U.S.C.

§ 1054(b)(1), and had violated the Plan's vesting provisions with respect to the rights of four

certified subclasses. *See Kifafi v. Hilton Hotels Retirement Plan*, 616 F. Supp. 2d 7 (D.D.C.

2009). On August 31, 2011, the Court issued a final remedial Order requiring Defendants to

amend the Plan to remedy the backloading and vesting violations and commence awarding back

payments and increased benefits to class members. *See generally* Order (Aug. 31, 2011), ECF

No. [258]. The Court stayed its August 31, 2011, Order pending the United States Court of

Appeals for the District of Columbia Circuit's resolution of the parties' appeal of the Court's liability and remedial orders. Mem. Op. & Order (Jan. 19, 2012), ECF No. [313], at 10–11. The Court granted the stay contingent upon Defendants posting a supersedeas bond in the amount of $75.8 million to secure the judgment. *Id.* at 11. Presently before the Court is Defendants' Motion to Release the Supersedeas Bond. Also before the Court are Plaintiff's Motion for Post-Judgment Discovery and Motion to Modify the Judgment in Aid of Enforcement, which Plaintiff effectively filed in opposition to Defendants' Motion. Upon consideration of the pleadings,[1] the relevant legal authorities, and the record as a whole, the Court finds that Defendants have satisfied the terms of the Court's judgment. Accordingly, Defendants' Motion to Release the Supersedeas Bond is GRANTED and Plaintiff's Motion for Post-Judgment Discovery and Motion to Modify the Judgment in Aid of Enforcement are DENIED.

## I. BACKGROUND

### A. Procedural History

The history of the case is thoroughly laid out in the Court's prior opinions, most significantly its opinion on summary judgment, *see Kifafi v. Hilton Hotels Retirement Plan*, 616 F. Supp. 2d 7 (D.D.C. 2009), and its opinions regarding equitable remedies, *see Kifafi v. Hilton Hotels Retirement Plan*, 736 F. Supp. 2d 64 (D.D.C. 2010) (initial remedial order); *Kifafi v. Hilton Hotels Retirement Plan*, 826 F. Supp. 2d 25 (D.D.C. 2011) (final remedial order); *Kifafi v.*

---

[1] Defendants' Motion to Release the Supersedeas Bond Obligation ("Defs.' Mot."), ECF No. [382]; Plaintiff's Response to Defendants' Motion to Release Bond and in Support of Discovery and Modification to Secure Complete Relief ("Pl.'s Opp'n"), ECF No. [385]; Defendants' Reply Memorandum in Support of Defendants' Motion to Release the Supersedeas Bond ("Defs.' Reply"), ECF No. [386]; Plaintiff's Motion for Post-Judgment Discovery and Modification in Aid of Enforcement ("Pl.'s Mot."), ECF No. [384]; Defendants' Opposition to Plaintiff's Motion for Post-Judgment Discovery and Modification in Aid of Enforcement ("Defs.' Opp'n"), ECF No. [387]; Plaintiff's Reply in Support of Motion for Post-Judgment Discovery and Modification in Aid of Enforcement ("Pl.'s Reply"), ECF No. [388].

*Hilton Hotels Retirement Plan*, 825 F. Supp. 2d 298 (D.D.C. 2011) (order on amendments to remedial plan). The Court assumes familiarity with these opinions. Nevertheless, the Court shall review the facts of this case insofar as they are relevant to the issues discussed herein.

On August 31, 2011, the Court issued its final remedial Order requiring Defendants to (1) amend the Plan's benefit accrual formula to remedy the backloading violation; (2) administer a claim procedure for crediting participants' years of union service for vesting purposes; (3) award back payments for increased benefits that should have been paid in the past; and (4) commence increased benefits for all class members by no later than January 1, 2012.  Order (Aug. 31, 2011), at 7, 9.  The Court retained "continuing and exclusive jurisdiction over the parties and over the administration and enforcement of this Order for a period of two (2) years."  *Id.* at 10–11.

Defendants and Plaintiff appealed the Court's liability and remedial orders to the United States Court of Appeals for the District of Columbia Circuit and Defendants sought a stay pending appeal, which the Court granted "until thirty days after the exhaustion of Defendants' appeal to the United States Court of Appeals for the District of Columbia Circuit."  Mem. Op. & Order (Jan. 19, 2012), at 11.  As Defendants asserted that they were only appealing the Court's rulings as to the backloading class, the Court granted the stay of the August 31, 2011, Order "to the extent it requires Defendants to amend the Plan or pay out benefits as part of the backloading remedy."  *Id.*  The Court still required Hilton to begin the process of paying out original benefits to newly vested participants.  *Id.* at 10-11.  The Court's granting of the stay was contingent upon Defendants posting a bond in the amount of $75.8 million, "Hilton's undisputed estimate of the increased liability the Plan faces under the Court's judgment in 2012, in order to secure Plaintiff's interest in the judgment."  *Id.* at 9.

3

On December 14, 2012, the Court of Appeals affirmed the Court's liability and remedial orders. *See Kifafi v. Hilton Hotels Retirement Plan*, 701 F.3d 718 (D.C. Cir. 2012). The Court of Appeals mandate was issued on January 23, 2013. *See* Ct. of Appeals Mandate, ECF No. [340]. Accordingly, the stay of the Court's final remedial order, which had been stayed until thirty days after the resolution of the parties' appeal, was lifted and the Court's two-year continuing and exclusive jurisdiction over the parties and over the administration and enforcement of its final remedial order began to run on February 22, 2013. The Court's jurisdiction over the parties and the administration and enforcement of the August 31, 2011, final remedial Order terminates on **February 23, 2015**.

Following the Court of Appeals' mandate, Defendants filed a Motion for Clarification, which the Court granted in part, clarifying that Defendants were not required to enact and implement the Plan amendment until after the Court's resolution of Plaintiff's motion for attorney's fees. Order (Oct. 11, 2013), ECF No. [366], at 4–5. The Court ordered Defendants to "amend the Plan within seven days of the Court's final order on the Plaintiff's motion for attorney's fees." *Id.* at 5–6. In turn, the Plan amendment required that the amendment "be implemented as soon as administratively feasible, but no later than 90 days from date of Court's final order resolving the Plaintiff's motion for attorney's fees, with respect to any payment required, or required to be increased." *See id.* at 7 (internal brackets omitted).

On November 18, 2013, the Court entered its final order on Plaintiff's Motion for Attorney's Fees. Order (Nov. 18, 2013), ECF No. [375]. Accordingly, Hilton was required to amend the Plan by no later than November 25, 2013, and implement the amendment by no later than February 16, 2014.

## B. Hilton's Efforts to Satisfy the Court's Judgment

As evidence of the efforts they have made to satisfy the Court's August 31, 2011, judgment, Defendants present sworn declarations from Javier Hernandez, Principal and consulting actuary with Aon Hewitt, the firm Hilton hired to provide recordkeeping and other consulting services in support of Hilton's administration of the Plan;[2] from Michael W. Duffy, Senior Vice President—Corporate Accounting of Hilton Worldwide, Inc.;[3] and from Ted Nelson, Vice President Benefits Americas of Hilton Worldwide, Inc.[4] These sworn declarations detail the efforts Defendants have made to comply with the Court's judgment.

Plaintiff has challenged Defendants' reliance on these declarations, arguing that they are "conclusory" and not sufficiently detailed to establish Defendants' compliance or substantial compliance. Pl.'s Opp'n at 6. Plaintiff contends that Defendants cannot simply rely on summary declarations or exhibits, but must provide the actual records supporting those exhibits. *Id.* at 7. In support of his argument, Plaintiff relies on this Court's ruling in *SEC v. Kenton Capital, Ltd.*, 983 F.Supp. 13 (D.D.C. 1997), where this Court rejected defendant's "bald and conclusory statements in his affidavit" supporting his contention that he was unable to satisfy an order of disgorgement because he had repaid several loans. 983 F.Supp. at 15. The Court finds Plaintiff's reliance on *Kenton Capital* unavailing because that case involved the defendant himself simply averring that he could not satisfy a court order because he had repaid several loans. *Id.* Moreover, it was clear to the Court that the defendant had more than sufficient assets

---

[2] Declaration of Javier Hernandez ("Hernandez Decl."), ECF No. [382-2]; Supplemental Declaration of Javier Hernandez ("Hernandez Suppl. Decl."), ECF No. [386-2].

[3] Declaration of Michael W. Duffy ("Duffy Decl."), ECF No. [382-3].

[4] Declaration of Ted Nelson ("Nelson Decl."), ECF No. [386-3].

to make the required payment. *Id.* at 16.  Here, by contrast, Defendants have provided sworn declarations from Hilton officials intimately involved with the benefits process and from an official from the accounting firm responsible for administrating the Plan, all attesting in great detail how Defendants have complied with the Court's judgment.  Defendants also provided directly to Plaintiff's counsel a summary categorization spreadsheet, "detailing participant-by-participant, which class members had been paid increased benefits or sent notices of increased benefits, including how much was paid to each participant."  Defs.' Opp'n at 5-6 (citing Declaration of Jonathan K. Youngwood, ECF No. [386-1], Ex. C; Declaration of Allison C. Pienta ("Pienta Decl."), ECF No. [385-5], Ex. 4, at 3).  Defendants' declarations do not make "bald and conclusory" assertions that the judgment has been satisfied, but break the class members down into different categories and detail the efforts they have made to satisfy the judgment as to each category and sub-category of class members.  Most importantly, through the briefing of these two motions, Plaintiff has had the opportunity to challenge Defendants' representations in their declarations.  The Court engages with each of those challenges in this Memorandum Opinion.  Although the Court shall order Defendants to provide limited additional information regarding their efforts to locate class members as discussed below, Plaintiff's challenges do not put into question the Court's reliance on Defendants' declarations.  Accordingly, the Court finds that Defendants' declarations provide sufficiently detailed and reliable evidence for the Court to rely on these declarations in evaluating whether Defendants have complied with the Court's August 31, 2011, judgment.

The declarations supporting Defendants' Motion to Release the Supersedeas Bond Obligation present the following information regarding Defendants' compliance with the Court's August 31, 2011, judgment.   Defendants state that three days after the Court's attorney's fees

order, Hilton executed the Plan amendment pursuant to the Court's August 31, 2011, and
October 13, 2013, orders.  *See* Duffy Decl. ¶ 7.  In addition, Defendants sent notices of increased
benefits to approximately 20,000 class members.  Hernandez Decl. ¶ 6.  Of these class members,
Hilton has paid lump sum payments or increased annuities to more than 11,000 class members
totaling $33.3 million.  Hernandez Suppl. Decl. ¶ 4.  Hilton has provided notice of increased
benefits to another approximately 5,600 class members who are not currently in pay status or
have chosen not to begin their benefits yet.  Hernandez Decl. ¶ 8.  As to these approximately
16,600 class members, Defendants contend that they have fully satisfied the Court's judgment
because these class members have received the full benefit they are due from the Court's
judgment at this point.  Defs.' Reply at 8.

As for the remaining class members, Hilton contends that they are class members whom
"neither Defendants nor Plaintiff have, after significant efforts, been able to locate or from whom
Defendants require information from the class member before Defendants can process the
payment."  *Id.* at 7.  Specifically, Defendants aver that 1,847 Plan participants or their survivors
have not responded to the notice of benefit increases or have had their notices returned as a "bad
address" by the United States Postal Service.  Hernandez Decl. ¶ 7.  Defendants have not
identified any address for another 149 participants who are eligible for a benefit increase.  *Id.*
Approximately 1,400 class members have not received any payment because they have not
responded to benefit communications seeking information necessary to pay their benefits.  *Id.*
Finally, Hilton is presently taking steps to confirm that 135 claimants of deceased participants'
benefits are in fact the appropriate payee.  *Id.*

Defendants note that Hilton enlisted a search firm, Pension Benefit Information
Participant Research Services ("PBI"), which was approved by the Court, to search for and

update the addresses of Plan participants so that they could be notified of their benefit increases

and paid. *Id.* ¶ 4. Hilton has also used information provided by Plaintiff about Plan participants'

addresses in its efforts to locate all Plan participants. *Id.* ¶¶ 4, 7.

Finally, Defendants aver that they have paid Plaintiff's counsel $21,738,000 in attorney's

fees and expenses pursuant to the Court's final attorney's fees order and sent Plaintiff's counsel

the $50,000 incentive award due Mr. Kifafi. Duffy Decl. ¶ 9.

## II.   LEGAL STANDARD

### A.  Supersedeas Bond

Under Federal Rule of Civil Procedure 62(d), an appellant may obtain a stay of a

judgment pending appeal by posting a supersedeas bond. Fed. R. Civ. P. 62(d). "The purpose of

a supersedeas bond is to preserve the status quo while protecting the non-appealing party's

rights pending appeal." *Halliburton Energy Services, Inc. v. NL Industries,* 703 F. Supp. 2d 666,

669 (S.D. Tex. 2010) (quoting *Poplar Grove Planting & Refining Co. v. Bache Halsey Stuart,*

*Inc.,* 600 F.2d 1189, 1190–91 (5th Cir. 1979)). Typically, "[c]ourts release supersedeas bonds

when the bond has served its purpose and no outstanding judgment remains." *Goss Int'l Corp. v.*

*Tokyo Kikai Seisakusho, Ltd.,* No. 00–CV–35–LRR, 2006 WL 4757279, at *3 (N.D. Iowa Aug.

9, 2006) (citations omitted). "A supersedeas bond posted for a stay of execution of judgment

should be released once all appeals are exhausted, the stay has been lifted and full payment has

been made." *Id.* (citation omitted). In certain circumstances, however, courts will release the

supersedeas bond even though the judgment award has not yet been fully paid. *See, e.g.,*

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Cubic*

*Defense System, Inc.,* No. 98–CV–1165–B, 2012 WL 2152068, at *3 (S.D. Cal. June 12, 2012)

(entering an order of satisfaction stating that Defendant "paid the bulk of the judgment but that it

may also be liable for attorney's fees and pre-judgment interest"); *Halliburton Energy Services, Inc.,* 703 F. Supp. 2d at 670 (releasing the bond where the "outstanding exposures at the Site [were] either nearly resolved or beyond the scope of the monetary award that the bond is securing" and defendant had "indicated that it will pay the outstanding amounts . . . within the next two weeks.").

### B.  Post-Judgment Discovery

"A court's powers to enforce its own injunction by issuing additional orders is broad, particularly where the enjoined party has not fully complied with the court's earlier orders." *National Law Center on Homelessness & Poverty v. U.S. Veterans Admin.*, 98 F.Supp.2d 25, 26–27 (D.D.C. 2000)); *see also Mass. Union of Public Housing Tenants v. Pierce*, No. 78–1895, 1983 WL 150, at *4 (D.D.C. Jan. 17, 1984)   ("It is undisputed that a Court has the power to enforce its orders, . . . and that in addition, a court has the authority to inquire whether there has been any disobedience of its orders." (citing *Shillitani v. United States*, 384 U.S. 364, 370 (1965); *In re Debs*, 158 U.S. 564, 595 (1895); and *In re Williams*, 306 F. Supp. 617 (D.D.C. 1969))).   However, "before a court . . . permits extensive discovery of suspected violations of its judgment, there should be at least a prima facie showing by the aggrieved party of disobedience of the order."   *800 Adept, Inc. v. Murex Sec., Ltd.*, No. 6:02-cv-1354-ORL-19DAB, 2007 WL 2826247, at *2 (M.D. Fla. Sept. 25, 2007) (quoting *N.W. Controls, Inc. v. Outboard Marine Corp.*, 349 F. Supp. 1254 (D. Del. 1972)); *see also Pierce*, 1983 WL 150, at *4 (concluding that "since plaintiffs have failed to present a prima facie case for non-compliance with the final judgment of the Court, no further discovery will be allowed.").   A court may find that a party moving for post-judgment discovery failed to meet its burden based on the nonmoving party's evidence of compliance with the court's judgment. *See Cent. Soya Co. v. Geo. A. Hormel & Co.*,

515 F. Supp. 798, 800 (W.D. Okla. 1980) (finding plaintiff not entitled to post-judgment discovery based on defendant's affidavit evidencing its compliance with court's judgment); *see also Pierce*, 1983 WL 150, at *4 (finding plaintiff "failed to present a prima facie case for non-compliance" given defendant's evidence of compliance).

### III.    DISCUSSION

The Court's main task for resolving both motions before the Court is the same: determine to what extent Defendants have complied with the Court's August 31, 2011, judgment.  Plaintiff proposes two different ways to measure Defendants' compliance.  First, Plaintiff asks the Court to look at the numbers; specifically, the dollar amount Defendants estimated they would spend satisfying the judgment in its first year as compared to the dollar amount Defendants have *actually* spent implementing the judgment in its first year.  Second, Plaintiff asks the Court to consider the class members to whom Defendants have paid their portion of the judgment. According to Plaintiff, Defendants have not complied with the Court's judgment under either measure.

The Court notes at the outset that it is not inclined to measure Defendants' compliance based on the estimated and actual dollar amounts spent on the judgment.  Defendants assert that they have paid approximately $33.3 million in increased benefits to class members.  Plaintiff notes that this number is substantially lower than the $75.8 million in judgment liabilities Hilton estimated it would incur in the first year of implementing the judgment when the Court set the bond in 2012.  Pl.'s Opp'n at 41.  Plaintiff also notes that it is lower than the $87 million in benefits which Hilton stated in its 2014 10-K report that it expected the Plan would pay out in its first year of implementing the judgment.  *Id.* at 24.  The Court will not measure Defendants' compliance based on how close Defendants have come to paying out $75.8 or $87 million or any

10

other estimated amount in judgment liabilities because these amounts were clearly and simply estimates.  As Hilton's Vice President Benefits Americas notes in his sworn declaration, the $87 million estimate is "an upper boundary on the amount that could be paid during 2014."  Nelson Decl. ¶ 5.  It "is calculated based on certain assumptions, including, but not limited to, that participants not yet receiving benefits will generally choose to receive their benefits at age 61 . . . and that all participants, surviving spouses, and heirs can and will be identified and located during 2014."  *Id.*  Similarly, the other dollar amounts by which Plaintiff seeks to measure Defendants' compliance are broad estimates liable to constant change given the many factors that determine when and whether a Plan participant or beneficiary will ultimately receive a retirement benefit.  *See* Pl.'s Reply at 10-11. The fact that Defendants have not paid out an amount close to the amounts they estimated they would pay does not mean Defendants have been doing something wrong and are not compliant with the Court's judgment.  As such, the fact that Defendants have not paid out the amount they broadly estimated they would pay in satisfying the Court's judgment is not by itself significant. What is significant to measuring compliance are Defendants efforts to remit payments to class members.  Indeed, Plaintiff himself appears to recognize that this is the most appropriate measure of Defendants' compliance because the majority of Plaintiff's briefing is focused on critiques of Hilton's efforts to locate and pay all class members.

Accordingly, in evaluating Defendants' compliance with the Court's judgment, the Court will consider the efforts Hilton has made to reach and pay all class members and the number of class members Hilton has paid or for whom Hilton has otherwise satisfied the judgment.  The Court accepts Defendants' representations that they have paid benefit increases to more than 11,000 class members and notified of their benefit increase approximately 5,600 class members

who are not currently in pay status or have chosen not to begin their benefits yet.  The Court

finds that Defendants' have satisfied the judgment as to these approximately 16,600 class

members. The only remaining question before the Court then is whether Defendants can be

considered in compliance with the Court's judgment in light of their efforts to locate and pay the

remaining class members.

The Court recognizes that Defendants are attempting to implement a judgment that is not

static or sum certain.  The provision of retirement benefits is a constantly evolving process as the

status of Plan participants and benefits due is perpetually changing.  Consequently, in evaluating

whether Defendants have complied with the judgment, the Court is looking for systemic

problems or failures in Defendants' implementation of the judgment.  While refinements and

adjustments to Defendants' efforts to implement the judgment might be appropriate, the

propriety of such improvements would not undermine the Court's finding that Defendants have

complied overall with the judgment.  The Court shall address in turn below each of Plaintiff's

arguments that Defendants are not in compliance with the Court's judgment.  Ultimately, the

Court finds that Defendants are in compliance such that they satisfied the terms of the Court's

judgment. Accordingly, the Court shall grant Defendants' request to release the supersedeas

bond.

## A.  Compliance with the Judgment

### i.    Class Members Listed as "No Benefit Increase Due"

Plaintiff's first category of arguments relates to class members whom Plaintiff alleges

have not been paid benefits which they are due.  Specifically, Plaintiff argues that Hilton's most

recent summary categorization spreadsheet inaccurately categorizes 663 individuals as "No

Benefit Increase Due" when they are due a 1999-1 Amendment[5] benefit or a 1999-1 Amendment benefit and a backloading benefit. Pl.'s Opp'n at 26. Plaintiff also argues that Retirement Calculator records provided by Hilton in October 2009 show that "at least 1,082 individuals are due 1999-1 benefit increases that have not been paid." *Id.* at 26-27.

In their Reply, Defendants argue that Plaintiff's concerns about payments of the 1999-1 Amendment benefits are irrelevant to Defendants' compliance with the Court's August 31, 2011, judgment because the 1999-1 Amendment was outside the scope of this case. Defendants clarify that the spreadsheet they provided Plaintiff only reflects "payments to class members who are due a *backloading Plan amendment* benefit increase"—it does not reflect "payments due only a 1999-1 Amendment because the 1999-1 Amendment was not implemented under the Court's order . . . ." Defs.' Reply at 12 (citing Hernandez Suppl. Dec. ¶ 5). Thus, "No Benefit Increase Due" means that no benefit increase is due under the backloading Plan amendment alone. *Id.* at 12. Defendants explain that, accordingly, 487 of the participants on the spreadsheet are listed as "No Benefit Increase Due" because they are due only a 1999-1 Amendment benefit. *Id.* (citing Hernandez Suppl. Decl. ¶ 6). Defendants provide four alternative reasons for why the participants whom Plaintiff has identified as due both a 1999-1 Amendment benefit and a backloading benefit are listed as "No Benefit Increase Due." *Id.* at 12-13.

The Court agrees with Defendants that payment of the 1999-1 Amendment benefits is outside the scope of this case. Indeed, the Court explicitly stated in its December 28, 2011, Order that "the payment of benefits under the 1999-1 Amendment are outside the scope of this

---

[5] Shortly after Plaintiff moved for class certification in November 1998, Hilton amended the Plan's benefit accrual formula. The 1999 amendment ("1999-1 Amendment") sought to comply with ERISA's fractional rule and changed two unrelated aspects of the Plan that lowered benefits for participants. *See Kifafi*, 616 F. Supp. 2d at 16.

case. The Plaintiff never challenged the Amendment, and the Court has never ruled on its validity except to say that it did not moot the class' backloading claims." Order (Dec. 28, 2011), ECF No. [304], at 8; *see also Kifafi v. Hilton Hotels Retirement Plan*, 999 F.Supp.2d 88, 98 n. 5 (D.D.C. 2013) ("*payment* of the baseline benefits under the 1999-1 Amendment and the Amendment's validity has always been outside the scope of this case . . . ."). Accordingly, to the extent that Plaintiff has concerns about the payment of 1999-1 Amendment benefits from the information provided in the summary categorization spreadsheet[6] or Hilton's Retirement Calculator,[7] these concerns have no bearing on Defendant's compliance with the Court's August 31, 2011, judgment and are not appropriately raised in this forum. The more appropriate forum would be Hilton's own claims appeals process. *See* Order (Dec. 28, 2011), at 8 ("If a participant believes they have not received the 'baseline' benefits owed under the Plan generally or as a result of intervening amendments, the administrative appeals process is the proper forum for that dispute.").

Hilton's own claims appeals process is also the most appropriate forum for Plaintiff's challenge to Defendants classifying as "No Benefit Increase Due" approximately 250 participants who Plaintiff alleges are due both a 1999-1 Amendment benefit and a backloading benefit. Defendants provide four reasons for why a participant in this category might not be due

---

[6] Defendants have clearly explained why participants due only a 1999-1 Amendment benefit are listed as "No Benefit Increase Due" on the summary categorization spreadsheet and explained that, of those participants, 374 are in pay status and have been paid their 1999-1 Amendment benefit, and 113 are not yet in pay status, but will be paid their benefit when they enter pay status. Defs.' Reply at 12 (citing Hernandez Suppl. Decl. ¶ 6).

[7] The Court notes that even though Plaintiff's arguments about Defendants' payment of the 1999-1 Amendment benefits are outside the scope of this case, Defendants nevertheless investigated Plaintiff's claim that 1,082 individuals have not been paid their 1999-1 Amendment benefit per the Retirement Calculator records. Defendants provided an explanation for why these individuals have not been paid and have been working to provide corrective payments for the affected participants. *See* Defs.' Reply at 14-15 (citing Hernandez Suppl. Dec. ¶ 12).

a backloading benefit increase based on that participant's particular life or payment history.  *See* Defs.' Reply at 12-13.  Plaintiff's challenge to the non-payment of these individuals is more appropriately characterized as a challenge to the denial of an individual claim as opposed to a broader challenge to Defendants' overall compliance with the Court's judgment.  To the extent Plaintiff's counsel identifies individuals in this category who believe they are owed a benefit payment, Hilton's claims appeals process is the most proper forum for Plaintiff's counsel to address that complaint.  While Plaintiff may have identified instances where individual adjustments for individual class members need to be made through Hilton's claims appeals process, these individual claims do not affect Defendants' overall compliance with the judgment nor evidence a systemic failure in the implementation.  Accordingly, the Court finds that Plaintiff's concerns about the payment of benefits to these categories of participants have no bearing on Defendants' overall compliance with the Court's August 31, 2011, judgment.

### ii.    Adequacy of Efforts to Confirm Class Members' Addresses

Plaintiff's second category of arguments relates to Defendants' efforts to locate class members.  Plaintiff argues that Defendants are mailing notices of benefit increases to unconfirmed addresses, but are not doing any follow-up for 4,121 notices sent when there has been no response to the notice or the mail is returned as undeliverable.  Pl.'s Opp'n at 32. Plaintiff also argues that Defendants have prematurely ended efforts to locate 149 individuals with "no addresses."  *Id.* at 33.  Plaintiff contends that, through their own efforts, they have been able to locate alternative addresses for each of the 149 "bad address" class members.  *Id.*

Defendants contend that they are making sufficient efforts to locate and follow-up with class members whose addresses are unconfirmed.  Defendants explain that they have used PBI— the search firm approved by the Court—to locate class members and that the Court did not order

that they make any additional efforts to locate class members.  Defs.' Reply at 22.  Defendants

further explain that when a notice addressed to a "bad address" is returned, "Defendants review

their files for any additional addresses, including any provided by Plaintiff.  A mailing is then

sent to the address believed to be the next best address."  *Id.* at 21-22 (citing Hernandez Suppl.

Decl. ¶ 27).

Defendants are correct that the Court has "decline[d] to order Hilton to take additional

steps beyond utilizing PBI to locate" class members.  *Kifafi*, 826 F. Supp. 2d at 44.

Nevertheless, the robustness of Defendants' efforts to locate class members has been a

continuous complaint on Plaintiff's part.  Accordingly, the Court shall order Hilton and PBI to

place on the public record a sworn declaration regarding their search efforts in order to resolve

this issue prior to the expiration of the Court's jurisdiction on February 23, 2015.  Specifically,

the Court shall order Defendants to provide a sworn declaration to the Court averring as to

whether they have verified that the addresses located by Plaintiff for the 149 "bad address" class

members are indeed correct addresses.  The Court shall also order PBI to provide in this sworn

declaration a description of their efforts undertaken to locate class members and, specifically, to

follow up when no response is received or a notice is returned as undeliverable or as addressed to

a bad address.  PBI shall also indicate whether they have taken all steps to locate class members

in conformance with prevailing industry practices.  If PBI is making all efforts to locate class

members in conformance with prevailing industry practices, the Court, in turn, will be satisfied

that Defendants are making all efforts to locate class members in compliance with the Court's

orders.   While it is possible that the declaration provided by Hilton and PBI will reveal

improvements that could be made to Defendants' efforts to locate class members, the Court

nevertheless finds that any room for improvement does not undermine the conclusion that

Defendants' efforts to locate class members are in compliance with the Court's judgment.

###   iii.   Adequacy of Efforts to Distribute Payments to Located Class Members

Plaintiff's third category of arguments revolves around the notices and information forms Defendants sent to class members to obtain information necessary to pay each class member his or her benefits.  Plaintiff contends that the inefficiencies in these forms and the manner in which they are sent out keep class members from obtaining their benefits.  Specifically, Plaintiff takes issue with the fact that Defendants do not send a "form for early or normal retirement" along with the notice of benefit increase when the notice is sent to a class member.  Pl.'s Opp'n at 30. Plaintiff also challenges the Information Form that Defendants send to surviving spouses and non-spouse beneficiaries.  Plaintiff claims it is not necessary for these forms to request Death Certificates, information about all of the decedent's marriages and the decedent's creditors, nor is it necessary to request the form be notarized.  *Id.* at 28.  Within the same category of complaints, Plaintiff contends that he has received three reports that the call center Defendants established to answer inquiries about increased benefits is providing incorrect information to class members "including information discouraging class members from pursuing their rights to benefits."  *Id.* at 35.

Defendants explain that they do not send retirement forms along with the initial notice of increased benefits because they do not want to send "highly personal and sensitive benefit information" to a class member before receiving that class member's confirmation, in response to the notice, that Defendants are contacting the class member at the correct address.  Defs.' Reply at 20 (citing Hernandez Suppl. Decl. ¶ 26).  As for the information requested on the Information Form, Defendants argue that they are taking reasonable steps to ensure that payments are made to the proper payees and to determine the value of any benefit due.  *Id.* at 15-

17

16 (citing Hernandez Suppl. Decl. ¶¶ 14, 15).  Finally, Defendants argue that three reports that the call center provided class members incorrect information is not evidence that Defendants are noncompliant with the Court's judgment order.  *Id.* at 25.  Defendants emphasize that they regularly "provide[] re-training to the entire call center team," they "conduct[] monthly random call audits to monitor customer service quality and the accuracy of the information provided by representatives," and "when any quality or accuracy issues are uncovered, they are immediately addressed and re-training conducted as necessary to correct them."  *Id.* at 25 (citing Hernandez Suppl. Decl. ¶ 34).

After reviewing all notices and information and retirement forms provided by the parties as exhibits to their briefs, the Court finds that Defendants are generally taking reasonable steps to ensure that the most class members receive their benefits while also protecting privacy concerns and ensuring that benefits are actually dispersed to the proper payee. The Court agrees with Defendants that it is in all parties' interest for Defendants to first ensure that they have the correct address for a class member before sending that class member their retirement forms. However, if PBI or Defendants have confirmed the class member's address, the Court finds there is no reason for Defendants not to send the increased benefits notice and retirement forms to the class member in the same mailing.

The Court finds that Defendants have provided reasonable explanations as to why the information they are requesting of surviving spouses and non-spouse beneficiaries on the Information Form is needed.  The Court does not find it unduly burdensome to require the completed Information Form to be notarized.  The Court does agree with Plaintiff, however, that Defendants should use the Social Security Master Death Index instead of requesting Death Certificates of class members since such a request is unnecessarily burdensome given that

Defendants can efficiently learn of a participant's date of death through the Master Death Index. While the Court understands that requiring Defendants to search the Social Security Master Death Index instead of waiting for the class member to produce a Death Certificate will result in additional work for Defendants, unless there are grounds to assert that the Social Security Master Death Index is an unreliable source, the Court finds that eliminating the Death Certificate requirement will cut down on additional paperwork that beneficiaries need to gather.  Assuming the Social Security Master Death Index is reliable, Defendants shall eliminate the request for Death Certificates from the Information Form sent to class members going forward. Furthermore, the Court understands that the Information Form now sent to class members replaces a more ad hoc method of requesting information that Defendants employed when they first began implementing the Court's judgment.  If Defendants did not receive the information they needed from this earlier ad hoc method, Defendants should send the new Information Form to the class members from whom they have not received the requested information.[8]  The modifications the Court is requiring to Defendants' notice and information-gathering system should not be viewed as evidence that Defendants have not complied with the Court's overall judgment, but should be viewed simply as certain improvements the Court is requiring be made

---

[8] Defendants developed the Information Form as a more comprehensive and systematic method of collecting information from beneficiaries.  Defs.' Reply at 15 (citing Hernandez Suppl. Decl. ¶ 14).  When they initially began implementing the Court's judgment, Defendants had been collecting the information they needed through ad hoc requests on benefit increase notices and were requiring documents such as birth certificates, letter testamentary, and letters of administration.  *Id.*  Plaintiff challenges these requirements as unnecessary and unduly burdensome in his briefing.  *See* Pl.'s Opp'n at 27-28.  However, since Defendants no longer require these documents in the new Information Form, the Court need not address Plaintiff's arguments.  *See* Pienta Suppl. Decl. ¶ 33.  To the extent that these requirements in Defendants' initial notice letter created a barrier to class members obtaining their benefits, the Court seeks to remedy such a barrier by requiring Defendants to send the new Information Form to class members from whom Defendants never received the necessary information for dispersing their benefits.

to Defendants' system for implementing the judgment.

Finally, the Court agrees with Defendants that they are taking all reasonable steps to ensure that the information provided to class members by the call center is accurate. Evidence that three class members allegedly received inaccurate information does not support a finding that Defendants have not complied overall with the Court's judgment. In sum, the Court finds that Defendants are generally taking reasonable steps to ensure that the most class members receive their benefits.

### iv.    Progress with Newly Vested Class Members and Vesting Service Claimants

Plaintiff's fourth category of complaints is that Defendants have not paid benefits to a sufficient number of newly vested participants or vested a sufficient number of "union service" claimants for the Court to view the judgment as satisfied. Specifically, Plaintiff complains that only 212 of the 713 newly vested participants have been paid according to Defendant's summary categorization spreadsheet. Pl.'s Opp'n at 29. Of the 2,612 class members who were selected to receive union service claim noticing, Plaintiff complains that only 551 vesting claims have been received and only 165 of those claims have resulted in vesting. *Id.* Plaintiff alleges that class members who contacted the call center were discouraged from filing claims unless they were positive they had union service. Pienta Suppl. Decl. ¶ 48. In regards to the union service vesting claims, Plaintiff also argues that Defendants' letters denying vesting claims do not comply with the requirement set out in ERISA, and mirrored in the Plan itself, that all denials of claims shall set forth "the specific reason or reasons for the adverse determination" and describe the procedures for reviewing the adverse determination. Pl.'s Opp'n at 29-30 (quoting The Plan, ECF No. [341-2], Ex. C, at § 7.2).

Defendants respond that 588 participants have been paid or are deferred vested and have

been noticed their entire benefit, and another 68 were paid their original and 1999-1 Amendment benefit. Defs.' Reply at 18 (citing Hernandez Decl. ¶¶ 20-22). Defendants explain that "[a]s is true for all participants due a true up, the only participants who remain unpaid are participants that have not been located by any party or for whom information is needed from the participant to complete payment." *Id.* at 18. Defendants contend that Plaintiff's argument that Defendants have made little progress in paying these participants is based on a misinterpretation of the benefits reflected in Defendants' summary categorization spreadsheet as discussed in Part III.A.i. *Id.* at 17. As for union service claims, Defendants respond that while the claims evaluation process was "slowed by the [Social Security Administration] giving conflicting advice on whether it would accept the form approved by the Court," Defendants "properly administered the union service claims process" ordered by the Court, determined all union service claims that were received, mailed notices to claimants informing them if they were vested with the claimed service credited, and have paid 100 of the 166 individuals who were vested. *Id.* at 18-19 (citing Hernandez Suppl. Decl. ¶¶ 23-25). Of the remaining participants, 48 are deferred vested and not yet in pay status, three are deceased and in the claims review process, one has a bad address and has not been located, and 14 have been sent the paperwork to start their benefit, but have not yet responded.[9] *Id.* at 20 (citing Hernandez Suppl. Decl. ¶ 24).

The Court finds that Defendants have made sufficient efforts towards satisfying the Court's judgment for these class members. This category of complaint is in essence a complaint that Defendants have not paid benefits to enough class members in these two categories.

---

[9] As of Defendants' February 2, 2015, Status Report on the Mailing of Union Service Notice and Claim Forms, 552 individuals have returned union service claim forms or a Social Security Earnings Request form and Defendants have vested 171 participants who are due a benefit. Status Report (Feb. 2, 2015), ECF No. [398], at 4.

However, as was made clear in the discussion relating to Plaintiff's second and third category of complaints, payment to all class members is not necessarily immediately feasible or immediately due or, in the case of union service claimant class members, ever due.   Consequently, the dispositive question is whether Defendants have made reasonable efforts to comply with the judgment and pay those who are due benefits and whether they will continue to make such efforts.   In regards to these specific categories of class members, Plaintiff does not offer any new argument concerning Defendants' compliance efforts that has not been addressed by the Court in relation to Plaintiff's previous two categories of complaints.   The Court has found that Defendants are making reasonable efforts to comply with the Court's judgment and shall order Defendants to provide the information and make the changes discussed above to assure the Court that the maximum number of class members receives the benefits they are due.   To the extent that Plaintiff uses this category of arguments to challenge the denial of vesting for specific individuals, the Court reiterates that Hilton's claims appeals process is the proper forum for these individual complaints.

The Court does, however, share some of Plaintiff's concern with Defendants' letter denying vesting claims.   Having reviewed the letter Defendants sent to class members who "could be eligible to claim additional vesting credit," the Court finds that it is most appropriately characterized as a hybrid acceptance/denial letter.   *See* Pl.'s Opp'n, Ex. 12.   In the letter, Defendants explain that they are accepting the class member's claim to additional years of service, but then indicate that the class member "did not qualify for benefits under the Plan."   *Id*. Pursuant to 29 U.S.C. § 1133 of ERISA "any participant or beneficiary whose claim for benefits under the plan has been denied" must receive "adequate notice in writing" "setting forth the specific reasons for such denial" and "a reasonable opportunity" "for a full and fair review by the

appropriate named fiduciary of the decision denying the claim." The Plan parrots this language and more explicitly requires the "claimant's right to a review" be explained in the denial letter. *See* The Plan, Ex. C, at § 7.2. While the Court finds that the letter sufficiently explains the basis for the denial of benefits—"*with the additional service*, you did not qualify for benefits under the Plan"—the letter does not meet Plan requirements because it does not provide an explanation of the procedures for reviewing adverse determinations. Pl.'s Opp'n, Ex. 12 (emphasis added). Accordingly, Defendants shall amend the "denial letter" to provide notice of the claimant's right to review if his or her claim to additional vesting service does not result in a benefit under the Plan. Changing the letter does not change the outcome that a class member did not qualify for benefits, but it does provide the class member notice of how to challenge the outcome. Defendants shall also send the amended "denial letter" to those claimants who already received a "denial letter" without the notice of the claimant's right to review.

### v.   Other Compliance Concerns

#### a.   Notice to Social Security Administration

Among Plaintiff's final complaints, Plaintiff argues that Defendants are not fully compliant with the Court's judgment because they have not provided notice of the increased deferred vested benefits to the Social Security Administration ("SSA") as required by 26 U.S.C. § 6507(a). Pl.'s Opp'n at 31-32. The provision of such notices to the SSA was not part of this Court's judgment. These notices are required by statute and the Court assumes that Defendants will follow the statute. Accordingly, Plaintiff's complaint regarding SSA notices has no bearing on the Court's evaluation of Defendants' compliance with the Court's judgment.

#### b.   Default Presumptions

Likewise, Plaintiff's argument that Defendants are not using defaults to process payments

fails to establish that Defendants are not complying with the Court's judgment.  *Id.* at 33-34. None of the Court's orders have required the use of presumptions in paying benefits to class members.  Indeed, in the Court's August 31, 2011, final remedial Order, the Court specifically rejected the use of presumptions similar to those which Plaintiff is presently arguing Defendants should employ.  *See Kifafi*, 826 F. Supp. 2d at 41-42, 43-44.  Accordingly, Plaintiff's complaint regarding default presumptions has no bearing on the Court's evaluation of Defendants' compliance with the Court's judgment.

      **vi.**    **Release of the Supersedeas Bond**

Having made the above findings regarding Defendants' compliance with the Court's August 31, 2011, judgment, the Court concludes that Defendants are in compliance such that the judgment is satisfied.  In sum, the Court finds that Defendants have paid increased benefits to approximately 11,000 of the approximately 20,000 class members, and sent notices of benefit increases to approximately 5,600 class members who are not yet in pay status and due a benefit. Defendants have unquestionably satisfied the Court's judgment as to these approximately 16,600 class members—a proportion far greater than the 50% satisfaction rate alleged by Plaintiff.  As for those class members who are due a payment, but have not yet received their payments, the Court finds that Defendants are making reasonable efforts, in compliance with the Court's orders, to locate these individuals and to provide them their payment.  The Court finds the fact that Defendants have not yet been able to locate or pay all of these remaining individuals is not evidence of noncompliance with the Court's judgment.  Defendants have indicated that they are steadily continuing to locate and pay outstanding class members and the Court finds that the improvements ordered by the Court as detailed above will facilitate the prompt payment of benefits to these class members.  Accordingly, the Court shall release the supersedeas bond. *See*

*Halliburton Energy Services, Inc.*, 703 F. Supp. 2d at 670 (releasing the bond where the "outstanding exposures at the Site [were] . . . nearly resolved" and defendant had "indicated that it will pay the outstanding amounts . . . within the next two weeks.")

**B. Discovery and Judgment Compliance Plan**

In Plaintiff's Opposition to Defendants' Motion to Release Supersedeas Bond and in Plaintiff's Motion for Post-Judgment Discovery, Plaintiff contends that Defendants should provide to Plaintiff's counsel the algorithms, calculation results, and mailing or payment records for the approximately 20,000 class members in this case. Plaintiff presents Defendants' failure to provide this information as both evidence of non-compliance with the Court's judgment, and evidence of the need for post-judgment discovery to determine Defendants' compliance with the Court's August 31, 2011, judgment. The Court finds that there is no evidence to support either of these conclusions. The Court has required Defendants to provide the calculation of the monthly annuity benefit, *see* Order (Aug. 31, 2011), at 8, and certain union service documents, *Kifafi*, 736 F.Supp.2d at 75, but has not required Defendants to provide any of the information Plaintiff now requests. Accordingly, Defendants' refusal to provide Plaintiff's counsel with this information is not evidence that Defendants have not complied with the Court's judgment.

The Court further finds that Plaintiff has not met his burden of showing that he is entitled to post-judgment discovery. As discussed at length in Part A, Plaintiff has not made a *prima facie* showing that Defendants have been non-compliant with the Court's order. *See 800 Adept, Inc.*, 2007 WL 2826247, at *2 ("[B]efore a court . . . permits extensive discovery of suspected violations of its judgment, there should be at least a prima facie showing by the aggrieved party of disobedience of the order."); *Mass. Union of Public Housing Tenants,* 83 WL 150, at *4 (concluding that "since plaintiffs have failed to present a prima facie case for non-compliance

with the final judgment of the Court, no further discovery will be allowed").   Moreover,

Defendants have provided Plaintiff with spreadsheets detailing participant-by-participant how

much Defendants have paid in the form of lump sums and the amount that participants' monthly

annuities have been increased.   Defendants have also provided Plaintiff's counsel with "a copy

of the executed backloading Plan amendment, the latest Actuarial Valuation Report, copies of

letters to union service claimants who were not vested, and additional detail on bad addresses,

union service claims, and current status of participants who have not responded to mailings."

Defs.' Reply at 24.   As the Court discussed at the outset of this Memorandum Opinion, this

documentation is sufficient for the Court to evaluate Defendants' compliance with the Court's

judgment.   In his briefing, Plaintiff raised an extensive number of potential problems with

Defendants' compliance, however, Defendants have either resolved these issues, provided an

acceptable explanation for the issue, or the issue was outside the scope of this case.

Accordingly, the Court finds that there is no need for discovery into Defendants' compliance

with the Court's judgment.

In requesting post-judgment discovery and a detailed compliance plan, Plaintiff's counsel

is effectively requesting to be made a special monitor of the administration of the Plan.

Plaintiff's counsel has made three previous attempts—in September 2009, April 2011, and

February 2013—to obtain a monitoring position over the administration of the Plan through the

appointment of a third party monitor or the appointment of Plaintiff's counsel himself as

monitor.   *See* Pl.'s Br. on Equitable Relief, ECF No.  [211], at 9-13, 35-36; Pl.'s Proposed Order,

ECF No. [242-8], at 22-23; Pl.'s Class' Response to Hilton's Motion for Clarification and

Correction, ECF No.  [343], at 18-20.   The Court has not accepted any of these attempts.   *See*

*Kifafi*, 736 F. Supp. 2d at 84-85 (denying Plaintiff's monitoring plan as too intrusive); *Kifafi*, 826

F. Supp. 2d at 37 (providing mechanism to present vesting and benefit disputes involving issues decided by the Court to the magistrate judge, but rejecting proposal that Court appoint a special master); Order (Oct. 11, 2013), at 6 (denying Plaintiff's request for a monitoring plan).  In its Reply in Support of its Motion to Release Supersedeas Bond, Hilton submitted a sworn declaration from Ted Nelson, Hilton's Vice President Benefits Americas, averring that

> Hilton is committed to complying with the Court's orders in the *Kifafi* . . . litigation.  Hilton has been and will continue to take all reasonable steps within its power to comply with the Court's orders, including working with Aon Hewitt, the Plan administrator, to pay all located participants who have provided information necessary to calculate the benefit and determine the appropriate payee, sending notices of benefit increases to located class members, promptly pay class members who provide information needed to determine the proper benefit amount and payee, and locate participants using PBI. To that end, Hilton, including myself, is supervising Aon Hewitt's administration of the Plan to ensure that Aon Hewitt also takes all reasonable steps within its power to comply with the Court's order.

Nelson Decl. ¶¶ 3-4.  The Court finds that Mr. Nelson is a Hilton official of sufficient authority and familiarity with the administration of the Plan and, thus, the Court shall hold Defendants accountable based on Mr. Nelson's commitment to complying with the judgment.  Accordingly, the Court denies both Plaintiff's request for post-judgment discovery and request for a detailed compliance plan.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that Defendants are in compliance such that they satisfied the terms of the Court's August 31, 2011, judgment.  Taking into account the constantly evolving nature of providing retirement benefits, the Court is satisfied that there are no systemic problems or failures in Defendants implementation of the judgment, only a few refinements to Defendants' forms and procedures that will further facilitate Defendants reasonable efforts to implement the judgment.  Accordingly, the Court GRANTS Defendants'

Motion for Release of Bond Obligation and DENIES Plaintiff's Motion for Post-Judgment Discovery and Motion to Modify the Judgment in Aid of Enforcement.

The Court's jurisdiction over the implementation of the judgment in this case expires on **February 23, 2015**.  Prior to the expiration of the Court's jurisdiction, Defendants shall aver in a sworn declaration as to whether they have verified that the addresses located by Plaintiff for the 149 "bad address" class members are indeed correct addresses; whether PBI has taken all steps to locate class members in conformance with prevailing industry practices; and the efforts PBI has undertaken to locate class members and to follow-up when no response is received or a notice is returned as undeliverable or as addressed to a bad address.  Defendants shall file this declaration with the Court by no later than **February 18, 2015**.

In addition, Defendants shall amend the "denial letter" sent to union service vesting claimants to provide notice of the claimant's right to review if his or her claim to additional vesting service does not result in a benefit under the Plan.  Defendants shall also send the amended "denial letter" to those claimants who already received a "denial letter" without the notice of the claimant's right to review.

Assuming the Social Security Master Death Index is a reliable database, Defendants shall also eliminate the request for Death Certificates from the Information Form sent to class members going forward.

In addition to sending the newly amended Information Form to class members going forward, if Defendants have not received the information requested of a surviving beneficiary through Defendants' prior ad hoc system for requesting such information, Defendants shall send the amended Information Form to the surviving beneficiary from whom Defendants have yet to receive the necessary requested information.

28

Finally, if PBI or Defendants have confirmed a class member's address, Defendants shall send the increased benefits notice and retirement forms to the class member in the same mailing.

Defendants shall file a Notice with the Court by no later than **February 18, 2015** indicating that Defendants' forms and procedures have been modified in conformance with the Court's orders outlined above and indicating that Defendants are in the process of sending the amended "denial letter," the amended Information Form, and retirement forms to class members as outlined above.

An appropriate Order accompanies this Memorandum Opinion.

_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE